## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 10-60149** |
| **LACK'S STORES, INCORPORATED,** *ET* | § | |
| *AL.,*[1] | § | **(Chapter 11)** |
| | § | **(Joint Administration Requested)** |
| **DEBTORS.** | § | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND COMMISSIONS TO EMPLOYEES AND (B) PAY PREPETITION BENEFITS AND TO CONTINUE SPECIFIED BENEFIT PROGRAMS IN THE ORDINARY COURSE, AND (II) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

Lack's Stores, Incorporated and its affiliated debtors, as debtors and debtors in possession (the "Debtors"), hereby file this motion (the "Motion") requesting (a) authority to pay all outstanding, prepetition wages, salaries, commissions, expense reimbursements, benefits, and related amounts, and (b) authority, but not direction, to continue specified benefit programs[2] in the ordinary course.[3]  In support of the Motion, the Debtors submit the *Declaration of Melvin Lack in Support of First Day Pleadings and Papers* (the "Lack Declaration")*,* and respectfully state as follows:

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).

[2] Postpetition, the Debtors will not offer employee discounts, bonus commissions, or "push money" incentives to their Employees.

[3] This Motion is without prejudice to the Debtor's right to subsequently request that all remaining benefit programs be terminated and related contracts be rejected.

## JURISDICTION AND PROCEDURAL BACKGROUND

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion concerns the administration of the estates, and, therefore, it is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      On the date of this Motion (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced cases (the "Cases").

4.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      As of the Date of this Motion, no official committee of unsecured creditors has been appointed.

6.      Contemporaneously with the filing of this Motion, the Debtors filed the *Debtors' Emergency Motion for Joint Administration of Cases* and their *Debtors' Request for Emergency Consideration of Certain "First Day" Matters*.

## STATEMENT OF FACTS

**A.      The Debtors and Their 70-Year History**

7.      Lack's Stores, Incorporated ("Lack's") is a Texas corporation with its corporate headquarters located in Victoria, Texas.  It is one of the largest independently-owned retail furniture chains in the United States.  Lack's operates under the trade names "Lack's" and "Lack's Home Furnishings" and sells a complete line of furnishings for the home, including furniture, bedding, major appliances and home electronics.

8.     The nucleus of the current company was formed on February 28, 1938 by David and Rebecca Lack, when they opened a small auto supply store in Beeville, Texas.  Because of the chronic shortage of cars and new auto parts during World War II, the company diversified into furniture in an attempt to maintain sales volume.  Furniture did well, and so became a growing segment of Lack's total business.

9.     In 1952, by which time the company had expanded to five retail stores, Lack's made a commitment to become a furniture and appliance chain.  It continued to carry auto supplies, tires and other hardware items at all locations, but the merchandising emphasis switched to home furnishings.  The original automotive and hardware merchandise was eventually phased out in the 1970's.

10.    Today, Lack's remains a family owned business that operates 36 retail home furnishing stores in 26 cities located in Texas.[4]  These stores are supported by a 380,000 square foot state-of-the-art distribution center in Schertz, Texas, several cross-docking central delivery facilities, and a service center.  According to surveys by Furniture/Today, an industry newspaper, Lack's sales volume place it among the top furniture retailers in the country.  In 2007, Lack's was named Retailer of the Year by the National Home Furnishings Association.

11.    Lack Properties, Inc. ("Lack Properties"), a wholly-owned subsidiary of Lack's, is the owner of the real property and improvements associated with approximately fourteen store and warehouse locations that are leased to Lack's.[5]  The remaining store locations are leased by

---

[4] Lack's retail stores are located in Abilene, Alice, Austin (3), Bay City, Beeville, College Station, Corpus Christi (2), Del Rio, El Campo, Killeen, Longview, Lubbock (2), Lufkin, Midland, New Braunfels, Odessa, Port Lavaca, Portland, San Angelo, San Antonio (5), Sinton, Temple, Tyler, Uvalde, Victoria (2), and Waco.

[5] Merchandise Acceptance Corporation ("Merchandise Acceptance") and Lack's Furniture Centers, Inc. ("Lack's Furniture") are also wholly-owned subsidiaries of Lack's, each of which own limited or no assets and have no operations.

**EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF**
**PREPETITION WAGES AND RELATED RELIEF**                                                      **Page 3 of 19**
US 611326v.6

Lack's from third party lessors, including locations that are leased from lessors that are affiliated with various members of the Lack's family.

12.     Since its inception, Lack's has financed a significant portion of its customers' purchases through the underwriting of "in store" financing.  Indeed, over the last several years, Lack's has financed approximately 70% of all customer sales.  The book amount of the customer notes receivable portfolio as of the Petition Date is more than $130,000,000.  There are currently in excess of 75,000 customer notes receivable, the average balance of each note is approximately $1,700, and the weighted average remaining term of each note is approximately eighteen to twenty-four months.

13.     Lack's services the customer notes portfolio with in-house employees.  Lack's has historically collected approximately 95% of the balance of the customer notes receivable, even though they are generally considered to be "sub-prime" by many credit institutions.

14.     Lack's revenue is derived from the sale of home furnishings and the interest earned from financing customer notes receivable.  From February 1, 2010 (the beginning of Lack's fiscal year) through the Petition Date, Lack's has generated revenue of more than $122,000,000 and has operating profit of more than $1,000,000.  Lack's currently employs approximately 886 persons.

**B.     Secured Credit Facility**

15.     Lack's is the borrower under that certain Second Amended and Restated Loan and Security Agreement dated as of July 10, 2007 (as amended from time to time, the "Senior Credit Agreement") among Lack's, The CIT Group / Business Credit, Inc., as agent (in such capacity, the "Agent"), and the other lenders from time to time party thereto (together with the Agent, the

"Senior Lenders").[6]  Lack's relationship with many of the Senior Lenders under the Senior Credit Agreement (or prior versions thereof) dates back to 1999.  The Senior Credit Agreement, with a stated maturity date of October 31, 2010,[7] is a revolving credit facility.  From 1999 through the maturity date, Lack's had never been in monetary default under the operative credit documents.

16.     As of the Petition Date, the aggregate principal amount of the advances currently outstanding under the Senior Credit Agreement is approximately $86,000,000, having been gradually reduced from $105,000,000 since January of 2009.  Lack's obligations under the Senior Credit Agreement are guaranteed by Merchandise Acceptance, Lack's Furniture, Lack Properties, and Melvin Lack.[8]  The Senior Lenders allege that the obligations under the Senior Credit Agreement are secured by a lien on substantially all of the Debtors' assets excluding certain real estate.  The Senior Lenders do not, however, have dominion over all of the Debtors' bank accounts.

17.     In addition to liens held by the Senior Lenders, certain of the properties owned by Lack Properties and leased to Lack's are subject to mortgages held by third party lenders, including stores in Bay City, Abilene, Wichita Falls (now closed), and Longview, as well as warehouse/distribution centers in Schertz and San Antonio.

## C.     Trade Creditors

18.     In the ordinary course of business, the Debtors purchase merchandise from an assortment of vendors, including furniture, bedding, home electronics and appliance

---

[6] The current Senior Lenders include The CIT Group / Business Credit, Inc.; U.S. Bank National Association; PNC Bank, National Association; Capital One Leverage Finance Corp.; and JPMorgan Chase Bank, N.A.

[7] By agreement, the maturity date was subsequently extended through and including November 12, 2010.

[8] Mr. Lack's obligations under the guarantee are limited.  Mr. Lack is not a debtor in these Cases and is represented by separate counsel in the Cases.

manufacturers.  The Debtors estimate that, as of the Petition Date, the general unsecured claims held by trade vendors against their respective estates are no more than $12,000,000 in the aggregate.  The Debtors' three largest vendors[9] account for approximately 60% of the amounts payable to trade creditors.

**D.      Events Leading to the Chapter 11 Cases**

19.      As a result of the economic slowdown, consumer demand in general – and the demand for home furnishings in particular – decreased sharply starting in the second half of 2008.  The decreased demand caused an approximate 20% decrease in Lack's revenues starting at the end of its 2008 fiscal year.  Notwithstanding this decrease, Lack's was able to reduce expenses and reach a monthly breakeven position by February 2009.  The effort to recover revenues and control expenses has continued.  Revenue and profitability have continued to improve during 2010.

20.      At the same time, the national economic slowdown resulted in an unprecedented tightening of credit markets.  The Senior Lenders stated that they would not refinance or restructure the obligations under the Senior Credit Agreement on terms which would allow the Debtors to continue their operations.  The Debtors have been unable to identify an alternative financing source for their business operations since the overwhelming majority of their customers are rated sub-prime, notwithstanding those customers' and Lack's great historical and current track record of payment and collection, respectively.

21.      Without an alternative funding source, Lack's will be unable to finance the purchase of new inventory or to underwrite additional customer notes receivable.  As a consequence, the Debtors determined that it was appropriate to commence these Cases in order

---

[9] Comprised of Sealy Mattress Company, Lane Furniture Industries, and Brownchild Ltd. Inc.

to maximize the value of their assets for the benefit of their creditors and equity holders and to conduct an orderly – as opposed to forced – liquidation, utilizing cash collateral to effect the wind-down which is anticipated to pay all creditors in full.

**E.     The Chapter 11 Cases**

22.     The Debtors submit that these Cases will have two macro components or goals. First, the Debtors will request that the Court approve the commencement of "Store Closing Sales" so that the Debtors (working with Hilco Merchant Resources, LLC ("Hilco")[10]) may sell their remaining inventory in a prompt and efficient manner designed to maximize recoveries and reduce the costs of operations.   Second, the Debtors intend to propose a chapter 11 plan that will provide for the collection of the customer notes receivable portfolio in the ordinary course of business and the marketing and disposition of their real estate interests over time and in such a manner as to maximize their value for the benefit of the estates.

23.     The Debtors anticipate that the orderly liquidation of their inventory and fixtures, ordinary course collection of customer notes receivable, and the marketing and disposition of real property interests and other miscellaneous assets will satisfy in full the claims of the Senior Lenders under the Senior Credit Agreement and likely the claims of all other creditors with a return available to the equity holders.

**F.     Overview of the Debtors' Compensation Structure**

24.     As of November 11, 2010, Lack's[11] employed approximately 886 individuals, 829 on a full time basis, 53 on a part time basis, and 4 temporary/contract employees (collectively,

---

[10] Pursuant to the Debtors' agreement with Hilco, Hilco is permitted to joint venture with SB Capital Group, LLC with respect to the "Store Closing" sales.

[11] All Employees are employed through Lack's, which is the only debtor owing Employee Obligations and continuing Employee Benefits (each as defined below).

the "Employees").  Approximately 15% of the Employees work on a salaried basis,[12] 57% work

on an hourly basis,[13] and 28% work on a commission basis.[14]

25.     **Lack's records indicate that no single Employee is owed in excess of the**

**$11,725 statutory cap imposed by 11 U.S.C. § 507(a) for prepetition services rendered.**

26.     Non-Commission Based Payroll.  Non-commission based payroll is paid in

arrears on a bi-weekly basis and averages approximately $840,000 per period, with an additional

$250,000 being remitted on account of payroll taxes.  The last prepetition, non-commission

payroll was paid on November 5, 2010, covering the period of October 16 through October 29,

in the amount of $820,202, with an additional $244,551 being remitted on account of payroll

taxes.

27.     The first postpetition, non-commission payroll is scheduled to be paid November

19, 2010, covering the period from October 30 through November 12, in the estimated amount of

$820,202, with approximately $244,551 to be remitted on account of payroll taxes.  The second

postpetition, non-commission payroll is scheduled to be paid December 3, 2010, and will include

three prepetition days (November 13 through 15).

28.     Commission-Based Payroll.  Commission-based payroll is paid monthly in arrears

on or about the 15th of each month and averages approximately $195,000 per period, with an

additional $40,000 being remitted on account of payroll taxes.  The last prepetition, commission-

based payroll was paid on or about October 15, 2010, covering the month of September, in the

amount of $158,035, with an additional $41,648 being remitted on account of payroll taxes.

---

[12] Employees on salary include buyers, supervisors, store managers, store office managers, and sales trainers.
Eligibility for salaried status is determined in accordance with Federal guidelines.

[13] Hourly employees ("Hourly Employees") include delivery personnel, warehouse personnel, store office personnel
(non-management), home office clerks, CDL drivers, and service technicians.  Further, limited sales staff are
permitted to elect an hourly rate, in lieu of commission, during initial training periods.

29.     The first postpetition, commission based payroll is scheduled to be paid on or after November 19 2010, covering the month of October 2010, in the estimated amount of $158,035, with approximately $41,648 to be remitted on account of payroll taxes.  The second postpetition, commission based payroll is scheduled to be paid on or about December 15, and will include the prepetition period of November 1 through 15.  The estimated prepetition commissions for this period are $79,017, with an additional $20,824 to be remitted on account of payroll taxes.

30.     <u>Incentive Compensation.</u>   In addition to bi-weekly payroll and monthly commission checks, certain Employees are also entitled to bonus commissions and "push money" incentives for meeting certain sales quotas, including incentives for selling specified merchandise and/or services.  Many of these incentives are tied to customer delivery dates and, as such, may lag several weeks behind the actual sale date.  It is estimated that incentive-based compensation owing for the prepetition period is approximately $43,000. The Debtors will not pay bonus commissions or push money incentives for goods or services sold postpetition.

31.     <u>Expense Reimbursements.</u>   Lack's reimburses its Employees for approved business-related expenses.  In addition to using a corporate charge card, Employees are permitted to personally pay permitted expenses and submit detailed requests for reimbursement.  It is essential for the continued operation of the Debtors' businesses that Lack's be permitted to continue reimbursing Employees for approved and authorized business expenses.  Lack's believes that it is substantially current in the payment of all prepetition expense reimbursements.

32.     <u>Payroll Administration.</u>   Lack's payroll is administered by Alliance Payroll Services, Inc. ("<u>Alliance</u>"), which also prepares the employment-related tax returns and handles

---

[14] Commission employees ("<u>Commission Employees</u>") are comprised of store sales staff.

all garnishment,[15] withholding, W-2 preparation, and other payroll-related functions.  Payments to Alliance are funded by Lack's Payroll Account with Wells Fargo (XXXX0336).   Virtually all Employees are paid by Alliance via direct deposit.

**G.    Overview of Lack's Benefits Structure**

33.    In the ordinary course of its business, Lack's also provides its Employees with certain benefits, including medical/dental insurance, basic and voluntary life and accidental death and dismemberment insurance, short- and long-term disability benefits, a retirement savings plan, paid leave benefits, and associate discounts on purchases.

a.    *Medical/Dental Insurance*

34.    Lack's offers comprehensive major medical benefits through a self-funded health care program that pays varying levels of coverage depending upon various factors, including whether the service provider is in or out of network and whether the Employee complies with the applicable notification procedures.   The plan covers medical care, dental care, certain prescription drugs, hospitalizations, and mental health and substance abuse services.   It is estimated that approximately $41,000 is owed on account of prepetition medical benefits.   Of this amount, $32,000 represents company contributions and $9,000 represents premiums collected from Employees.   The medical/dental plan is administered by Benefits Administrative Consultants.

35.    The Debtors seek permission to continue this program in the ordinary course during the pendency of these Cases.

---

[15] Approximately 125 Employees are subject to wage garnishment.  Alliance makes the relevant deduction from each Employee's check and remits such amount to the proper state agency.

b.      *Sick Pay and Disability Benefits*

36.     Lack's offers its Employees a limited number of paid sick days and disability benefits.  The number of sick days to which an Employee is entitled is dependent upon years of service and may not accrue year-to-year.  Disability benefits are also based upon years of service and range from between 6 months to one year, with a maximum disability benefit of 66-2/3% of the eligible Employee's average basic monthly salary or wage for the proceeding twelve months (with a maximum benefit of $3,000 per month).  As of the Petition Date, three (3) Employees are receiving disability benefits, with $2,249 owing on account of the prepetition period

37.     The Debtors seek permission to continue these programs in the ordinary course during the pendency of these Cases.

c.      *Paid Leave*

38.     Lack's offers its employees five paid holidays per year, paid vacation days, paid bereavement, and jury duty leave.[16]

39.     The paid holidays offered by Lack's to its Employees include New Years Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.  If an Employee works on a holiday, he or she is paid as if the holiday is a normal working day and will receive another day off with pay.

40.     Prepetition, an Employee's eligibility for paid vacation was determined based upon years of service and was fully available to each Employee as of February 1st (the Debtors' fiscal year runs February 1 – January 31).[17]  Lack's traditionally pays its Employees for all

---

[16] Other programs available to Employees include FMLA leave and military duty leave, each of which is unpaid. While on FMLA leave, group life and medical benefits coverages continue at the company's expense.

[17] One calendar year of employment entitles an Employee to two weeks paid vacation and 12 calendar years of employment entitles an Employee to three weeks paid vacation.  Employees employed less than one year receive prorated vacation time based upon length of service.  Vacation time may not be accrued from year to year.

vacation time accrued but not used during a given year.  Debtors estimate that no more than $350,000 is outstanding on account of vacation accrued prepetition.  Postpetition, Employee vacation will not accrue for those employees who are terminated prior to April 1, 2011.  All other Employees will continue to accrue vacation benefits in the ordinary course of business.

41.    Full-time associates are eligible for (a) paid bereavement leave of one to three days,[18] which may be taken only for a death in the immediate family member, and (b) paid leave if called to jury duty (pay is comprised of the difference between the Employee's standard pay and jury duty pay).

42.    With the exception of postpetition vacation for terminated Employees, as discussed above, the Debtors seek permission to continue these programs in the ordinary course during the pendency of these Cases.

d.    *Termination Payments*

43.    Prepetition, Lack's paid its employees termination payments upon termination of employment, excluding termination for cause (the "Termination Payments"),[19]  with full benefits during the termination pay period.  As of the Petition Date, one (1) Employee is entitled to termination pay in the amount of approximately $80.00.  The provision of Termination Payments is subject to the discretion of Lack's, and it could cease making such payments at any time.

44.    In relation to postpetition store closings, Lack's proposes to offer the following Termination Payments: (a) regular full-time Employees employed for more than six months, but less than one year, will receive one week termination pay and (b) regular full-time Employees employed more than one year will receive two weeks termination pay.  In accordance with

---

[18] Dependent upon supervisor approval.

[19] The current store-closing termination policy has been in effective since July 2, 2008.

Federal law, Termination Payments would be in addition to any payments and benefits, if any, due to terminated Employees under the WARN Act.[20]

45.     The Debtors are seeking immediate authority to make all outstanding Termination Payments owing as of the Petition Date.  The Debtors, however, are not requesting interim authority to offer Termination Payments to Employees terminated postpetition and will, instead, request such authority at the final hearing on this Motion.

            e.      *Retirement Plan*

46.     Lack's also offers a 401(k) Profit Sharing Plan to its Employees.  The Debtors are under no contractual obligation to contribute to the retirement plan and will make no postpetition contributions from estate assets to these plans.  The Debtors request, however, that Employees be permitted to continue to contribute, and the Debtors be authorized to remit, pre-tax dollars to personal accounts.  The retirement plan is administered by Reliance Trust Company.

            f.      *Group Life Insurance*

47.     Lack's also provides life and accidental death and dismemberment insurance to its Employees in an amount equal to an Employee's annual earnings (with a maximum coverage of $50,000).[21]   Monthly costs associated with this program total approximately $5,000.   The Debtors seek permission to continue providing group life insurance in the ordinary course during the pendency of these Cases.

---

[20] There are two facilities that may be impacted by the WARN Act: one in San Antonio/Schertz and one in Victoria. Out of an abundance of caution, the Debtors will be sending WARN Act notices to certain employees in those locations.

[21] Spouses and children over six months old are insured up to $2,000 each, and children two weeks to six months are insured up to $1,000 each.

g.    *Associate Injury Program*

48.    Lack's provides its associates with an Associate Injury Program for injuries or serious illnesses caused by work.  The program is administered by ProcesOne, Inc.  Lack's instituted this program after it ceased workers' compensation coverage effective as of January 1, 2002.  As of the Petition Date, one (1) Employee was receiving benefits under the Associate Injury Program.  Payments under the Associate Injury Program reflected in the last postpetition payroll totaled approximately $21.00.  The Debtors seek authority to continue the Associate Injury Program during the pendency of these Cases.

h.    *Associate Purchase Programs*

49.    Prepetition, Lack's offered its Employees, retirees, and certain deceased employee family members a discount program that entitled such persons to a 10% discount on appliances and electronics and a 20% discount on furniture, accessories, product protection plans, and deliveries.  As of the Petition Date, Lack's has discontinued all employment-related discount plans and does not seek authority to continue such plans postpetition.

## **RELIEF REQUESTED**[22]

50.    Because of the filing of the Cases, Lack's cannot pay prepetition claims, including salaries, wages, commissions, benefits, termination payments, and reimbursable business expenses incurred prior to the Petition Date, absent specific Court authorization.

51.    In order to preserve the value of the estate and minimize the undue hardship that would undoubtedly befall the Employees if they were not paid, Lack's requests that the Court enter an order under Bankruptcy Code §§ 105(a), 363, 507(a)(4), 541, 1107, and 1108 granting it the authority (but not the obligation), in its discretion and in the exercise of its business

judgment, to pay or continue:   (a)  all obligations owing to or on behalf of Employees (the "Employee Claims"),[23] including prepetition claims, whether accrued or currently due and payable and (b) all prepetition benefits and to continue Lack's various Employee benefit plans and programs to the extent described herein (the "Employee Benefits") in the ordinary course. Lack's also requests that this Court enter an order directing all financial institutions to honor prepetition checks for payment of Employee Claims and Employee Benefits (collectively, the "Employee Obligations") and prohibiting such financial institutions from placing any holds on, or attempting to reverse, any automatic transfers made on Employee Obligations.  Subject to the Court's approval of the Debtors' use of cash collateral, the Debtors have sufficient funds available to pay all requested amounts as and when due, and all payments made on account of Employee Obligations will be made in accordance with any budgeted use of cash collateral approved by the Court.

52.    Payment of the Employee Claims and continuation of the Employee Benefits are necessary to permit the Debtors to continue to operate their businesses during the pendency of these Cases.  As set forth in the Lack Declaration, an orderly wind-down will maximize value to the estate and the ultimate distribution to creditors and equity holders.  Moreover, the Debtors believe that it is critical for Employee productivity and stability that all Employee Benefits and payments remain current and be continued postpetition.  If the Employees' wages, Termination

---

[22] Any requests to continue incentive programs or pay additional incentive amounts, if any, will be handled via separate motion.

[23] Including, but not limited to, wages, salaries, commissions, expense reimbursements, vacation pay, termination pay, sick pay, and medical/dental benefits, and insurance programs. The Debtors also seek authority to pay all federal, state, and local income withholding, payroll, employment, unemployment, social security, and similar taxes, whether withheld from Employees' wages or paid directly by the Debtors to governmental authorities, as well as other Employee withholdings, including, but not limited to, charitable contributions and garnishment contributions, if any.  The defined term "Employee Claims" is meant to include all such payments.

Payments, reimbursements, and benefits are not received in the ordinary course of business, or the Employee Benefits are discontinued, Employee morale will deteriorate and there would likely be a loss of Employees going into the critical holiday season, which, in turn, would substantially and adversely impact the Debtors' ability to maximize the value of their estates for the benefit of creditors and equity holders.

53.     Further, if the Employee Obligations are not paid in the ordinary course of business, the Employees will suffer personal hardship, will not receive needed medical services, and, in some cases, will be unable to pay basic living expenses.  Any material loss of Employees would disrupt the Debtors' businesses and would deplete the value of the estates.  Accordingly, the Debtors seek authorization for Lack's to pay all Employee Obligations in the ordinary course of business.

54.     Bankruptcy courts in the Fifth Circuit have granted authority for a debtor's payment of claims similar to the Employee Obligations.  *See, e.g.*, *In re Energy Partners, Ltd.*, Case No. 09-32956 (Bankr. S.D. Tex. 2009); *In re CDX Gas, LLC*, Case No. 08-37922 (Bankr. S.D. Tex. 2008); *In re Integrated Elec. Servs., Inc.*, Case No. 06-30602 (Bankr. N.D. Tex. 2006).

A.     **Employee Claims and Employee Benefits**

55.     Bankruptcy Code §§ 507(a)(4) and (5) provide priority status for prepetition claims for wages, salaries, commissions, termination pay, vacation pay, sick leave pay, and contributions to Employee benefit plans in an amount not to exceed $11,725 per Employee. Information provided by Lack's personnel indicates that the aggregate amounts outstanding for prepetition Employee Obligations totals approximately $1,060,587, with no single employee being owed in excess of the statutory cap.

**B.      Payment of Trust Fund Taxes**

56.    Lack's is required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, social security taxes, and Medicare taxes.  Lack's is required to (a) match the social security and Medicare taxes; (b) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (c) remit these payroll taxes to various taxing authorities.

57.    The failure to make such payments may subject Lack's and its officers to federal or state liability.  *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 98-99 (3d Cir. 1994) (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld taxes); *DuCharmes & Co. v. Michigan (In re DuCharmes & Co.)*, 852 F.2d 194, 194-96 (6th Cir. 1988) (noting the special liabilities for failure to pay trust fund taxes).  Further, under 11 U.S.C. § 541, such funds are not property of the Debtors' estates, and therefore the funds are not subject to the normal bankruptcy prohibitions against payment.  *See Begier v. IRS*, 496 U.S. 53, 59 (1990) (noting that because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate").

58.    Accordingly, the Debtors seek authorization for Lack's to collect and pay all taxes attributable to prepetition wages and benefits, as required by state and federal law, in the ordinary course of business.

**C.      Honoring Prepetition Checks and Electronic Transfers**

59.    Lack's requests that, to the extent of funds on deposit, all applicable banks and other financial institutions be directed to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests made by it relating to the Employee

Obligations, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date.  Further, Lack's requests authority to issue postpetition checks, or to effect postpetition funds transfer requests in replacement of any checks or funds transfer requests with respect to its prepetition Employee Obligations dishonored or denied as a consequence of the commencement of these Cases.

## REQUEST FOR IMMEDIATE RELIEF

60.    Bankruptcy Rule 6003 prohibits the payment of prepetition claims, or the other use of property outside the ordinary course of business, within the first twenty-one (21) days of these Cases, except as necessary to prevent immediate and irreparable harm.  For the reasons stated previously herein, the Debtors submit that the relief requested is absolutely necessary to prevent immediate and irreparable harm to these estates.

61.    Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h).  The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to continue to operate their businesses and preserve value in their estates.

## NOTICE

62.    Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the U.S. Trustee; (b)  counsel for The CIT Group/Business Credit, Inc., as Agent for the Senior Lenders, and each Debtor's other secured creditors; (c) each Debtor's 20 largest unsecured creditors; (d) the Internal Revenue Service and all governmental agencies required to receive notice under the Bankruptcy Rules and the Local Bankruptcy Rules; and (e) those

persons or entities that have formally appeared and requested service in these Cases pursuant to Rule 9010(b) of the Bankruptcy Rules.

**PRAYER**

Lack's respectfully requests that this Court enter an order (a) authorizing, but not directing, it to (i) pay all Employee Claims, including, but not limited to, prepetition wages, accrued vacation, Termination Payments, employment taxes, and expense reimbursements in the ordinary course and (ii) pay prepetition claims for Employee Benefits and continue the maintenance of Employee Benefits, to the extent discussed above, in the ordinary courses; (b) directing banks to honor prepetition checks for payment of prepetition Employee Obligations; and (c) granting the Debtors such other relief to which they may be entitled.

Dated:  November 16, 2010

Respectfully submitted,

**VINSON & ELKINS LLP**

By:  */s/ Michaela C. Crocker*
   Daniel C. Stewart, SBT #19206500
   Paul E. Heath, SBT #093555050
   Michaela C. Crocker, SBT #24031985
   Richard H. London, SBT #24032678
   2001 Ross Avenue, Suite 3700
   Dallas, Texas 75201
   Tel: 214.220.7700
   Fax: 214.999.7787
   mcrocker@velaw.com
   rlondon@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS**