IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| IN RE: § | § |
| § | CASE NO. 10-60149 |
| LACK'S STORES, INCORPORATED, *ET* § | (Chapter 11) |
| *AL.,*[1] § | (Jointly Administered) |
| § | |
| DEBTORS. § | |
| § | |

### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION

Lack's Stores, Incorporated and its affiliated debtor entities, as debtors and debtors in possession (collectively, the "Debtors"), file this *Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Grant of Adequate Protection* (the "Motion"). In support of the Motion, the Debtors incorporate the statements contained in the *Declaration of Melvin Lack in Support of First Day Pleadings and Papers* and would respectfully show the Court as follows:

### JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estates; and therefore, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced cases (collectively, the "Cases").

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**          Page 1 of 15

US 627896v.6

4. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5. As of the Date of this Motion, no official committee of unsecured creditors has been appointed.

6. Contemporaneously with the filing of this Motion, the Debtors filed the *Debtors' Emergency Motion for Joint Administration of Cases* and their *Debtors' Request for Emergency Consideration of Certain "First Day" Matters*.

## STATEMENT OF FACTS

### A. The Debtors and Their 70-Year History

7. Lack's Stores, Incorporated ("Lack's") is a Texas corporation with its corporate headquarters located in Victoria, Texas. It is one of the largest independently-owned retail furniture chains in the United States. Lack's operates under the trade names "Lack's" and "Lack's Home Furnishings" and sells a complete line of furnishings for the home, including furniture, bedding, major appliances and home electronics.

8. The nucleus of the current company was formed on February 28, 1938 by David and Rebecca Lack, when they opened a small auto supply store in Beeville, Texas. Because of the chronic shortage of cars and new auto parts during World War II, the company diversified into furniture in an attempt to maintain sales volume. Furniture did well, and so became a growing segment of Lack's total business.

9. In 1952, by which time the company had expanded to five retail stores, Lack's made a commitment to become a furniture and appliance chain. It continued to carry auto supplies, tires and other hardware items at all locations, but the merchandising emphasis

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**   Page 2 of 15

US 627896v.6

switched to home furnishings. The original automotive and hardware merchandise was eventually phased out in the 1970's.

10. Today, Lack's remains a family owned business that operates 36 retail home furnishing stores in 26 cities located in Texas.[2] These stores are supported by a 380,000 square foot state-of-the-art distribution center in Schertz, Texas, several cross-docking central delivery facilities, and a service center. According to surveys by Furniture/Today, an industry newspaper, Lack's sales volume place it among the top furniture retailers in the country. In 2007, Lack's was named Retailer of the Year by the National Home Furnishings Association.

11. Lack Properties, Inc. ("Lack Properties"), a wholly-owned subsidiary of Lack's, is the owner of the real property and improvements associated with approximately fourteen store and warehouse locations that are leased to Lack's.[3] The remaining store locations are leased by Lack's from third party lessors, including locations that are leased from lessors that are affiliated with various members of the Lack's family.

12. Since its inception, Lack's has financed a significant portion of its customers' purchases through the underwriting of "in store" financing. Indeed, over the last several years, Lack's has financed approximately 70% of all customer sales. The book amount of the customer notes receivable portfolio as of the Petition Date is more than $130,000,000. There are currently in excess of 75,000 customer notes receivable, the average balance of each note is approximately

---

[2] Lack's retail stores are located in Abilene, Alice, Austin (3), Bay City, Beeville, College Station, Corpus Christi (2), Del Rio, El Campo, Killeen, Longview, Lubbock (2), Lufkin, Midland, New Braunfels, Odessa, Port Lavaca, Portland, San Angelo, San Antonio (5), Sinton, Temple, Tyler, Uvalde, Victoria (2), and Waco.

[3] Merchandise Acceptance Corporation ("Merchandise Acceptance") and Lack's Furniture Centers, Inc. ("Lack's Furniture") are also wholly-owned subsidiaries of Lack's, each of which own limited or no assets and have no operations.

$1,700, and the weighted average remaining term of each note is approximately eighteen to twenty-four months.

13. Lack's services the customer notes portfolio with in-house employees. Lack's has historically collected approximately 95% of the balance of the customer notes receivable, even though they are generally considered to be "sub-prime" by many credit institutions.

14. Lack's revenue is derived from the sale of home furnishings and the interest earned from financing customer notes receivable. From February 1, 2010 (the beginning of Lack's fiscal year) through the Petition Date, Lack's has generated revenue of more than $122,000,000 and has operating profit of more than $1,000,000. Lack's currently employs approximately 886 persons.

**B.      Secured Credit Facility**

15. Lack's is the borrower under that certain Second Amended and Restated Loan and Security Agreement dated as of July 10, 2007 (as amended from time to time, the "<u>Senior Credit Agreement</u>") among Lack's, The CIT Group / Business Credit, Inc., as agent (in such capacity, the "<u>Agent</u>"), and the other lenders from time to time party thereto (together with the Agent, the "<u>Senior Lenders</u>").[4] Lack's relationship with many of the Senior Lenders under the Senior Credit Agreement (or prior versions thereof) dates back to 1999. The Senior Credit Agreement, with a stated maturity date of October 31, 2010,[5] is a revolving credit facility. From 1999 through the maturity date, Lack's had never been in monetary default under the operative credit documents.

---

[4] The current Senior Lenders include The CIT Group / Business Credit, Inc.; U.S. Bank National Association; PNC Bank, National Association; Capital One Leverage Finance Corp.; and JPMorgan Chase Bank, N.A.

[5] By agreement, the maturity date was subsequently extended through and including November 12, 2010.

16. As of the Petition Date, the aggregate principal amount of the advances currently outstanding under the Senior Credit Agreement is approximately $86,000,000, having been gradually reduced from $105,000,000 since January of 2009. Lack's obligations under the Senior Credit Agreement are guaranteed by Merchandise Acceptance, Lack's Furniture, Lack Properties, and Melvin Lack.[6] The Senior Lenders allege that the obligations under the Senior Credit Agreement are secured by a lien on substantially all of the Debtors' assets excluding certain real estate. The Senior Lenders do not, however, have dominion over all of the Debtors' bank accounts.

17. In addition to liens held by the Senior Lenders, certain of the properties owned by Lack Properties and leased to Lack's are subject to mortgages held by third party lenders, including stores in Bay City, Abilene, Wichita Falls (now closed), and Longview, as well as warehouse/distribution centers in Schertz and San Antonio.

**C.  Trade Creditors**

18. In the ordinary course of business, the Debtors purchase merchandise from an assortment of vendors, including furniture, bedding, home electronics and appliance manufacturers. The Debtors estimate that, as of the Petition Date, the general unsecured claims held by trade vendors against their respective estates are no more than $12,000,000 in the aggregate. The Debtors' three largest vendors[7] account for approximately 60% of the amounts payable to trade creditors.

---

[6] Mr. Lack's obligations under the guarantee are limited. Mr. Lack is not a debtor in these Cases and is represented by separate counsel in the Cases.

[7] Comprised of Sealy Mattress Company, Lane Furniture Industries, and Brownchild Ltd. Inc.

**D.     Events Leading to the Chapter 11 Cases**

19.     As a result of the economic slowdown, consumer demand in general – and the demand for home furnishings in particular – decreased sharply starting in the second half of 2008.  The decreased demand caused an approximate 20% decrease in Lack's revenues starting at the end of its 2008 fiscal year.  Notwithstanding this decrease, Lack's was able to reduce expenses and reach a monthly breakeven position by February 2009.  The effort to recover revenues and control expenses has continued.  Revenue and profitability have continued to improve during 2010.

20.     At the same time, the national economic slowdown resulted in an unprecedented tightening of credit markets.  The Senior Lenders stated that they would not refinance or restructure the obligations under the Senior Credit Agreement on terms which would allow the Debtors to continue their operations.  The Debtors have been unable to identify an alternative financing source for their business operations since the overwhelming majority of their customers are rated sub-prime, notwithstanding those customers' and Lack's great historical and current track record of payment and collection, respectively.

21.     Without an alternative funding source, Lack's will be unable to finance the purchase of new inventory or to underwrite additional customer notes receivable.  As a consequence, the Debtors determined that it was appropriate to commence these Cases in order to maximize the value of their assets for the benefit of their creditors and equity holders and to conduct an orderly – as opposed to forced – liquidation, utilizing cash collateral to effect the wind-down which is anticipated to pay all creditors in full.

### E.     The Chapter 11 Cases

22.     The Debtors submit that these Cases will have two macro components or goals. First, the Debtors will request that the Court approve the commencement of "Store Closing Sales" so that the Debtors (working with Hilco Merchant Resources, LLC ("Hilco")[8]) may sell their remaining inventory in a prompt and efficient manner designed to maximize recoveries and reduce the costs of operations. Second, the Debtors intend to propose a chapter 11 plan that will provide for the collection of the customer notes receivable portfolio in the ordinary course of business and the marketing and disposition of their real estate interests over time and in such a manner as to maximize their value for the benefit of the estates.

23.     The Debtors anticipate that the orderly liquidation of their inventory and fixtures, ordinary course collection of customer notes receivable, and the marketing and disposition of real property interests and other miscellaneous assets will satisfy in full the claims of the Senior Lenders under the Senior Credit Agreement and likely the claims of all other creditors with a return available to the equity holders.

### RELIEF REQUESTED

### Introduction

24.     Pursuant to Bankruptcy Code §§ 361 and 363, the Debtors request, *inter alia*, (a) interim authority to use the cash collateral ("Cash Collateral") of the Agent and the Senior Lenders in accordance with the terms and conditions set forth herein, the budget attached hereto as **Exhibit "A"** (the "Interim Budget"), and the proposed Order attached hereto as **Exhibit "B"**

---

[8] Pursuant to the Debtors' agreement with Hilco, Hilco is permitted to joint venture with SB Capital Group, LLC with respect to the "Store Closing" sales.

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**          **Page 7 of 15**

US 627896v.6

(the "Interim Order");[9] (b) authority to use Cash Collateral on a final basis following the conclusion of a final hearing on this Motion; and (c) the grant of adequate protection to the Agent and the Senior Lenders as more particularly set forth herein and in the Interim Order.

## Immediate Need for Use of Cash Collateral

25. Bankruptcy Code § 363(c) provides, in relevant part:

(c) (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363 (c).

26. The Debtors have an immediate need to use Cash Collateral, including cash proceeds, to conduct the orderly wind-down of their businesses. Without such funds, the Debtors will not be able to pay costs and expenses, including, but not limited to, wages, salaries, rent, professional fees, and general and administrative operating expenses, that will arise in the administration of these Cases as the business operations are wound down in an orderly fashion.

27. The Debtors are in the process of seeking Court approval of "Store Closing" sales with respect to each of their retail stores and the orderly liquidation of their inventory assets. Absent the ability to use Cash Collateral, the Debtors will be forced to abandon such sales, which

---

[9] The form of the Interim Order is crafted from the form order set forth in this Court's Procedures for Complex Chapter 11 Bankruptcy Cases.

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**     **Page 8 of 15**

US 627896v.6

will negatively impact the value of their assets to the detriment of all stakeholders, including the Senior Lenders, unsecured creditors and equity holders. The Debtors further believe that an abrupt shutdown will result in a severe and dramatic loss of asset value, causing all creditors and equity holders to receive a drastically reduced value for the estate assets.

28. The Debtors request interim authorization to use Cash Collateral as set forth in the Interim Budget until a final order granting further use of Cash Collateral can be entered. The Debtors are without sufficient funds, other than Cash Collateral, to operate for fourteen or more days until a final hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to their estates. Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of their estates pending a final hearing, their request complies with Rules 4001(b)(2) and 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

29. The Interim Budget itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures. The Interim Budget includes a list of business expenses (including expenses associated with the "<u>Store Closing</u>" sales) that are reasonable and necessary and that must be paid until such time as a final hearing on the Motion can be held. The Debtors propose that any amounts listed in the Interim Budget that are unused in any week may be carried over and used by the Debtors in any subsequent week, on a line-item basis.

30. The Debtors also request that the Court authorize them to continue to use Cash Collateral on a final basis as will be set forth in a supplemental Budget (the "<u>Final Budget</u>") to be submitted to the Court in connection with a final hearing on the Motion.

## Grant of Adequate Protection

31. Bankruptcy Code § 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . ., the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."[10] Bankruptcy Code § 361 sets forth a non-exclusive list of forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. A determination of adequate protection is decided on a case-by-case basis, involving a consideration of the "nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection." *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986). The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case. *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

32. The Debtors propose to adequately protect the alleged interest of the Agent and the Senior Lenders in their prepetition collateral in a number of ways. First, the Senior Lenders are grossly oversecured and they hold a sizeable equity cushion in their alleged collateral. As set forth above, the Senior Lenders' alleged collateral can be broken down into the following three (3) basic components:

---

[10] The Debtors have requested (but have not yet obtained) the consent of the Agent and Senior Lenders to the use of Cash Collateral. Prior to the Petition Date, the Agent advised the Debtors that it would only consent to funding the Cases through the use of a "roll-over" "super-priority" DIP financing facility. The DIP Financing proposed by the Agent would not provide for any "new" money to the estates. Rather, such proposed facility would provide that all Cash Collateral be applied in reduction of the Secured Lenders' prepetition debt with all necessary estate funding to be re-advanced under the proposed DIP facility. The only benefit to the estates proffered by the Agent was the avoidance of the cost and uncertainty of a contested cash collateral hearing. Given that such a roll-over DIP facility, as proposed by the Agent, would contain no benefit (and indeed be a detriment) to the estates, unsecured creditors or equity holders, the Debtors are forced to seek the use of Cash Collateral on a non-consensual basis.

| Collateral | Value |
|---|---|
| Inventory | $ 19,500,000 |
| Customer Notes Receivable | $132,500,000 |
| Equity Value of Real Estate | $ 19,750,000 |
| Total: | $171,750,000[11] |

33. The value of the prepetition collateral substantially exceeds the sum total of the indebtedness to the Senior Lenders (approximately $86,000,000), and the resulting equity cushion will protect the Senior Lenders against any decrease in the value of their interests in the prepetition collateral for the duration of the requested use of Cash Collateral.

34. Second, the Debtors propose to make periodic payments to the Agent on behalf of the Senior Lenders in the amounts and at the times set forth in the Interim Budget. Specifically, during the first four (4) weeks of the Cases, the Debtors have budgeted payments to the Senior Lenders in the aggregate amount of $2,070,000.

35. Third, the Debtors propose to grant the Agent for the benefit of the Senior Lenders replacement liens in their prepetition collateral as set forth herein and in the Interim Order. Subject to prior perfected and unavoidable liens and security interests and only to the extent of any actual diminution in the value of the Senior Lenders' interests in Cash Collateral as a result of the Debtors' use thereof, the Debtors propose to grant the Agent for the benefit of the

---

[11] The inventory is valued at cost. The face amount of customer notes receivable is approximately $132,500,000. The historic collection rate on these receivables approximates 95%. The equity value of real estate is the mid-point range based upon appraisals conducted on behalf of the Agent.

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**          **Page 11 of 15**

US 627896v.6

Senior Lenders replacement liens[12] upon: (a) all assets in which the Agent for the benefit of the Senior Lenders held a validly perfected lien as of the Petition Date (the "<u>Prepetition Collateral</u>"), and (b) all property acquired by the Debtors after the Petition Date that is of the exact nature, kind or character as the Prepetition Collateral.  The Debtors anticipate that those replacement liens will adequately protect the Agent and the Senior Lenders for the use of Cash Collateral.  The Debtors do not propose to grant the Agent or the Senior Lenders liens in avoidance actions under chapter 5 of the Bankruptcy Code or the proceeds thereof.

36. Fourth, the Debtors are seeking the approval of the employment of Hilco Merchant Resources, LLC and SB Capital Group, LLC, as joint consultants, to conduct "Store Closing" sales with respect to all of the Debtors' retail stores.  Those sales will liquidate substantial inventory in an orderly and expeditious fashion, ultimately eliminate rents and other over-head costs that would otherwise be administrative expense claims against the Debtors' estates, and provide the best means to promptly monetize assets of the estates.

37. Fifth, the Debtors will provide the Agent and the Senior Lenders with ample information relating to projected revenues and expenses, actual revenue and expenses, variances from the Interim Budget, and the store closing sales.  This information will enable the Agent and the Senior Lenders to monitor their interests in the Prepetition Collateral and Cash Collateral.  Reporting of financial information is also a sufficient form of adequate protection.  *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection . . . .");

---

[12] The liens requested herein would be effective upon the Petition Date and without the necessity of the execution by the Debtors of additional mortgages, security agreements, pledge agreements, financing statements, or other documents.

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**   Page 12 of 15

US 627896v.6

*Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

## NOTICE

38.    Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the U.S. Trustee; (b) counsel for The CIT Group/Business Credit, Inc., as Agent for the Senior Lenders, and each Debtor's other secured creditors; (c) each Debtor's 20 largest unsecured creditors; (d) the Internal Revenue Service and all governmental agencies required to receive notice under the Bankruptcy Rules and the Local Bankruptcy Rules; and (e) those persons or entities that have formally appeared and requested service in these Cases pursuant to Rule 9010(b) of the Bankruptcy Rules.

## REQUEST FOR IMMEDIATE RELIEF

39.    Bankruptcy Rule 6003 prohibits the payment of prepetition claims, or other use of property outside the ordinary course of business, within the first twenty-one (21) days of these Cases, except as necessary to prevent immediate and irreparable harm. For the reasons stated previously herein, the Debtors submit that the relief requested is necessary to prevent immediate and irreparable harm to the Debtors' estate.

40.    Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h) (to the extent applicable). The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to continue to operate their businesses and preserve value in their estates.

## **PRAYER**

The Debtors respectfully request that this Court enter an Order (a) authorizing, on an interim and final basis, the Debtors' use the Cash Collateral; (b) granting adequate protection to the Agent on behalf of the Senior Lenders as more particularly set forth herein and in the Interim Order; and (c) granting them such other and further relief to which they may be justly entitled.

Dated:  November 16, 2010

    Respectfully submitted,

    **VINSON & ELKINS L.L.P.**

    By: /s/ *Michaela C. Crocker*
        Daniel C. Stewart, SBT #19206500
        Paul E. Heath, SBT #093555050
        Michaela C. Crocker, SBT #24031985
        Richard H. London, SBT #24032678
        2001 Ross Avenue, Suite 3700
        Dallas, Texas 75201
        Tel: 214.220.7700
        Fax: 214.999.7787
        mcrocker@velaw.com
        rlondon@velaw.com

    **PROPOSED ATTORNEYS FOR THE DEBTORS**

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**    **Page 14 of 15**

US 627896v.6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| IN RE: | § |
| | § CASE NO. CASE NO. 10-60149 |
| LACK'S STORES, INCORPORATED, *ET AL.*,[13] | § |
| | § (Chapter 11) |
| | § (Jointly Administered) |
| DEBTORS. | § |

## CERTIFICATE OF CONFERENCE

I hereby certify that both a proposed Interim Budget and a proposed Interim Order relating to the *Debtors' Emergency Motion for Interim and Final Orders Approving Use of Cash Collateral and Grant of Adequate Protection* (the "Cash Collateral Motion") have been provided to James Chadwick and Robert Jones of Patton Boggs LLP, counsel to The CIT Group / Business Credit, Inc., as agent to the Debtors' Senior Lenders, and a request has been made to them to allow interim cash collateral usage by the Debtors for a period of 4 to 5 weeks, in accordance with the Interim Budget and the Cash Collateral Motion and Interim Order, or until a Final Hearing is held thereon. Mr. Jones has advised me that the Senior Lenders do not so consent at this time.

November 16, 2010

                                              */s/ Daniel C. Stewart*
                                                   One of Counsel

---

[13] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).