IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 10-60149** |
| **LACK'S STORES, INCORPORATED,** *ET* | § | **(Chapter 11)** |
| *AL.,*[1] | § | **(Jointly Administered)** |
| | § | |
| **DEBTORS.** | § | |

**DEBTORS' EMERGENCY (I) MOTION FOR AUTHORITY TO (A) CONDUCT STORE
CLOSING SALES AND (B) ASSUME CONSULTING AGREEMENT AND (II)
APPLICATION FOR ORDER AUTHORIZING RETENTION OF A JOINT VENTURE
COMPRISED OF HILCO MERCHANT RESOURCES, LLC AND SB CAPITAL
GROUP, LLC AS CONSULTANT TO THE DEBTORS**

Lack's Stores, Incorporated and its affiliated debtor entities, as debtors and debtors in

possession (collectively, the "Debtors"), file this *Debtors' Emergency (I) Motion for Authority to*

*(A) Conduct Store Closing Sales and (B) Assume Consulting Agreement and (II) Application for*

*Order Authorizing Retention of A Joint Venture Comprised of Hilco Merchant Resources, LLC*

*and SB Capital Group, LLC as Consultant to the Debtors* (the "Motion and Application"). In

support of the Motion and Application, the Debtors incorporate the statements contained in the

*Declaration of Melvin Lack in Support of First Day Pleadings and Papers* and would

respectfully show the Court as follows:

**JURISDICTION AND PROCEDURAL BACKGROUND**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157. This Motion and Application concerns the administration of the estates; and therefore, it is

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528),
Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc.
(8961).

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.        Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced cases (the "Case").

4.        Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.        As of the Date of this Motion and Application, no official committee of unsecured creditors has been appointed.

6.        Contemporaneously with the filing of this Motion and Application, the Debtors filed the *Debtors' Emergency Motion for Joint Administration of Cases and their Debtors' Request for Emergency Consideration of Certain "First Day" Matters*.

<u>**STATEMENT OF FACTS**</u>

**A.        The Debtors and Their 70-Year History**

7.        Lack's Stores, Incorporated ("Lack's") is a Texas corporation with its corporate headquarters located in Victoria, Texas.   It is one of the largest independently-owned retail furniture chains in the United States.   Lack's operates under the trade names "Lack's" and "Lack's Home Furnishings" and sells a complete line of furnishings for the home, including furniture, bedding, major appliances and home electronics.

8.        The nucleus of the current company was formed on February 28, 1938 by David and Rebecca Lack, when they opened a small auto supply store in Beeville, Texas.   Because of the chronic shortage of cars and new auto parts during World War II, the company diversified

**DEBTORS' EMERGENCY (I) MOTION FOR AUTHORITY TO (A) CONDUCT STORE CLOSING SALES AND (B) ASSUME CONSULTING AGREEMENT AND (II) APPLICATION FOR ORDER AUTHORIZING RETENTION OF A JOINT VENTURE COMPRISED OF HILCO MERCHANT RESOURCES, LLC AND SB CAPITAL GROUP, LLC AS CONSULTANT TO THE DEBTORS     Page 2 of 23**
US 634530v.12

into furniture in an attempt to maintain sales volume. Furniture did well, and so became a growing segment of Lack's total business.

9.     In 1952, by which time the company had expanded to five retail stores, Lack's made a commitment to become a furniture and appliance chain. It continued to carry auto supplies, tires and other hardware items at all locations, but the merchandising emphasis switched to home furnishings. The original automotive and hardware merchandise was eventually phased out in the 1970's.

10.     Today, Lack's remains a family owned business that operates 36 retail home furnishing stores in 26 cities located in Texas.[2] These stores are supported by a 380,000 square foot state-of-the-art distribution center in Schertz, Texas, several cross-docking central delivery facilities, and a service center. According to surveys by Furniture/Today, an industry newspaper, Lack's sales volume place it among the top furniture retailers in the country. In 2007, Lack's was named Retailer of the Year by the National Home Furnishings Association.

11.     Lack Properties, Inc. ("Lack Properties"), a wholly-owned subsidiary of Lack's, is the owner of the real property and improvements associated with approximately fourteen store and warehouse locations that are leased to Lack's.[3] The remaining store locations are leased by Lack's from third party lessors, including locations that are leased from lessors that are affiliated with various members of the Lack's family.

---

[2] Lack's retail stores are located in Abilene, Alice, Austin (3), Bay City, Beeville, College Station, Corpus Christi (2), Del Rio, El Campo, Killeen, Longview, Lubbock (2), Lufkin, Midland, New Braunfels, Odessa, Port Lavaca, Portland, San Angelo, San Antonio (5), Sinton, Temple, Tyler, Uvalde, Victoria (2), and Waco.

[3] Merchandise Acceptance Corporation ("Merchandise Acceptance") and Lack's Furniture Centers, Inc. ("Lack's Furniture") are also wholly-owned subsidiaries of Lack's, each of which own limited or no assets and have no operations.

12.     Since its inception, Lack's has financed a significant portion of its customers' purchases through the underwriting of "in store" financing.  Indeed, over the last several years, Lack's has financed approximately 70% of all customer sales.  The book amount of the customer notes receivable portfolio as of the Petition Date is more than $130,000,000.  There are currently in excess of 75,000 customer notes receivable, the average balance of each note is approximately $1,700, and the weighted average remaining term of each note is approximately eighteen to twenty-four months.

13.     Lack's services the customer notes portfolio with in-house employees.  Lack's has historically collected approximately 95% of the balance of the customer notes receivable, even though they are generally considered to be "sub-prime" by many credit institutions.

14.     Lack's revenue is derived from the sale of home furnishings and the interest earned from financing customer notes receivable.  From February 1, 2010 (the beginning of Lack's fiscal year) through the Petition Date, Lack's has generated revenue of more than $122,000,000 and has operating profit of more than $1,000,000.  Lack's currently employs approximately 886 persons.

**B.    Secured Credit Facility**

15.     Lack's is the borrower under that certain Second Amended and Restated Loan and Security Agreement dated as of July 10, 2007 (as amended from time to time, the "Senior Credit Agreement") among Lack's, The CIT Group / Business Credit, Inc., as agent (in such capacity, the "Agent"), and the other lenders from time to time party thereto (together with the Agent, the "Senior Lenders").[4]   Lack's relationship with many of the Senior Lenders under the Senior

---

[4] The current Senior Lenders include The CIT Group / Business Credit, Inc.; U.S. Bank National Association; PNC Bank, National Association; Capital One Leverage Finance Corp.; and JPMorgan Chase Bank, N.A.

Credit Agreement (or prior versions thereof) dates back to 1999. The Senior Credit Agreement, with a stated maturity date of October 31, 2010,[5] is a revolving credit facility. From 1999 through the maturity date, Lack's had never been in monetary default under the operative credit documents.

16.     As of the Petition Date, the aggregate principal amount of the advances currently outstanding under the Senior Credit Agreement is approximately $86,000,000, having been gradually reduced from $105,000,000 since January of 2009. Lack's obligations under the Senior Credit Agreement are guaranteed by Merchandise Acceptance, Lack's Furniture, Lack Properties, and Melvin Lack.[6] The Senior Lenders allege that the obligations under the Senior Credit Agreement are secured by a lien on substantially all of the Debtors' assets excluding certain real estate. The Senior Lenders do not, however, have dominion over all of the Debtors' bank accounts.

17.     In addition to liens held by the Senior Lenders, certain of the properties owned by Lack Properties and leased to Lack's are subject to mortgages held by third party lenders, including stores in Bay City, Abilene, Wichita Falls (now closed), and Longview, as well as warehouse/distribution centers in Schertz and San Antonio.

## C.     Trade Creditors

18.     In the ordinary course of business, the Debtors purchase merchandise from an assortment of vendors, including furniture, bedding, home electronics and appliance manufacturers. The Debtors estimate that, as of the Petition Date, the general unsecured claims

---

[5] By agreement, the maturity date was subsequently extended through and including November 12, 2010.

[6] Mr. Lack's obligations under the guarantee are limited. Mr. Lack is not a debtor in these Cases and is represented by separate counsel in the Cases.

held by trade vendors against their respective estates are no more than $12,000,000 in the aggregate.  The Debtors' three largest vendors[7] account for approximately 60% of the amounts payable to trade creditors.

### D.    Events Leading to the Chapter 11 Cases

19.    As a result of the economic slowdown, consumer demand in general – and the demand for home furnishings in particular – decreased sharply starting in the second half of 2008.  The decreased demand caused an approximate 20% decrease in Lack's revenues starting at the end of its 2008 fiscal year.  Notwithstanding this decrease, Lack's was able to reduce expenses and reach a monthly breakeven position by February 2009.  The effort to recover revenues and control expenses has continued.  Revenue and profitability have continued to improve during 2010.

20.    At the same time, the national economic slowdown resulted in an unprecedented tightening of credit markets.  The Senior Lenders stated that they would not refinance or restructure the obligations under the Senior Credit Agreement on terms which would allow the Debtors to continue their operations.  The Debtors have been unable to identify an alternative financing source for their business operations since the overwhelming majority of their customers are rated sub-prime, notwithstanding those customers' and Lack's great historical and current track record of payment and collection, respectively.

21.    Without an alternative funding source, Lack's will be unable to finance the purchase of new inventory or to underwrite additional customer notes receivable.  As a consequence, the Debtors determined that it was appropriate to commence these Cases in order

---

[7] Comprised of Sealy Mattress Company, Lane Furniture Industries, and Brownchild Ltd. Inc.

to maximize the value of their assets for the benefit of their creditors and equity holders and to conduct an orderly – as opposed to forced – liquidation, utilizing cash collateral to effect the wind-down which is anticipated to pay all creditors in full.

## E.      The Chapter 11 Cases

22.      The Debtors submit that these Cases will have two macro components or goals. First, the Debtors will request that the Court approve the commencement of "Store Closing Sales" so that the Debtors (working with Hilco Merchant Resources, LLC ("Hilco")[8]) may sell their remaining inventory in a prompt and efficient manner designed to maximize recoveries and reduce the costs of operations.  Second, the Debtors intend to propose a chapter 11 plan that will provide for the collection of the customer notes receivable portfolio in the ordinary course of business and the marketing and disposition of their real estate interests over time and in such a manner as to maximize their value for the benefit of the estates.

23.      The Debtors anticipate that the orderly liquidation of their inventory and fixtures, ordinary course collection of customer notes receivable, and the marketing and disposition of real property interests and other miscellaneous assets will satisfy in full the claims of the Senior Lenders under the Senior Credit Agreement and likely the claims of all other creditors with a return available to the equity holders.

## F.      Store Closing Sales

24.      After exploring alternative strategies to maximize the value of the Debtors' estates, the Debtors, in an exercise of their business judgment, have decided to close all of their stores (the "Stores") and sell, among other things, their remaining inventory pursuant to an

---

[8] Pursuant to the Debtors' agreement with Hilco, Hilco is permitted to joint venture with SB Capital Group, LLC with respect to the "Store Closing" sales.

orderly liquidation process.  The Debtors have determined that utilizing the services of a nationally-recognized liquidation firm to assist in the sale of certain assets at the Stores and at the Debtors' distribution center (the "Distribution Center") will maximize value to the Debtors' estates and creditors.

25.    The Debtors considered a number of possibilities regarding the timing and structure of the Store Closing Sales (as defined below), including whether to conduct the Store Closing Sales themselves, to engage a liquidation firm under a consulting agreement, or to sell the rights to dispose of the inventory to a liquidation firm.  The Debtors received proposals (on both sale and consulting bases) from three liquidation firms and ultimately accepted an offer from the joint venture comprised of Hilco Merchant Resources, LLC and SB Capital Group, LLC ("Hilco/SB") to serve as consultant in connection with the Store Closing Sales.  In order to facilitate the Store Closing Sales, the Debtors and Hilco/SB entered into a consulting agreement (the "Consulting Agreement") dated November 15, 2010, which is attached hereto as **Exhibit "A"**.  The Debtors determined that it is appropriate to commence the Store Closing Sales immediately upon receipt of Court approval.  The Debtors expect the Store Closing Sales to wrap up in sixty to ninety days.

26.    Pursuant to the Consulting Agreement, Hilco/SB will advise the Debtors with respect to the sale of the Debtors' merchandise (the "Merchandise") and furniture, fixtures,[9] and equipment (the "FF&E," and together with the Merchandise and Additional Goods (as defined below), the "Assets")) at the Stores and the Distribution Center.  Pursuant to the Consulting Agreement, certain additional inventory ("Additional Goods"), such as bedding and other

---

[9] Sales of fixtures will be effectuated to the extent such sales are consistent with the relevant real property leases.

accessories, may be included in the Store Closing Sales to compliment and enhance the Merchandise to be sold.[10]  No inventory will be sold to Hilco/SB; rather, Hilco/SB will earn a "Base Fee" and an "Incentive Fee" relating to sales of Merchandise and Additional Goods and a commission relating to the sale of FF&E, as more fully set forth in the Consulting Agreement.[11]

## RELIEF REQUESTED

### A.    Introduction

27.    By this Motion and Application, the Debtors seek entry of interim and final orders (the "Order") pursuant to §§ 105, 327, 328, 363, and 365 of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing and approving their implementation of store closing or similarly themed sales (the "Store Closing Sales") in accordance with the Consulting Agreement and the *Store Closing Guidelines* (the "Sale Guidelines") attached hereto as **Exhibit "B"**; (b) authorizing the assumption of the Consulting Agreement with Hilco/SB; and (c) authorizing the employment of Hilco/SB.

### B.    Authority to Conduct Store Closing Sales

28.    Bankruptcy Code § 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

---

[10] Hilco may also provide services to third parties, including the equity owners of Lack's and entities owned by one or more of them, to liquidate certain of their assets which are currently located at the Stores or the Distribution Center.  All such assets are separately identified, and the proceeds from the sales of those assets will be accounted for and segregated.  Such services will be on similar terms to the services to be rendered to the Debtors.

[11] Hilco/SB will earn a fee equal to $4,500 per Store (the "("Base Fee") plus 20% of Net Proceeds of the Sale (each, as defined in the Consulting Agreement) of the Merchandise and the Additional Goods at the Stores in excess of 64.4% of Cost Value for such Merchandise and Additional Goods (the "Incentive Fee").  The Base Fee is to be paid weekly in 10 installments.  The Incentive Fee is to be paid in connection with a final reconciliation.  Hilco/SB will also earn a commission equal to 15 percent of the proceeds (net of applicable sales taxes) from the sale of FF&E.

estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code § 1107(a) provides the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under § 363(b)(1).

29.    To approve the use, sale, or lease of property outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by "some articulated business justification, as set forth by the Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983), which decision has been adopted in the Fifth Circuit.  *See Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc,)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession can sell assets of his estate outside the ordinary course of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale"); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

30. If a sound business reason exists, the law vests a debtor's decision to sell property out of the ordinary course of business with a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest, or gross negligence." *Id.*

31. The Debtors have decided to conduct an orderly wind down of their businesses. As an exercise of their business judgment, the Debtors have determined that a necessary component of the orderly wind down of their businesses is an orderly liquidation of the Assets in the Stores and Distribution Center. The sale of the Assets pursuant to the Consulting Agreement will ensure that the highest possible price will be received for the Assets and that the Assets will be sold in an efficient and expeditious fashion. Additionally, selling the Assets in the Store Closing Sales will maximize recovery for the Debtors' estates because the sales will increase customer traffic in the Stores and because such orderly sales will yield more value for the estates than would any other alternatives. Maximizing recovery for the Debtors' estates from the Store Closing Sales is the best option available to the Debtors, is in the best interests of the Debtors, their estates, creditors, equity holders, and other parties in interest, and is necessary to maximize the value of the Debtors' estates for the benefit of all stakeholders.

32. Moreover, the Debtors solicited and obtained bids from the other reputable and industry-leading liquidators prior to selecting Hilco/SB. The Debtors believe that the services to be rendered by Hilco/SB would be superior to those to be rendered by the two other liquidators,

and Hilco/SB's pricing and fee structure is competitive with the other proposals.  The retention of Hilco/SB to run the Store Closing Sales will be beneficial relative to the alternative of conducting such sales without assistance.

33.    Bankruptcy courts routinely approve requests by debtors to conduct store closing sales, finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code.  *See, e.g.*, *In re BFW Liquidation, LLC*, *f/k/a Bruno's Supermarkets, LLC*, Case No. 09-00634, Dkt. No. 306 (Bankr. N.D. Ala. March 2, 2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653, Dkt. No. 82 (Bankr. E.D. Va. Nov. 10, 2008)*; In re Winn-Dixie Stores, Inc.*, Case No. 05-03817-3F1, Dkt. No. 2537 (Bankr. M.D. Fla. July 27, 2005); *In re Breuners Home Furnishings Corp.*, Case No. 04-12030, Dkt. No. 171 (Bankr. D. Del. July 30, 2004); *In re Mansour's, Inc.*, Case No. 04-10979, Dkt. No. 39 (Bankr. N.D. Ga. Apr. 20, 2004); *In re Gadzooks, Inc.*, Case No. 04-31486, Dkt. No. 209 (Bankr. N.D. Tex. Feb. 26, 2004); *In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring Debtor to maximize estate assets").

**C.      Authority to Conduct Sales Free and Clear of Liens, Claims, and Encumbrances**

34.    The Debtors seek authority to conduct the Store Closing Sales pursuant to the Consulting Agreement free and clear of all liens, claims, and encumbrances, if any, with such liens, claims, and encumbrances, including, without limitation, the liens of the Debtors' Senior Lenders, to attach to the amounts payable to the Debtors from the Store Closing Sales, in the same order, priority, force, and effect as such liens, claims, or encumbrances presently enforceable against the Debtors' Merchandise and FF&E.

**DEBTORS' EMERGENCY (I) MOTION FOR AUTHORITY TO (A) CONDUCT STORE CLOSING SALES AND (B) ASSUME CONSULTING AGREEMENT AND (II) APPLICATION FOR ORDER AUTHORIZING RETENTION OF A JOINT VENTURE COMPRISED OF HILCO MERCHANT RESOURCES, LLC AND SB CAPITAL GROUP, LLC AS CONSULTANT TO THE DEBTORS**     **Page 12 of 23**

US 634530v.12

35.     Under Bankruptcy Code § 363(f), a debtor in possession may sell property free and clear of any lien, claim, or interest of an entity in such property if, among other things:

(1)     Applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     Such entity consents;

(3)     Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     Such interest is in bona fide dispute; or

(5)     Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

36.     The provisions of § 363(f) of the Bankruptcy Code are satisfied because, among other things, the Senior Lenders, who assert a lien on all of the Debtors' inventory have stopped funding the Debtors pre-petition and requested that the Debtors conduct such sales. Accordingly, the Agent and the Senior Lenders have implicitly consented to the commencement of the Store Closing Sales.

**D.      Compliance with Applicable State and Local Law**

37.     Section 17.91 of the Texas Business & Commerce Code provides that the subchapter concerning restrictions and administrative requirements relating to store closing sales "does not apply to . . . a sale for which an accounting must be made to a court of law" or "a sale conducted pursuant to an order of a court."  TEX. BUS. & COMM. CODE § 17.91 (2007).  The Debtors' Store Closing Sales (if approved by this Court) are thus not subject to the requirements set forth in the Texas Business and Commerce Code §§ 17.81-17.93.  The Debtors and Hilco/SB will, however, conduct the Store Closing Sales in accordance with applicable state and local

health and safety laws and consumer protection laws.  Further, the Debtors and Hilco/SB are implementing the Sale Guidelines, which set forth reasonable parameters for the Store Closing Sales.  Notwithstanding the foregoing, in the event that the Store Closing Sales would be contrary to laws relating to store closing, liquidation, or "going out of business" sales, the Debtors hereby seek to be relieved of compliance with such laws.

38.     Federal bankruptcy law preempts state and local laws that conflict with the underlying policies of the Bankruptcy Code.  *Belculfine v. Aloe (In re Sheango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995), *aff'd*, 112 F.3d 633 (3d Cir. 1997); *P.K.R. Convalescent Ctrs., Inc. v. Virginia (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90, 93 (Bankr. E.D. Va. 1995); *see also Baker J. Drake, Inc. v. Public Serv. Comm's of Nev.*, 35 F.3d 1348, 1352 (9th Cir. 1994) ("It is a familiar and well-established principle that the Supremacy Clause invalidates state laws that interfere with, or are contrary to federal law") (quoting *Hillsborough City v. Automated Med. Labs, Inc.*, 471 U.S. 707, 712 (1985)).

39.     Additionally, the Debtors request that the Court provide that the automatic stay and the Court's injunctive powers apply to any actions involving the Store Closing Sales that may be taken by any parties or persons pursuant to such state and local laws.  *See Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981), *cert. denied*, 454 U.S. 1162 (1982) (holding that an attempt to enforce state regulation governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of the estate and thus violated the automatic stay); *In re First Alliance Mortgage Co.*, 264 B.R. 634, 652 (C.D. Cal. 2001) (noting that bankruptcy courts have the power to enjoin governmental regulatory actions under Bankruptcy Code § 105).

40.     Many bankruptcy courts, under similar circumstances, have permitted debtors to conduct store closing sales notwithstanding such local laws in chapter 11 cases.  *See, e.g., In re BFW Liquidation, LLC*, *f/k/a Bruno's Supermarkets, LLC*, Case No. 09-00634, Dkt. No. 306 (Bankr. N.D. Ala. March 2, 2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653, Dkt. No. 82 (Bankr. E.D. Va. Nov. 10, 2008)*; In re Winn-Dixie Stores, Inc.*, Case No. 05-03817-3F1, Dkt. No. 2537 (Bankr. M.D. Fla. July 27, 2005); *In re Breuner's Home Furnishings Corp.*, Case No. 04-12030, Dkt. No. 171 (Bankr. D. Del. July 30, 2004); *In re Gadzooks, Inc.*, Case No. 04-31486, Dkt. No. 209 (N.D. Tex. Feb. 26, 2004).

**E.     Authority to Conduct Store Closing Sales Notwithstanding Contrary Lease Provisions**

41.     The Debtors seek authority to conduct the Store Closing Sales notwithstanding any provisions in any of the Debtors' leases that prohibit, limit, or seek to prevent such Store Closing Sales.  Some of the leases governing the Stores contain provisions restricting or prohibiting Debtors from conducting "going out of business sales," liquidations, or similar sales; however, such provisions are unenforceable in bankruptcy.  *See In re Friedman's, Inc.,* 336 B.R. 880, 882-84 (Bankr. S.D. Ga. 2005) (permitting retail jeweler to conduct going out of business sales despite prohibition against such in the lease); *In re T.A.C. Group, Inc.,* 294 B.R. 199, 202-03 (Bankr. D. Mass. 2003) (holding lease's purported automatic termination due to debtor's going-out-of-business sale was not effective, and lease remained property of the estate of chapter 11 debtor); *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 74-75 (Bankr. S.D.N.Y. 1994) (finding that lease provision requiring lessee to remain open was not "obligation" that must be timely performed by debtor within meaning of Bankruptcy Code § 365); *In re Ames Dept. Stores, Inc*., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("This Court believes that to enforce the anti-GOB

sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets"); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga. 1990) (using equitable powers of the court to preclude lessors from enforcing anti-liquidation sale lease restriction); *In re Libson Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (permitting debtor to conduct going out of business sale in contravention of express prohibition in lease agreement).   The Debtors request that the Order authorize the Store Closing Sales notwithstanding any provisions in leases relating to the Stores that would prohibit, limit, or seek to prevent such Store Closing Sales and order that lessors of any of the Debtors' leases shall not interfere with or otherwise restrict or impede the Debtors or Hilco/SB from conducting such sales.

## F.      Assumption of the Consulting Agreement

42.      The Debtors seek to assume the Consulting Agreement with Hilco/SB.   Under Bankruptcy Code § 365 a debtor-in-possession may "subject to the Court's approval . . . assume or reject any executory contract and unexpired lease of the debtor."   11 U.S.C. § 365(a).

43.      Whether an executory contract or unexpired lease should be assumed or rejected is a question left to a debtor's business judgment.   *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *see also, Lifemark Hospitals, Inc. v. Liljeberg Enters., Inc. (Matter of Liljeberg Enters., Inc.)*, 304 F.3d 410, 438 (5th Cir. 2002); *Sharon Steel Corp. v. Nat'l Fuel Gas Distr. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987).   In applying the business judgment standard, courts show great deference to the debtor's decision to assume or reject.   *See, e.g., Lubrizol Enters. Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1985); *Summit Land Co. v. Allen (In re Summit*

*Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).  "As long as assumption . . . appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the [contract] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."  *Richmond Leasing Co.*, 762 F.2d at 1309.  "The act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services."  *Matter of Liljeberg Enters., Inc.*, 304 F.3d at 438 (citing *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000)).

44.     As set forth above, in an exercise of their business judgment, the Debtors have determined that a necessary component of the orderly wind down of their business is an orderly and expeditious liquidation of the Merchandise and FF&E in the Stores and Distribution Center. The Debtors solicited and received multiple bids from nationally-competitive retail liquidation firms and determined that the bid from Hilco/SB is the best offer and that Hilco/SB is best able to provide liquidation services to the Debtors.  The Debtors engaged in good faith, arms-length negotiations with Hilco/SB regarding the terms of the Consulting Agreement, and the Debtors believe that the terms of the Consulting Agreement are fair and reasonable and are designed to maximize the value of the Assets to be sold.

45.     Prior to the filing of these Cases, the Debtors advanced $400,000 (the "Advance") to Hilco/SB to cover certain start-up expenses for the Store Closing Sales, such as advertising (costs related to purchasing and shipping the appropriate sign packages for the Store Closing Sales) and supervision (costs related to travel and supervision fees associated with the Hilco/SB personnel who travels to the various stores to supervise the Store Closing Sales).  The Debtors

anticipate making additional payments in the amount of approximately $600,000 to cover the remaining start-up expenses to be incurred during the first three weeks of the Store Closing Sales.  To the extent that the advances are insufficient to satisfy such reasonable start-up expenses and to the extent necessary to satisfy start-up expenses incurred thereafter, Hilco/SB has agreed to cover such expenses (at the election of the Debtors) subject to reimbursement out of proceeds related to the sale of Merchandise, FF&E and Additional Goods.

46.     Hilco/SB has extensive experience in conducting store closing sales and can oversee and assist in the management and implementation of the Store Closing Sales in an efficient and cost-effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the experience, skills, and resources of Hilco/SB to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the potential value to be received by the Debtors' estates from the Assets, which will inure to the benefit of all stakeholders.

47.     Therefore, assuming the Consulting Agreement is a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estate, creditors, and other parties in interest, and is necessary in order to maximize the value of the Debtors' estate for the benefit of all stakeholders.

48.     Bankruptcy Code § 365(b)(1) requires as a condition to assumption that a debtor (i) cure, or provide adequate assurance that the trustee will promptly cure any defaults under the executory contracts to be assumed, (ii) compensate, or provide adequate assurance of compensation, for actual pecuniary loss of the contract counterparty associated with such default, and (iii) provide adequate assurance of future performance under the contract.     11 U.S.C. § 365(b)(1).  There are no defaults under the Consulting Agreement, and thus, no cure

costs or compensation relating to any defaults are owed to Hilco/SB relating to the requested assumption.  If the Motion and Application is approved, the Debtors will continue to perform under the Consulting Agreement in order to effectuate their goal with respect to the Store Closing Sales.  Because liquidating the Merchandise and FF&E in the Stores and Distribution Center in the most orderly and value-maximizing way is in the Debtors' best interests, the Debtors submit that they have provided adequate assurance of future performance under the Consulting Agreement.

**G.      Employment of Hilco/SB**

49.      In an abundance of caution, in the event that Hilco/SB is determined to be a professional as such term is used in Bankruptcy Code § 327, the Debtors seek to employ and retain Hilco/SB as a consultant to the Debtors.

50.      Section 327(a) of the Bankruptcy Code authorizes the trustee, subject to the court's approval, to employ one or more professional persons, such as attorneys, accountants, appraisers and auctioneers, or other professional persons to represent or perform services for the estate.  11 U.S.C. § 327(a).

51.      Section 328(a) of the Bankruptcy Code authorizes the Court to review the terms and conditions of employment of any professional person employed under Bankruptcy Code § 327, and to allow different compensation if the original terms and conditions "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).

52.      The Debtors submit that Hilco/SB's fee provisions, as described herein, are reasonable terms and conditions of retention and should be approved under Bankruptcy Code §§ 327 and 328.  The fee provisions comport with the nature of the services to be provided by

Hilco/SB, and the fee provisions typically utilized by Hilco/SB and other leading liquidation firms.

53.     Subject to the Court's approval of this Motion and Application, Hilco/SB has indicated that it is willing to provide the above-mentioned services to the Debtors in these Cases.

54.     For purposes of this Motion and Application and any further notices, the name, mailing address, and telephone number of the professional primarily responsible for the services rendered by Hilco/SB is:

| | |
|---|---|
| Name: | Hilco Merchant Resources, LLC |
| | Joseph A. Malfitano, VP, Deputy General Counsel, Member |
| Address: | One Northbrook Place |
| | 5 Revere Drive, Suite 206 |
| | Northbrook, IL  60062 |
| Tel: | 847-504-3257 |
| Fax: | 847-897-0868 |
| Email: | jmalfitano@hilcotrading.com |

55.     As discussed above, the employment of Hilco/SB as consultant to the Debtors is in the best interest of the Debtors' estates and their constituents and will help the Debtors maximize the value of the Assets in the stores and Distribution Center.

56.     Based on, and except as otherwise provided in, the *Affidavit of Joseph A. Malfitano in Support of Retention of a Joint Venture Comprised of Hilco Merchant Resources, LLC and SB Capital Group, LLC as Consultants to the Debtors* (the "Malfitano Affidavit"), a copy of which is attached hereto as **Exhibit "C"** and the *Affidavit of Robert Raskin in Support of Retention of a Joint Venture Comprised of Hilco Merchant Resources, LLC and SB Capital Group, LLC as Consultants to the Debtors* (the "Raskin Affidavit" and together with the Malfitano Affidavit, the "Affidavits"), a copy of which is attached hereto as **Exhibit "D**," Hilco/SB does not have any connection with or any interest adverse to the Debtors, the creditors

of the estates, or any other party in interest or their respective attorneys and accountants in any matter relating to the Debtors or their estates.  Hilco/SB may, however, have consulted or may currently consult creditors of the Debtors or parties in interest in connection with matters unrelated to these Cases.

57.     To the best of the Debtors' knowledge, information, and belief, Hilco/SB represents no interest adverse to the Debtors or their estates in the matters for which it is proposed to be retained, and is a "disinterested person" as defined in Bankruptcy Code § 101(14).  Except as otherwise set forth in the Affidavits, Hilco/SB has not provided, and will not provide, professional services to any of the creditors, or other parties in interest, or their attorneys with regard to any matter relating to these Cases.

58.     The Debtors request that the Court approve the employment of Hilco/SB pursuant to the Consulting Agreement, §§ 327 and 328 of the Bankruptcy Code, and Bankruptcy Rule 2014(a).

## REQUEST FOR IMMEDIATE RELIEF

59.     Bankruptcy Rule 6003 prohibits the use, sale, or lease of property outside the ordinary course of business and the employment of professionals under Bankruptcy Rule 2014, within the first twenty-one (21) days of these Cases, except as necessary to prevent immediate and irreparable harm.  Similarly, Bankruptcy Rule 2002(a)(2) requires twenty-one (21) days' notice of a proposed use, sale, or lease of property outside the ordinary course of business absent approval of the Court.  For the reasons stated previously herein, the Debtors submit that the relief requested is necessary to prevent immediate and irreparable harm to the Debtors' estate, and they request a waiver of those Bankruptcy Rules.

60.     Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the fourteen (14) day stay under Bankruptcy Rule 6004(h).  The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to continue to operate their businesses and preserve value in their estates.

## NOTICE

61.     Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the U.S. Trustee; (b)  counsel for The CIT Group/Business Credit, Inc., as Agent for the Senior Lenders, and each Debtor's other secured creditors; (c) each Debtor's 20 largest unsecured creditors; (d) the Internal Revenue Service and all governmental agencies required to receive notice under the Bankruptcy Rules and the Local Bankruptcy Rules; and (e) landlords of the Debtors' store leases; and (f) those persons or entities that have formally appeared and requested service in these Cases pursuant to Rule 9010(b) of the Bankruptcy Rules.

## PRAYER

62.     The Debtors respectfully request that this Court enter an interim and then a final Order (a) authorizing and approving their implementation of Store Closing Sales in accordance with the Consulting Agreement and the Sale Guidelines, (b) authorizing the assumption of the Consulting Agreement with Hilco/SB, (c) authorizing the employment and retention of Hilco/SB, and (d) granting such other and further relief both at law and in equity to which they may be justly entitled.

Dated:  November 16, 2010

Respectfully submitted,

**VINSON & ELKINS LLP**

By:   /s/ *Michaela C. Crocker*
      Daniel C. Stewart, SBT #19206500
      Paul E. Heath, SBT #093555050
      Michaela C. Crocker, SBT #24031985
      Richard H. London, SBT #24032678
      2001 Ross Avenue, Suite 3700
      Dallas, Texas 75201
      Tel: 214.220.7700
      Fax: 214.999.7787
      mcrocker@velaw.com
      rlondon@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS**