IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| IN RE: § | |
| § | CASE NO. 10-60149 |
| LACK'S STORES, INCORPORATED, *ET AL.*,[1] § | |
| § | (Chapter 11) |
| § | (Jointly Administered) |
| DEBTORS. § | |

### DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF PREPETITION TAXES

Lack's Stores, Incorporated and its affiliated debtor entities, as debtors and debtors in possession (collectively, the "Debtors"), file this *Debtors' Emergency Motion for Order Authorizing Payment of Prepetition Taxes* (the "Motion"). In support of the Motion, the Debtors incorporate the statements contained in the *Declaration of Melvin Lack in Support of First Day Pleadings and Papers* and would respectfully show the Court as follows:

### JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estates, and, therefore, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced cases (the "Cases").

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).

4. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5. As of the Date of this Motion, no official committee of unsecured creditors has been appointed.

6. Contemporaneously with the filing of this Motion, the Debtors filed the *Debtors' Emergency Motion for Joint Administration of Cases* and their *Debtor's Request for Emergency Consideration of Certain First Day Matters*.

## STATEMENT OF FACTS

A. **The Debtors and Their 70-Year History**

7. Lack's Stores, Incorporated ("Lack's") is a Texas corporation with its corporate headquarters located in Victoria, Texas. It is one of the largest independently-owned retail furniture chains in the United States. Lack's operates under the trade names "Lack's" and "Lack's Home Furnishings" and sells a complete line of furnishings for the home, including furniture, bedding, major appliances and home electronics.

8. The nucleus of the current company was formed on February 28, 1938 by David and Rebecca Lack, when they opened a small auto supply store in Beeville, Texas. Because of the chronic shortage of cars and new auto parts during World War II, the company diversified into furniture in an attempt to maintain sales volume. Furniture did well, and so became a growing segment of Lack's total business.

9. In 1952, by which time the company had expanded to five retail stores, Lack's made a commitment to become a furniture and appliance chain. It continued to carry auto supplies, tires and other hardware items at all locations, but the merchandising emphasis

switched to home furnishings.  The original automotive and hardware merchandise was eventually phased out in the 1970's.

10.     Today, Lack's remains a family owned business that operates 36 retail home furnishing stores in 26 cities located in Texas.[2]  These stores are supported by a 380,000 square foot state-of-the-art distribution center in Schertz, Texas, several cross-docking central delivery facilities, and a service center.  According to surveys by Furniture/Today, an industry newspaper, Lack's sales volume place it among the top furniture retailers in the country.  In 2007, Lack's was named Retailer of the Year by the National Home Furnishings Association.

11.     Lack Properties, Inc. ("Lack Properties"), a wholly-owned subsidiary of Lack's, is the owner of the real property and improvements associated with approximately fourteen store and warehouse locations that are leased to Lack's.[3]  The remaining store locations are leased by Lack's from third party lessors, including locations that are leased from lessors that are affiliated with various members of the Lack's family.

12.     Since its inception, Lack's has financed a significant portion of its customers' purchases through the underwriting of "in store" financing.  Indeed, over the last several years, Lack's has financed approximately 70% of all customer sales.  The book amount of the customer notes receivable portfolio as of the Petition Date is more than $130,000,000.  There are currently in excess of 75,000 customer notes receivable, the average balance of each note is approximately $1,700, and the weighted average remaining term of each note is approximately eighteen to twenty-four months.

---

[2] Lack's retail stores are located in Abilene, Alice, Austin (3), Bay City, Beeville, College Station, Corpus Christi (2), Del Rio, El Campo, Killeen, Longview, Lubbock (2), Lufkin, Midland, New Braunfels, Odessa, Port Lavaca, Portland, San Angelo, San Antonio (5), Sinton, Temple, Tyler, Uvalde, Victoria (2), and Waco.

13. Lack's services the customer notes portfolio with in-house employees. Lack's has historically collected approximately 95% of the balance of the customer notes receivable, even though they are generally considered to be "sub-prime" by many credit institutions.

14. Lack's revenue is derived from the sale of home furnishings and the interest earned from financing customer notes receivable. From February 1, 2010 (the beginning of Lack's fiscal year) through the Petition Date, Lack's has generated revenue of more than $122,000,000 and has operating profit of more than $1,000,000. Lack's currently employs approximately 886 persons.

**B.  Secured Credit Facility**

15. Lack's is the borrower under that certain Second Amended and Restated Loan and Security Agreement dated as of July 10, 2007 (as amended from time to time, the "<u>Senior Credit Agreement</u>") among Lack's, The CIT Group / Business Credit, Inc., as agent (in such capacity, the "<u>Agent</u>"), and the other lenders from time to time party thereto (together with the Agent, the "<u>Senior Lenders</u>").[4] Lack's relationship with many of the Senior Lenders under the Senior Credit Agreement (or prior versions thereof) dates back to 1999. The Senior Credit Agreement, with a stated maturity date of October 31, 2010,[5] is a revolving credit facility. From 1999 through the maturity date, Lack's had never been in monetary default under the operative credit documents.

---

[3] Merchandise Acceptance Corporation ("<u>Merchandise Acceptance</u>") and Lack's Furniture Centers, Inc. ("<u>Lack's Furniture</u>") are also wholly-owned subsidiaries of Lack's, each of which own limited or no assets and have no operations.

[4] The current Senior Lenders include The CIT Group / Business Credit, Inc.; U.S. Bank National Association; PNC Bank, National Association; Capital One Leverage Finance Corp.; and JPMorgan Chase Bank, N.A.

[5] By agreement, the maturity date was subsequently extended through and including November 12, 2010.

16. As of the Petition Date, the aggregate principal amount of the advances currently outstanding under the Senior Credit Agreement is approximately $86,000,000, having been gradually reduced from $105,000,000 since January of 2009. Lack's obligations under the Senior Credit Agreement are guaranteed by Merchandise Acceptance, Lack's Furniture, Lack Properties, and Melvin Lack.[6] The Senior Lenders allege that the obligations under the Senior Credit Agreement are secured by a lien on substantially all of the Debtors' assets excluding certain real estate. The Senior Lenders do not, however, have dominion over all of the Debtors' bank accounts.

17. In addition to liens held by the Senior Lenders, certain of the properties owned by Lack Properties and leased to Lack's are subject to mortgages held by third party lenders, including stores in Bay City, Abilene, Wichita Falls (now closed), and Longview, as well as warehouse/distribution centers in Schertz and San Antonio.

**C.    Trade Creditors**

18. In the ordinary course of business, the Debtors purchase merchandise from an assortment of vendors, including furniture, bedding, home electronics and appliance manufacturers. The Debtors estimate that, as of the Petition Date, the general unsecured claims held by trade vendors against their respective estates are no more than $12,000,000 in the aggregate. The Debtors' three largest vendors[7] account for approximately 60% of the amounts payable to trade creditors.

---

[6] Mr. Lack's obligations under the guarantee are limited. Mr. Lack is not a debtor in these Cases and is represented by separate counsel in the Cases.

[7] Comprised of Sealy Mattress Company, Lane Furniture Industries, and Brownchild Ltd. Inc.

Case 10-60149   Document 13   Filed in TXSB on 11/16/10   Page 6 of 14

**D.     Events Leading to the Chapter 11 Cases**

19.     As a result of the economic slowdown, consumer demand in general – and the demand for home furnishings in particular – decreased sharply starting in the second half of 2008.  The decreased demand caused an approximate 20% decrease in Lack's revenues starting at the end of its 2008 fiscal year.  Notwithstanding this decrease, Lack's was able to reduce expenses and reach a monthly breakeven position by February 2009.  The effort to recover revenues and control expenses has continued.  Revenue and profitability have continued to improve during 2010.

20.     At the same time, the national economic slowdown resulted in an unprecedented tightening of credit markets.  The Senior Lenders stated that they would not refinance or restructure the obligations under the Senior Credit Agreement on terms which would allow the Debtors to continue their operations.  The Debtors have been unable to identify an alternative financing source for their business operations since the overwhelming majority of their customers are rated sub-prime, notwithstanding those customers' and Lack's great historical and current track record of payment and collection, respectively.

21.     Without an alternative funding source, Lack's will be unable to finance the purchase of new inventory or to underwrite additional customer notes receivable.  As a consequence, the Debtors determined that it was appropriate to commence these Cases in order to maximize the value of their assets for the benefit of their creditors and equity holders and to conduct an orderly – as opposed to forced – liquidation, utilizing cash collateral to effect the wind-down which is anticipated to pay all creditors in full.

**DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING**
**PAYMENT OF PREPETITION TAXES**                                                                                            Page 6 of 14

US 623298v.6

### E. The Chapter 11 Cases

22. The Debtors submit that these Cases will have two macro components or goals. <u>First</u>, the Debtors will request that the Court approve the commencement of "Store Closing Sales" so that the Debtors (working with Hilco Merchant Resources, LLC ("<u>Hilco</u>")[8]) may sell their remaining inventory in a prompt and efficient manner designed to maximize recoveries and reduce the costs of operations. <u>Second</u>, the Debtors intend to propose a chapter 11 plan that will provide for the collection of the customer notes receivable portfolio in the ordinary course of business and the marketing and disposition of their real estate interests over time and in such a manner as to maximize their value for the benefit of the estates.

23. The Debtors anticipate that the orderly liquidation of their inventory and fixtures, ordinary course collection of customer notes receivable, and the marketing and disposition of real property interests and other miscellaneous assets will satisfy in full the claims of the Senior Lenders under the Senior Credit Agreement and likely the claims of all other creditors with a return available to the equity holders.

### F. Prepetition Taxes

24. In connection with the normal operation of their business, the Debtors accrue liability for certain taxes ("<u>Taxes</u>") to various state and local taxing authorities (the "<u>Taxing Authorities</u>"). A comprehensive list of these Taxing Authorities is attached hereto as **Exhibit "A."**[9] On a periodic basis, which varies depending on the type of Tax, the Debtors pay

---

[8] Pursuant to the Debtors' agreement with Hilco, Hilco is permitted to joint venture with SB Capital Group, LLC with respect to the "Store Closing" sales.

[9] Although the list of taxing entities set forth on <u>Exhibit "A"</u> is substantially complete, the relief requested herein is to be applicable with respect to all Taxing Authorities and is not limited to only the Taxing Authorities included on <u>Exhibit "A."</u>

to the Taxing Authorities collected, accrued, and/or owing taxes by funds drawn by check or by means of an electronic funds transfer.

### G. Sales and Use Taxes

25. Certain Taxing Authorities require the Debtors to collect from their customers sales and use taxes ("Sales and Use Taxes") that are based on a percentage of sales price. The Debtors' Sales and Use Taxes are paid in arrears once collected. Certain of the Debtors' Sales and Use Taxes are subject to deferred payment (the "Deferred Sales Tax") because they relate to installment payment contracts the Debtors have with customers. Each month, the Debtors update the Deferred Sales Tax based upon the net change in the monthly customer notes receivable balance. An increase in net customer notes receivable results in an increase to the total Deferred Sales Tax liability, while a decrease in net customer notes receivable results in a decrease to the total Deferred Sales Tax liability. As of the Petition Date, the Debtors estimate that they owe Sales and Use Taxes to the Taxing Authorities in the aggregate amount of at least $900,000. In addition, the Deferred Sales Tax liability on the Debtors' balance sheet as of the Petition Date is $8,293,529 on a portfolio of approximately $130 million worth of customer notes receivable. On an ongoing basis, as payments are received on the customer notes receivable, the Debtors pay a portion of those payments toward the Deferred Sales Tax liability, and the Deferred Sales Tax liability decreases accordingly.

### H. Ad Valorem Taxes

26. Ad valorem taxes ("Ad Valorem Taxes") for both real and personal property are assessed and become payable in the ordinary course of business and are calculated based on a statutorily mandated percentage of property value. Ad valorem taxes are due annually, and the last date to pay them without penalty is January 31. All of the Debtors' ad valorem taxes are

owed to the State of Texas. As of the Petition Date, the Debtors estimate that they owe the Taxing Authorities Ad Valorem Taxes in the aggregate amount of at least $2,200,000.

## I. Income and Franchise Taxes

27. Income taxes ("<u>Income Taxes</u>") are assessed and become payable in the ordinary course of business and are calculated based upon a percentage of taxable income. Generally Income Taxes are paid on a quarterly basis. As of the Petition Date, the Debtors estimate that they owe $0 in Income Taxes to the Taxing Authorities as of the Petition Date due to a net operating loss carryforward.

28. Franchise taxes ("<u>Franchise Taxes</u>") are assessed and become payable in the ordinary course of business and generally are calculated based upon a percentage of taxable capital. Generally, Franchise Taxes are due May 15th. As of the Petition Date, the Debtors estimate that they owe the Taxing Authorities Franchise Taxes in the aggregate amount of at least $423,000.

## **RELIEF REQUESTED**

29. By this Motion, the Debtors seek entry of an order authorizing, but not directing, them to pay all prepetition Taxes. The Debtors seek to pay Sales and Use Taxes on an immediate basis and to pay all other Taxes in the ordinary course. To the extent that an issued check or an electronic funds transfer requested prior to the Petition Date has not cleared the Debtors' banks (the "<u>Banks</u>"), the Debtors seek entry of an order (a) authorizing the Banks to honor such prepetition checks and/or fund transfer requests, and (b) authorizing the Debtors to issue postpetition replacement checks, submit replacement fund transfer requests, or provide other means of payment to the taxing authorities or other such entity required to collect such

funds, to the extent necessary to pay all Taxes. Such relief shall be without prejudice to the Debtors' rights to contest the amounts of any Taxes on any grounds they deem appropriate.

30. The Debtors submit that many of the Taxes likely constitute "trust fund" taxes which are required to be collected from third parties and held in trust for payment to the Taxing Authorities. *See* TEX. TAX CODE ANN. § 111.016(a) (Vernon 2007) ("Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected"); *Tex. Comptroller of Public Accounts v. Liuzza (In re Tex. Pig Stands)*, 610 F.3d 937, 940 n.2 (5th Cir. 2010) (explaining that under Texas law, collected sales taxes are "trust-fund taxes"); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 97 (3rd Cir. 1994) (holding that income required to be withheld by city ordinance and state law is held "in trust" for the taxing authority); *Begier v. Internal Revenue Service*, 496 U.S. 53 (1990); *In re Megafoods Stores, Inc.*, 163 F.3d 1063, 1067-68 (9th Cir. 1998); *In re Al Copeland Enterprises, Inc.*, 991 F.2d 233, 237 (5th Cir. 1993); *In re Equalnet Communications Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("[C]ertain prepetition tax claims, such as sales taxes, could be trust fund claims."); 5 *Collier on Bankruptcy*, ¶ 541.11[4], at 541-67 (15th Ed. 2000); *see also In re Shank*, 792 F.2d 829 (9th Cir. 1986).

31. To the extent that "trust fund" taxes are collected, they are not property of the Debtors' estates under Bankruptcy Code § 541(d). *See Begier v. I.R.S.*, 496 U.S. 53 (1990); *In re Al Copeland Enterprises, Inc.*, 133 B.R. 837 (Bankr. W.D. Tex. 1991). Therefore, the Debtors have no equitable interest in those Taxes which would be deemed "trust fund" taxes.

32. Further, where Taxes constitute "trust fund" taxes, officers and directors of the collecting entity may be held personally liable for the payment of such funds to the Taxing

Authorities. *See* TEX. TAX CODE ANN. § 111.016(b), (d) (Vernon 2007) (providing that officers, managers, directors, or employees may be liable for unpaid trust-fund taxes). To the extent any accrued Taxes of the Debtors were unpaid as of the Petition Date, the Debtors' officers and directors may be subject to lawsuits during the pendency of these Cases. Such lawsuits would prove extremely distracting for the Debtors, the named officers and directors whose immediate and full-time attention to the Cases is required, and this Court, which might be asked to entertain one or more requests for injunctions relating to the potential state court actions. It is in the best interest of the Debtors' estates to eliminate the possibility of such time consuming and potentially damaging distractions.

33. To the extent any of the Taxes are not "trust fund" taxes, payment of such Taxes would be authorized pursuant to Bankruptcy Code § 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of Bankruptcy Code § 105(a) is to "assure the Bankruptcy Court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 *Collier on Bankruptcy* 105.01, at 105-3 (15th ed. 1996). Thus, Bankruptcy Code § 105(a) essentially codifies the bankruptcy court's inherent equitable powers. *See Mgmt. Tech. Corp. v. Pardo,* 56 B.R. 337, 339 (Bankr. D.N.J. 1985).

34. That the payment of the Taxes is necessary to avoid potential administrative difficulties is unquestionable. If the Taxes were not timely paid, Taxing Authorities likely would take precipitous action, including a possible marked increase in state audits and lien filings or lift stay motions. Only the prompt and regular payment of the Taxes will avoid these unnecessary governmental actions.

35. Finally, most, if not all, of the Taxes are entitled to priority status under Bankruptcy Code § 507(a)(8). The Debtors' payment of the Taxes now, in all likelihood, would only affect the timing of the payments to the Taxing Authorities and would reduce the amount of Taxes owed if later paid under a confirmed plan (due to the high interest rates and late fees attributable to delinquent tax payments). Therefore, other creditors and parties in interest would benefit, and would not be prejudiced, if the relief sought herein were granted by this Court.

36. For the foregoing reasons, the Debtors seek authorization, but not direction, to pay, perform, or otherwise honor any or all obligations with respect to the Taxes. All payments made pursuant to an order granting the relief requested herein will be in accordance with the cash collateral budget approved by this Court.

## Honoring Prepetition Checks and Electronic Transfers

37. The Debtors request that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be authorized to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors relating to the Taxes, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date. Further, the Debtors request authority to issue postpetition checks or to effect postpetition transfer requests in replacement of any checks or fund transfer requests with respect to their Tax obligations that may be dishonored or denied as a consequence of the commencement of the Case.

## RESERVATION OF RIGHTS

38. Nothing in this Motion should be construed as impairing the Debtors' rights to contest the validity, basis, or amount of any Taxes that may be owed to the Taxing Authorities, and the Debtors expressly reserve all of their rights with respect thereto.

**REQUEST FOR IMMEDIATE RELIEF**

39. Bankruptcy Rule 6003 prohibits the payment of prepetition claims, or other use of property outside the ordinary course of business, within the first twenty-one (21) days of these Cases, except as necessary to prevent immediate and irreparable harm. For the reasons stated previously herein, the Debtors submit that the relief requested is necessary to prevent immediate and irreparable harm to the Debtors' estate. As explained above, the only Taxes the Debtors seek to pay on an immediate basis are Sales and Use Taxes.

40. Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h). The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to continue to operate their businesses and preserve value in their estates.

**NOTICE**

41. Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the U.S. Trustee; (b) counsel for The CIT Group/Business Credit, Inc., as Agent for the Senior Lenders, and each Debtor's other secured creditors; (c) each Debtor's 20 largest unsecured creditors; (d) the Internal Revenue Service and all governmental agencies required to receive notice under the Bankruptcy Rules and the Local Bankruptcy Rules; (e) the Taxing Authorities listed on <u>Exhibit "A"</u>; and (f) those persons or entities that have formally appeared and requested service in these Cases pursuant to Rule 9010(b) of the Bankruptcy Rules.

## PRAYER

The Debtors respectfully request that this Court enter an order authorizing, but not directing, them to pay Sales and Use Taxes immediately, to pay all other Taxes in the ordinary course, and granting them such other and further relief to which they may be justly entitled.

Dated: November 16, 2010

        Respectfully submitted,

        **VINSON & ELKINS LLP**

        By: /s/ *Michaela C. Crocker*
            Daniel C. Stewart, SBT #19206500
            Paul E. Heath, SBT #093555050
            Michaela C. Crocker, SBT #24031985
            Richard H. London, SBT #24032678
            2001 Ross Avenue, Suite 3700
            Dallas, Texas 75201
            Tel: 214.220.7700
            Fax: 214.999.7787
            mcrocker@velaw.com
            rlondon@velaw.com

        **PROPOSED ATTORNEYS FOR THE DEBTORS**