IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 10-60149** |
| LACK'S STORES, INCORPORATED, *ET AL.,*[1] | § | |
| | § | **(Chapter 11)** |
| | § | **(Joint Administration Requested)** |
| DEBTORS. | § | |

## DECLARATION OF MELVIN LACK
## IN SUPPORT OF FIRST DAY PLEADINGS AND PAPERS

I, **MELVIN LACK**, declare the following to be true and accurate under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     "My name is Melvin Lack.  I am over twenty-one (21) years of age and am competent to make this declaration.  I am the Chief Executive Officer and President of Lack's Stores, Incorporated ("Lack's") and the President of Merchandise Acceptance Corporation ("Merchandise Acceptance"), Lack's Furniture Centers, Inc. ("Lack's Furniture"), and Lack Properties, Inc. ("Lack's Properties" and, together with Lack's, Merchandise Acceptance, and Lack's Furniture, the "Debtors").  Each Debtor is a Texas corporation  I was named President of Lack's in January 1978, and Chief Executive Officer of Lack's 1988.

2.     I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "Cases") on November 16, 2010 (the "Petition Date") and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the relief requested in the emergency motions and applications filed by the Debtors on the Petition Date (collectively, the "First Day Pleadings").

3.     The First Day Pleadings seek relief aimed at preserving and maximizing the value of the Debtors' estates by, among other things: (a) maintaining the Debtors' operations and retail properties pending their liquidation in an orderly manner; (b) maintaining employee confidence and morale; (c) ensuring the continuation of the Debtors' cash management system and other business operations without interruption; (d) establishing the procedure by which the Debtors may liquidate their merchandise in an orderly and expeditious fashion, and (e) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.  Through an orderly liquidation, over time, the Debtors hope to pay all creditors in full and provide a distribution to equity holders.

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, conversations with other members of the Debtors' management, or my opinion based upon my experience, knowledge, and information concerning the Debtors, their operations and assets, and the retail furniture industry.

## I.     BUSINESS OVERVIEW

### A.     The Debtors and Their 70-Year History

5.     Lack's is a Texas corporation with its corporate headquarters located in Victoria, Texas.  It is one of the largest independently-owned retail furniture chains in the United States. Lack's operates under the trade names "Lack's" and "Lack's Home Furnishings" and sells a complete line of furnishings for the home, including furniture, bedding, major appliances and home electronics.

6.     The nucleus of the current company was formed on February 28, 1938 by my parents, David and Rebecca Lack, when they opened a small auto supply store in Beeville, Texas.  Because of the chronic shortage of cars and new auto parts during World War II, the company diversified into furniture in an attempt to maintain sales volume.  Furniture did well, and so became a growing segment of Lack's total business.

7.     In 1952, by which time the company had expanded to five retail stores, Lack's made a commitment to become a furniture and appliance chain.  It continued to carry auto supplies, tires and other hardware items at all locations, but the merchandising emphasis switched to home furnishings.   The original automotive and hardware merchandise was eventually phased out in the 1970's.

8.     Today, Lack's remains a family owned business that operates 36 retail home furnishing stores in 26 cities located in Texas.[2]  These stores are supported by a 380,000 square foot state-of-the-art distribution center in Schertz, Texas, several cross-docking central delivery facilities, and a service center.  According to surveys by Furniture/Today, an industry newspaper, Lack's sales volume place it among the top furniture retailers in the country.  In 2007, Lack's was named Retailer of the Year by the National Home Furnishings Association.

9.     Lack Properties, a wholly-owned subsidiary of Lack's, is the owner of the real property and improvements associated with approximately fourteen store and warehouse locations that are leased to Lack's.[3]  The remaining store locations are leased by Lack's from third party lessors, including locations that are leased from lessors that are affiliated with various members of the Lack family.

10.     Since its inception, Lack's has financed a significant portion of its customers' purchases through the underwriting of "in store" financing.  Indeed, over the last several years,

---

[2] Lack's retail stores are located in Abilene, Alice, Austin (3), Bay City, Beeville, College Station, Corpus Christi (2), Del Rio, El Campo, Killeen, Longview, Lubbock (2), Lufkin, Midland, New Braunfels, Odessa, Port Lavaca, Portland, San Angelo, San Antonio (5), Sinton, Temple, Tyler, Uvalde, Victoria (2), and Waco.

[3] Merchandise Acceptance and Lack's Furniture are also wholly-owned subsidiaries of Lack's, each of which own limited or no assets and have no operations.

Lack's has financed approximately 70% of all customer sales. The book amount of customer notes receivable portfolio as of the Petition Date is more than $130,000,000. There are currently in excess of 75,000 customer notes receivable, the average balance of each note is approximately $1,700, and the average remaining term of each note is 18-24 months.

11.    Lack's services the customer notes portfolio with in-house employees. Lack's has historically collected approximately 95% of the balance of the customer notes receivable, even though such notes receivable are generally considered to be "sub-prime" by many credit institutions.

12.    Lack's revenue is derived from the sale of home furnishings and the interest earned from financing customer notes receivable. From February 1, 2010 (the beginning of Lack's fiscal year) through the Petition Date, Lack's has generated revenue of more than $122,000,000 and has operating profit of more than $1,000,000. Lack's currently employs approximately 886 persons.

**B.    Secured Credit Facility**

13.    Lack's is the borrower under that certain Second Amended and Restated Loan and Security Agreement dated as of July 10, 2007 (as amended from time to time, the "Senior Credit Agreement") among Lack's, The CIT Group / Business Credit, Inc., as agent (in such capacity, the "Agent"), and the other lenders from time to time party thereto (together with the Agent, the "Senior Lenders").[4] Lack's relationship with many of the Senior Lenders under the Senior Credit Agreement (or prior versions thereof) dates back to 1999. The Senior Credit Agreement, with a stated maturity date of October 31, 2010,[5] is a revolving credit facility. From 1999 through the maturity date, Lack's had never been in monetary default under the operative credit documents.

14.    As of the Petition Date, the aggregate principal amount of the advances currently outstanding under the Senior Credit Agreement is approximately $86,000,000, having been gradually reduced from $105,000,000 since January of 2009. Lack's obligations under the Senior Credit Agreement are guaranteed by Merchandise Acceptance, Lack's Furniture, Lack Properties, and Melvin Lack.[6] The Senior Lenders allege that the obligations under the Senior Credit Agreement are secured by a lien on substantially all of the Debtors' assets excluding certain real estate. The Senior Lenders do not, however, have dominion over all of the Debtors' bank accounts.

15.    In addition to liens held by the Senior Lenders, certain of the properties owned by Lack Properties and leased to Lack's are subject to mortgages held by third party lenders, including stores in Bay City, Abilene, Wichita Falls (now closed), and Longview, as well as warehouse/distribution centers in Schertz and San Antonio.

---

[4] The current Senior Lenders include The CIT Group / Business Credit, Inc.; U.S. Bank National Association; PNC Bank, National Association; Capital One Leverage Finance Corp.; and JPMorgan Chase Bank, N.A.

[5] By agreement, the maturity date was subsequently extended through and including November 12, 2010.

[6] My personal obligations under the guarantee are limited. I am not a debtor in these Cases, and I am represented by separate counsel in the Cases.

## C.     Trade Creditors

16.     In the ordinary course of business, the Debtors purchase merchandise from an assortment of vendors, including furniture, bedding, home electronics, and appliance manufacturers.  The Debtors estimate that, as of the Petition Date, the general unsecured claims held by trade vendors against their respective estates are no more than $12,000,000 in the aggregate.  The Debtors' three largest vendors[7] account for approximately 60% of the amounts payable to trade creditors.

## D.     Events Leading to the Chapter 11 Cases

17.     As a result of the economic slowdown, consumer demand in general – and the demand for home furnishings in particular – decreased sharply starting in the second half of 2008.  The decreased demand caused an approximate 20% decrease in Lack's revenues starting at the end of its 2008 fiscal year.  Notwithstanding this decrease, Lack's was able to reduce expenses and reach a monthly breakeven position by February 2009.  The effort to recover revenues and control expenses has continued.  Revenue and profitability have continued to improve during 2010.

18.     At the same time, the national economic slowdown resulted in an unprecedented tightening of credit markets.  The Senior Lenders stated that they would not refinance or restructure the obligations under the Senior Credit Agreement on terms that would allow the Debtors to continue their operations.  The Debtors have been unable to identify an alternative financing source for their business operations since the overwhelming majority of their customers are rated sub-prime, notwithstanding those customers' and Lack's great historical and current track record of payment and collection, respectively.

19.     Without an alternative funding source, Lack's will be unable to finance the purchase of new inventory or to underwrite additional customer notes receivable.  As a consequence, the Debtors determined that it was appropriate to commence these Cases in order to maximize the value of their assets for the benefit of their creditors and equity holders and to conduct an orderly – as opposed to forced – liquidation, utilizing cash collateral to effect the wind-down that is anticipated to pay all creditors in full.

## E.     The Chapter 11 Cases

20.     The Debtors submit that these Cases will have two macro components or goals. First, the Debtors will request that the Court approve the commencement of "Store Closing" sales so that the Debtors (working with Hilco Merchant Resources, LLC ("Hilco")[8]) may sell their remaining inventory in a prompt and efficient manner designed to maximize recoveries and reduce the costs of operations.  Second, the Debtors intend to propose a chapter 11 plan that will provide for the collection of the customer notes receivable portfolio in the ordinary course of

---

[7] Comprised of Sealy Mattress Company, Lane Furniture Industries, and Brownchild Ltd. Inc.

[8] Pursuant to the Debtors' agreement with Hilco, Hilco is permitted to joint venture with SB Capital Group, LLC ("SB") with respect to the "Store Closing" sales.

business and the marketing and disposition of their real estate interests over time and in such a manner as to maximize their value for the benefit of the estates.

21.     The Debtors anticipate that the orderly liquidation of their inventory and fixtures, ordinary course collection of customer notes receivable, and the marketing and disposition of real property interests and other miscellaneous assets will satisfy in full the claims of the Senior Lenders under the Senior Credit Agreement and likely the claims of all other creditors with a return available to the equity holders.

## II.     FIRST DAY PLEADINGS

22.     Concurrently with the filing of their respective Petitions, the Debtors filed the First Day Pleadings.[9]  I believe the relief sought in these pleadings is necessary to enable the Debtors' businesses to operate with a minimum of disruption and loss of productivity. The Debtors intend to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules.

23.     I have reviewed the First Day Pleadings listed below and the allegations contained in each are true and correct to the best of my knowledge, information, and belief.

**Administrative and Procedural Matters:**

a.     Debtors' Notice of Designation as Complex Chapter 11 Cases (the "Notice of Complex Designation");

b.     Debtors' Emergency Motion for Joint Administration of Cases (the "Joint Administration Motion");

c.     Debtors' Emergency Motion for Approval of the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Notification Motion"); and

d.     Debtors' Emergency Motion for Extension of Time to File Schedules and Statements of Financial Affairs (the "Motion for Extension of Time").

**Substantive Motions:**

a.     Debtors' Emergency Motion for Interim and Final Orders Approving Use of Cash Collateral and Grant of Adequate Protection (the "Cash Collateral Motion");

b.     Debtors' Emergency Motion for Interim and Final Orders Approving (I) Maintenance of Certain Prepetition Bank Accounts and Cash Management

---

[9] Capitalized terms used in this Declaration, but not defined, have the meanings set forth in the respective First Day Pleadings.

System and (II) Continued Use of Existing Checks and Business Forms (the "<u>Cash Management Motion</u>");

c.    Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Commissions to Employees and (B) Pay Prepetition Benefits and to Continue Specified Benefit Programs in the Ordinary Course and (II) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations (the "<u>Employee Motion</u>");

d.    Debtors' Emergency (I) Motion for Authority to (A) Conduct Store Closing Sales and (B) Assume Consulting Agreement and (II) Application for Order Authorizing Retention of Hilco Merchant Resources, LLC as Consultant to the Debtors (the "<u>Motion to Conduct Store Closing Sales and Application to Employ Hilco</u>");

e.    Debtors' Emergency Motion for Order Authorizing Payment of Prepetition Taxes (the "<u>Tax Motion</u>"); and

f.    Debtors' Emergency Motion for Order Providing Adequate Assurance of Utility Payments (the "<u>Utility Motion</u>").

## A.    Administrative and Procedural Matters

### <u>Notice of Complex Designation</u>

24.    I am aware of the requirements for complex designation set forth in the <u>Procedures for Complex Chapter 11 Bankruptcy Cases</u> adopted in this District. Currently, Lack's has total debt of more than $10 million and there are more than 50 parties in interest in its Case. I believe that application of the complex case procedures to these Cases will assure appropriate notice of the filings in these Cases, assist in the efficient administration of the estates, and serve the best interests of the Debtors and their creditors and equity holders.

### <u>Joint Administration Motion</u>

25.    Pursuant to the Joint Administration Motion, the Debtors request that the Court authorize and direct the joint administration and consolidation of the Cases for procedural purposes only. I am aware that many, if not all, of the motions, applications, and other pleadings filed in these Cases will relate to relief sought jointly by all of the Debtors. Joint administration of the Cases, for procedural purposes only, under a single docket entry, will ease the administrative burdens on the Court by allowing these Cases to be administered as a single joint proceeding instead of four independent chapter 11 cases.

26.    Joint administration of these Cases will also create a centralized location for the numerous documents that are likely to be filed and served in these Cases and for all notices and orders entered by the Court. A single docket will make it easier for all parties in each of the Cases to stay apprised of the various matters before the Court. The Debtors will also likely realize substantial cost savings and reduced administrative burdens by sending notices to a single

matrix or master service list, as the case may be, rather than maintaining several separate notice lists.

27.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Joint Administration Motion.

## Notification Motion

28.     There are several thousand creditors and parties in interest in these Cases.  The size and magnitude of the noticing process to parties in interest makes it impracticable for the Clerk to undertake that task.  The Debtors maintain lists of the names and addresses of all such entities on various computer programs that permit the Debtors or an outside firm to print mailing labels for each such entity.  The Debtors respectfully submit that the most effective and efficient manner by which to accomplish the process of photocopying and transmitting notices in these Cases is to authorize an independent third party to act as an authorized noticing agent of the Court.  The Debtors will separately file an application to employ a claims and noticing agent to serve this purpose.

29.     As part of their notice procedures, the Debtors are requesting authority, where possible, to serve all relevant pleadings via e-mail.  I believe that electronic service of documents will not only increase the effectiveness of emergency notice by virtually eliminating delivery delays, it will also preserve estate resources by reducing copy and delivery charges, particularly overnight or expedited delivery charges.

30.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Notification Motion.

## Motion for Extension of Time (Schedules and Statements)

31.     In the Motion for Extension of Time, the Debtors request that they be granted forty-five (45) days[10] to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively the "Schedules and Statements"), without prejudice to their ability to request additional time if necessary.

32.     The Debtors' management and employees, together with the Debtors' outside legal and financial advisors, have begun compiling the information necessary to complete the Schedules and Statements. While the Debtors maintain extensive books and records, completing the Schedules and Statements will require the collection, analysis, and compilation of a significant amount of data.  Meanwhile, the Debtors are experiencing the considerable stresses of preparing for the filing of these Cases, transitioning into chapter 11, preparing to conduct store closing sales, and the preexisting, ongoing responsibilities of operating their business.

---

10 The Debtors have requested an additional thirty-one (31) days beyond the fourteen (14) day period prescribed by Bankruptcy Rule 1007(c), for a total of forty-five (45) days from the Petition Date.

33.   Thus, due to the number of creditors, the size of the Debtors' business, and the limited staffing available to gather, process, and complete the Schedules and Statements, I do not believe that fourteen (14) days will be sufficient to complete the Schedules and Statements. Granting the Debtors additional time to collect the data needed to prepare and file the Schedules and Statements will greatly enhance their accuracy.

34.   For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Motion for Extension of Time.

## B.   Substantive Matters

### Cash Collateral Motion

35.   The Debtors need immediate authorization to use Cash Collateral in order to conduct the orderly liquidation of their businesses and assets for the benefit of all stakeholders. By having immediate access to cash that is sufficient to enable the Debtors to operate their businesses, the value of the estates will be preserved and enhanced. Use of Cash Collateral (including cash generated from the collection of customer notes receivable) will be the sole source of working capital with which to operate the Debtors' businesses.  Absent immediate authority to use Cash Collateral to fund their day-to-day operations, I believe that the Debtors could be compelled to immediately shut down their operations, which would bring the Debtors' pending orderly liquidation to a halt.  In sum, the failure to obtain authorization for the use of Cash Collateral could be disastrous to the Debtors and their creditors and result in immediate and irreparable harm to these estates and their creditors.  I believe that the Senior Lenders will remain more than adequately secured at all times during this process.

36.   For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Cash Collateral Motion.

### Cash Management Motion

37.   Cash Management.  Before the commencement of these Cases, the Debtors, in the ordinary course of business, used an automated and integrated cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System").  Importantly, the Debtors' Cash Management System allows for an integrated method for accounting for revenues and expenses to be collected and paid, and permits the Debtors to maintain detailed records of all transfers made.  With periodic adjustments, the Debtors have used the current Cash Management System since November 2009.

38.   I believe that the Cash Management System is essential to the ordinary operation of the Debtors' business.  Changing their bank accounts and creating a new cash management system would not only force the Debtors to incur significant and unnecessary costs and expenses, but would also completely impair the operation of the Debtors' business.  The Cash Management System is highly computerized and automated, and it completely and accurately tracks and

accounts for all transactions. Forcing the Debtors to employ a new cash management system would cause confusion, disrupt payments, and introduce inefficiency at a time when efficiency is most critical.

39.     Bank Accounts.   The Debtors operate approximately 36 stores and maintain approximately 63 bank accounts at various banks and financial institutions across Texas and one account in Oklahoma holding funds required under the Oklahoma Warranty Insurance Act. A flow chart explaining the Debtors' Cash Management System may be found at Exhibit A to the Cash Management Motion, and a complete list of bank accounts may be found at Exhibit B to the Cash Management Motion.

40.     I understand that the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases. I believe that, under the circumstances, a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new postpetition bank accounts be opened is warranted. If enforced in these Cases, I believe that such requirements would cause significant and unnecessary disruption in the Debtors' business, thereby impairing their efforts to liquidate in a timely and orderly manner and pursue opportunities to maximize the value of the estates.

41.     Business Forms. Prior to the Petition Date and in the ordinary course of business, the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "Business Forms"). In order to minimize expenses to the Debtors' estates, the Debtors are requesting authorization to continue to use all Business Forms subsequent to the Petition Date, without reference to the Debtors' status as debtors in possession. I believe that requiring the Debtors to change their business forms would be expensive and burdensome to the Debtors' estates and extremely disruptive to the Debtors' business operations. Consequently, I believe that the costs and potential disruption are not justified in these Cases.

42.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Cash Management Motion.

### Employee Motion

43.     Wages, Salaries, and Other Compensation.   As of the Petition Date, Lack's employed approximately 886 individuals, 829 on a full-time basis, 53 on a part-time basis, and 4 temporary/contract employees (collectively, the "Employees"). All Employees are employed through Lack's, which is the only debtor owing Employee Obligations and continuing Employee Benefits.

44.     Non-Commission Based Payroll.   Non-commission based payroll is paid in arrears on a bi-weekly basis and averages approximately $840,000 per period, with an additional $250,000 being remitted on account of payroll taxes.

45.     The last prepetition, non-commission payroll was paid on November 5, 2010, covering the period of October 16 through October 29, in the amount of $820,202, with an

additional $244,551 being remitted on account of payroll taxes. The first postpetition, non-commission payroll is scheduled to be paid November 19, 2010, covering the period from October 30 through November 12, in the estimated amount of $820,202, with approximately $244,551 to be remitted on account of payroll taxes. The second postpetition, non-commission payroll is scheduled to be paid December 3, 2010, and will include three prepetition days (November 13 through 15).

46.    Commission Based Payroll. Commission-based payroll is paid monthly in arrears on or about the 15th of each month and averages approximately $195,000 per period, with an additional $40,000 being remitted on account of payroll taxes.

47.    The last prepetition, commission-based payroll was paid October 15, 2010, covering the month of September, in the amount of $158,035, with an additional $41,648 being remitted on account of payroll taxes.

48.    The first postpetition, commission based payroll is scheduled to be paid on or after November 19 2010, covering the month of October 2010, in the estimated amount of $158,035, with approximately $41,648 to be remitted on account of payroll taxes. The second postpetition, commission based payroll is scheduled to be paid on or about December 15, and will include the prepetition period of November 1 through 15. The estimated prepetition commissions for this period are $79,017, with an additional $20,824 to be remitted on account of payroll taxes.

49.    Incentive Compensation. In addition to bi-weekly payroll and monthly commission checks, certain Employees are also entitled to bonus commissions and "push money" incentives for meeting certain sales quotas, including incentives for selling specified merchandise and/or services. Many of these incentives are tied to customer delivery dates and, as such, may lag several weeks behind the actual sale date. It is estimated that incentive-based compensation owing for the prepetition period is approximately $43,000. The Debtors do not intend to pay bonus commissions or push money incentives on goods sold postpetition.

50.    Termination Payments. Prepetition, Lack's paid its employees termination of service payments upon termination of employment (excluding termination for cause), with full benefits during the termination pay period. As of the Petition Date, one (1) Employee is entitled to termination pay in the amount of approximately $80.00. In relation to postpetition store closings, Lack's proposes to offer the following termination payments: (a) regular full-time Employees employed for more than six months, but less than one year, will receive one week termination pay and (b) regular full-time Employees employed more than one year will receive two weeks termination pay.

51.    Employment and Withholding Taxes. The Debtors, in the ordinary course of business, accrue state, local and federal employment and withholding taxes (the "Employment and Withholding Taxes") as wages are earned by the Debtors' employees, which taxes are calculated based upon statutorily mandated percentages of earned wages. The Debtors historically have timely paid all Employment and Withholding Taxes to the relevant taxing authority by check or automated transfer as required, which is usually on a monthly or quarterly basis, or immediately prior to, on or within a specified number of days of, each payroll date.

52.     I am aware that the Employment and Withholding Taxes may be considered "trust fund" taxes, and that Lack's officers and directors may be held personally liable for the payment of such funds.  Any suits or other actions instituted against the Debtors' officers and directors would prove extremely distracting for the Debtors, the named officers and directors whose immediate and full-time attention to the Cases is required, and this Court, which may be asked to entertain various motions seeking injunctions relating to the potential state court actions.  As such, I believe that it is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions by the timely payment of the Employment and Withholding Taxes.

53.     Paid Leave.  The Debtors also provide Employees with sick days, bereavement leave, and vacation pay.  It is estimated that no more than $350,000 is owed to Employees on account of accrued vacation to be taken during the 2010 fiscal year.  The Debtors seek authority to continue to offer paid leave to Employees in the ordinary course, including permitting their Employees, to the extent eligible, to utilize vacation days accrued prepetition in the ordinary course of business, or to be paid for such vacation days in lieu of days off.  Postpetition, Employee vacation will not accrue for those Employees who are terminated prior to April 1, 2011.  All other Employees will continue to accrue vacation benefits in the ordinary course of business.

54.     Reimbursable Business Expenses.  Prepetition, in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment.  The Employees incurred the reimbursable expenses on the Debtors' behalf in connection with their employment and in reliance upon the understanding that such expenses would be reimbursed.  I believe that the failure to reimburse the Employees would detrimentally affect Employee morale and may cause a financial hardship for Employees with outstanding, prepetition, reimbursable expenses.  Accordingly, the Debtors seek to pay reimbursable expenses in the ordinary course of business.

55.     Employee Benefits.  In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including medical/dental insurance, basic and voluntary life and accidental death and dismemberment insurance, short- and long-term disability benefits, a retirement savings plan, and paid leave benefits (collectively, the "Employee Benefits").  The Employee Benefits that the Debtors seek to continue in the ordinary course, as more fully described in the Employee Motion, are:

| Benefit | Administrator | Est. Prepetition Amounts Owed |
|---|---|---|
| Medical/Dental | Benefits Administrative Consultant | $32,000 |
| Basic and Voluntary Life and AD&D Insurance | N/a | $5,000 |
| Short- and Long-Term | N/a | $2,249 |

| Benefit | Administrator | Est. Prepetition Amounts Owed |
|---------|---------------|-------------------------------|
| Disability | | |
| Retirement Savings | Reliance Trust Company | $0 |
| Paid Leave | N/a | To be Used or Paid Out in the Ordinary Course |
| Associate Injury Program | ProcessOne, Inc. | $0 |
| Termination Pay | N/a | $80 |

56.     The Debtors' books and records indicates that: (a) other than amounts related to the period immediately prior to the Petition Date, the Debtors are current on all Employee Obligations and (ii) as of the Petition Date no single Employee is owed in excess of the $11,725 statutory cap imposed by 11 U.S.C. § 507(a) for prepetition services rendered.

57.     I believe that the amounts requested to be paid to the Employees pursuant to the Employee Motion are reasonable compared with the importance and necessity of preserving Employee loyalty and morale, and with the difficulties and losses the Debtors likely will suffer if those amounts are not paid.  I believe that, if the Employee Obligations are not paid, and the Employee Benefits not continued postpetition, the Debtors will suffer an immediate reduction in staff that will hamper their efforts towards an orderly liquidation of store merchandise, which will decrease the overall value of the estates.  Moreover, if the Employee Obligations are not paid in the ordinary course of business, I believe that the Employees will suffer personal hardship, would not receive needed medical services, and in some cases, would be unable to pay basic living expenses.

58.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Employee Motion.

### Motion to Conduct Store Closing Sales and Application to Employ Hilco

59.     Store Closing Sales.  After considering and exploring various alternatives to maximize the value of their estates, the Debtors decided, in the exercise of their business judgment, to conduct an orderly wind-down of their retail stores.  Upon determining to close their stores, the Debtors considered a number of possibilities regarding the timing and structure of the store closing sales, including whether to conduct the sales themselves, to engage a liquidation firm under a consulting agreement, or to sell the inventory to a liquidation firm.  The Debtors received formal proposals (on both sale and consulting bases) from three reputable and industry-leading liquidation firms, and ultimately accepted an offer from Hilco Merchant Resources, LLC ("Hilco") to serve as consultant in connection with the store closing sales.  I

personally negotiated the terms of the Hilco consulting agreement (the "Consulting Agreement")[11] in consultation with Debtors' counsel, Vinson & Elkins LLP.

60.      I believe that a necessary component of the Debtors' wind-down is an orderly liquidation of the merchandise in the retail locations and distribution center pursuant to the Consulting Agreement.  Assumption of the Consulting Agreement, coupled with the store closing sale procedures set forth in the motion, will help ensure that the highest possible price will be received for the assets and that the assets will be sold in an efficient and expeditious manner.  Moreover, I believe that selling the assets in the proposed store closing sales will maximize recovery for the Debtors' estates because the sales will increase customer traffic in the stores and because such orderly sales will yield more value for the estates than would any other alternative.  I believe that maximizing recovery for the Debtors' estates through assumption of the Consulting Agreement and from the store closing sales is the best option available to the Debtors and is an exercise of the Debtors' sound business judgment.

61.      After reviewing multiple proposals, I believe that the Debtors' engagement of Hilco reflects normal business terms in the marketplace.  No inventory will be sold to Hilco; rather, Hilco will earn a "Base Fee" and an "Incentive Fee" relating to sales of the Debtors' Merchandise and Additional Goods and a commission relating to the sale of furniture, fixtures, and equipment ("FF&E").  Specifically, Hilco will earn a fee equal to $4,500 per store (the "Base Fee") plus 20% of Net Proceeds of the Sale (each, as defined in the Consulting Agreement) of the Merchandise and the Additional Goods at the Stores in excess of 64.4% of Cost Value for such Merchandise and Additional Goods (the "Incentive Fee").  The Base Fee is to be paid weekly in 10 installments.  The Incentive Fee is to be paid in connection with a final reconciliation.  Hilco will also earn a commission equal to 15% of the proceeds (net of applicable sales taxes) from the sale of FF&E.  The Debtors have evaluated proposals to conduct the Store Closing Sales by three industry-leading liquidation firms and have found that Hilco's pricing and fee structure is competitive with the other proposals.

62.      Application to Employ Hilco.  The Debtors are requesting authority to employ Hilco as their liquidation consultants.  I believe that Hilco's retention is in the best interests of the Debtors' estates and creditors and that such retention will maximize the value realized by the Store Closing Sales.  I believe that the services to be rendered by Hilco would be superior to those to be rendered by the two other liquidators who submitted proposals to the Debtors.  I am aware that Hilco is a preeminent consulting firm specializing in strategic asset disposition advisory services, and I believe that Hilco is both well-qualified and uniquely able to represent the Debtors in these Cases in a most efficient and timely manner. Moreover, it is my belief that the compensation plan set forth in the Hilco Application is reasonable, necessary, and appropriate.

63.      For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Motion to Conduct Store Closing Sales and Application to Employ Hilco.

---

11 As set forth above, pursuant to the Consulting Agreement, Hilco is permitted to joint venture with SB with respect to the "Store Closing" sales.

DECLARATION OF MELVIN LACK N SUPPORT OF
FIRST DAY PLEADINGS AND PAPERS                                                        Page 13 of 15
US 634218v.10

## Tax Motion

64.     By the Tax Motion, the Debtors seek authority to pay prepetition sales, use, trust-fund, franchise, and other taxes (however denominated, the "Taxes") and related obligations owed to the appropriate federal, state, and local taxing or related authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as such payments become due and payable and to the extent adequate funds are available to make such payments. The Debtors historically have timely paid all Taxes to the relevant authority.  As such, I believe that the only Taxes immediately payable in accordance with the Tax Motion are sales and use taxes collected in the period preceding the Petition Date in the approximate amount of $900,000.

65.     Payment of the prepetition Taxes is critical to the Debtors' continued, uninterrupted operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and possibly seeking to impose personal liability on the Debtors' officers and directors for certain unpaid taxes, all of which could disrupt day-to-day operations and could potentially impose significant costs on these estates.  I believe that the authority to pay the Taxing Authorities in accordance with the Debtors' prepetition business practices will enable the Debtors to continue to operate their business in chapter 11 without disruption, pending the orderly liquidation of the estates.

66.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Tax Motion.

## Utilities Motion

67.     The Debtors use electric, water, telephone, internet, and similar services from numerous service providers as set forth on Exhibit A to the Utility Motion.  Uninterrupted utility service, including telephone and internet-based communication between and among the stores, distribution centers, and corporate headquarters, is critical to the Debtors' operations. Loss of utility service at any store would require cessation of that store's operations, and loss of utility service at a distribution center would cripple the Debtors' supply chain.

68.     The Debtors expect that funds generated by postpetition liquidation will be sufficient to satisfy postpetition obligations to utility providers.  Moreover, I believe that the procedures set forth in the Utility Motion adequately protect the rights of the utility providers and that deposits in an amount equal to two-weeks' worth of utility service are sufficient adequate assurance of the Debtors' future payments to the utility providers

69.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Utility Motion.

70.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest in these Cases that the Court grant the relief requested in the Customer Deposits Motion.

### III.   CONCLUSION

71.    The Debtors' ultimate goal is to realize on the value of their assets over a period of time in order to pay creditors in full and provide a distribution to equity holders.  In the near term, however, to minimize any loss of value during the pendency of these Cases, the Debtors' immediate objective is to continue to operate their business, with as little interruption or disruption as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful and orderly liquidation of the Debtors' business will be substantially enhanced."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 16, 2010

_____

Melvin Lack
Chief Executive Officer and President of
Lack's Stores, Incorporated