**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 10-60149** |
| LACK'S STORES, INCORPORATED, | § | |
| *ET AL.,* | § | **(CHAPTER 11)** |
| | § | |
| DEBTOR. | § | **(Jointly Administered)** |
| | § | |

**REPLY OF THE WILKERSON ENTITIES IN SUPPORT OF MOTION OF THE
WILKERSON ENTITIES (A) TO COMPEL TIMELY PERFORMANCE OF POST-
PETITION LEASE OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(D)(3)
OR, (B) IN THE ALTERNATIVE, FOR THE ALLOWANCE OF
ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. § 503(B)(1)
[RELATES TO DOC. NOS. 231, 428]**

The Wilkerson Entities file this reply (the "Reply") and legal memorandum in support of

the *Motion of the Wilkerson Entities in Support of the Motion of the Wilkerson Entities (a) to*

*Compel Timely performance of Post-petition Lease Obligations Pursuant to*

*11 U.S.C. § 365(d)(3) or, (b) in the Alternative, for the Allowance of Administrative Expense*

*Claims Pursuant to 11 U.S.C. § 503(b)(1)* [Doc. No. 231] (the "Motion"),[1] and in response to the

objection [Doc. No. 428] (the "Objection") filed by CIT Group/Business Credit, Inc. ("CIT").

## I.   SUMMARY OF REPLY

1.   In its Objection, CIT contends that some courts have applied the "accrual"

approach to post-petition lease obligations.  As noted in the Motion, this approach is but one of

two approaches applied to motions such as the one filed by the Wilkerson Entities, seeking

payment under 11 U.S.C. § 365(d)(3).  CIT fails to acknowledge that the "billing date" approach

has garnered support by an overwhelming majority of Bankruptcy and Circuit courts, as well as

most courts in the Fifth Circuit.  For the reasons that follow, this Court should do the same.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

3293471.1

## II.   REPLY AND AUTHORITY

*Accrual vs. Billing Date Approach*

2.      Section 365(d)(3) was added to the Bankruptcy Code in 1984, based on perceived inequities between landlords and their bankrupt tenants.  Before that time, the typical remedy for a party to an unexpired lease who is suffering economic losses as a result of a bankruptcy was to move for an order compelling the bankruptcy trustee to assume or reject the lease within a certain time period pursuant to section 365(d)(2) of the Bankruptcy Code.  *See Memphis-Shelby Counts v. Braniff Airways, Inc.,* 783 F.2d 1283, 1285 (5th Cir. 1986).  Section 365(d)(3) was added to give landlords more certainty of payment during the post-petition period while the debtor-tenant decided what to do with the leases.  However, as discussed below, courts remain split on what happens if the debtor does not abide by section 365(d)(3).  As discussed below, the split of authority now favors an application of the "billing date" approach, based on a clear reading of the plain language of the statute.

3.      According to an oft-quoted statement of Senator Hatch on the amendment:

> This subtitle contains three major substantive provisions which are *intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code*. . . . A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments under the lease. In this situation, the landlord is forced to provide current services -- the use of its property, utilities, security, and other services -- without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance

> requirement will insure that debtor-tenants pay their rent, common
> area, and other charges on time pending the trustee's assumption or
> rejection of the lease.

H.R. Rep. No. 882, 95th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 576 (emphasis added).

Since its enactment, courts have split on the effect of the provision.

4.      Judge Greendyke was one of the first courts to address the accrual/billing date

issue.  In *In re AppletreeMarkets*, 139 B.R. 417 (Bankr. S.D. Tex. 1992), the debtor commenced

its case on January 2, 1992, the day after rents, utilities and 1991 ad valorem taxes came due

under the lease.  The landlords filed motions to compel prorated rents for January. Said Judge

Greendyke:

> The Supreme Court in *Union Bank v. Wolas[]*, in construing a
> 1984 Amendment to the Code and the effect of its legislative
> history stated that "*the fact that Congress may not have foreseen
> all of the consequences of a statutory enactment is not sufficient
> reason for refusing to give effect to its plain meaning*."[] As
> discussed above, the plain meaning of Section 365(d)(3) provides
> for payment of obligations arising after the petition is filed, not
> before.

*Id.* at 420 (quoting in *Union Bank v. Wolas*, 116 L. Ed. 2d 514, 112 S. Ct. 527 (1991); and citing

*Toibb v. Radloff*, 115 L. Ed. 2d 145, 111 S. Ct. 2197 (1991)) (emphasis added).   Judge

Greendyke found the equities to lie with the landlords in this instance, because by filing on the

second day of the month, the debtor was able to avoid paying rents, utilities and taxes as

administrative expenses.  *See id.* at 420-21.

5.      However, Judge Greendyke explained that equity did not prevail over the clear

language of the statute.  Instead, he concluded that the statute only required the debtor to perform

obligations to the extent they arise on or after the bankruptcy petition date.  For that reason, the

Court denied the landlords' motion to compel payment of prorated rents for the first month of the case. *Id.* at 421. In so holding, the Court did *not* decide the issue of payment of utilities and taxes, noting that the issues were not properly before him, but did decide that there was no basis in law to adopt the "accrual" which CIT now argues in its Objection.

6. A few years later, in *In re Krystal Co.,* 194 B.R. 161, 164 (Bankr. E.D. Tenn. 1996) (Cook, J.), the Court addressed this issue. At the time, *Child World* appeared to be the majority position.[2] Nevertheless, the Court in *Krystal* explained why the so-called "billing date" approach was the one best supported by the unambiguous language of section 365(d)(3). Said the Court:

> From a reading of the statute and its legislative history, it appears that Congress specifically intended to except a tenant's lease obligations to his landlord from the workings of the Code's administrative expense provisions because Congress believed nonresidential landlords and their other solvent tenants were particularly vulnerable creditors under the old procedures. Rather than forcing the landlord to take the initiative, apply for, and wait for an administrative expense allowance, as it was required to do before 1984, Congress intended § 365(d)(3) to shift the burden of indecision to the debtor: the debtor must now continue to perform all the obligations of its lease or make up its mind to reject it before some onerous payment comes due during the prerejection period. That is a sensible adjustment of this particular debtor-creditor relationship.

*Id.* at 164. For that reason, the Court held that the statute "requires a debtor under an unexpired, nonresidential real estate lease to perform the obligations of that lease, including the

---

[2] The cases cited were *Schneider & Reiff v. William Schneider, Inc. (In re William Schneider, Inc.),* 175 B.R. 769 (S.D. Fla. 1994); *Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.),* 161 B.R. 571 (S.D.N.Y. 1993); *In re All For A Dollar, Inc.,* 174 B.R. 358 (Bankr. D. Mass. 1994); *In re Almac's, Inc.,* 167 B.R. 4 (Bankr. D. R.I. 1994). This is the line of cases cited by CIT.

reimbursement of real estate taxes paid by the landlord, *at the time they come due according to the terms of the lease*." *Id.* (emphasis added).

7.     That same year, the Sixth Circuit became the first Circuit Court to address this issue.  In *Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.),* 203 F.3d 986, 988 (6th Cir. 1996), the Court of Appeals for the Sixth Circuit adopted the "billing date" approach.  In that case, the debtor rejected its lease and vacated the premises on the second day of the month.  *Id.*  Several weeks later, the landlord filed a request for payment of the full month's rent, which was due on the first day of the month.  *Id.*  The debtor opposed the motion, arguing that it should only have to pay the prorated amount for the first two days of the month during which the debtor actually occupied the premises.  *Id.*  The Sixth Circuit disagreed, holding that the lease required payment for the full month's rent on the first day of each month, and that section 365(d)(3) unambiguously required performance of the obligation to pay rent in full when it came due.  *See id.* at 989.

8.     In following this strict approach, the Court of Appeals for the Sixth Circuit specifically rejected the debtor's arguments for an equitable application of the "proration approach."  *Id.*  The court found nothing inequitable about requiring full payment of the lease obligation, particularly where the debtor controlled its own destiny.  Said the Court:

> The debtor alone was in the position to control [the landlord]'s entitlement to payment of rent for December. If the debtor had rejected the lease effective November 30, 1997, rather than December 2, it would not have been obligated to pay rent for December under 11 U.S.C. § 365(d)(3).  Instead, an election was made to reject the lease effective December 2, one day after the debtor's monthly rent obligation would arise.

*Id.*

9.      The seminal opinion employing the "proration" approach, as CIT cites, is *Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.)*, 161 B.R. 571 (S.D.N.Y. 1993).   In that case, the lease at issue provided that the debtor would be responsible for reimbursing the landlord for taxes upon the presentation of a bill from the landlord that such taxes had been paid.  *Id.* at 572.  When the landlord presented a bill for $47,451.46 after the petition date, the debtor argued that it was only required to pay the portion of that amount attributable to the period after the petition date but before the rejection date.  *Id.* at 572-73.  The bankruptcy court disagreed, and focused on the plain language of the statute to conclude that the debtor was obligated to pay the full tax reimbursement because the obligation to reimburse arose upon the presentation of the bill, which occurred during the post-petition/pre-rejection period. *Id.*at 573.  The District Court reversed.

10.      On appeal, the District Court focused on the case law before the 1984 amendments, when post-petition rents and obligations to reimburse landlords for taxes were deemed to be administrative expenses under section 503(b)(1), to the extent they were reasonable, actual and necessary.  *See id.* at 574-75.  The *Child World* Court believed that the 1984 amendments did not change the pre-1984 case law significantly.

> Section 365(d)(3) altered the existing law for nonresidential leases by fixing the amount to be paid by debtor-tenants pending assumption or rejection of the lease at the amount provided in the lease, thus removing the bankruptcy courts' power to review the terms of the lease for reasonableness, and by requiring these payments to be paid "at the time required in the lease."

*Id.* at 575.  The Court believed that the addition of section 365(d)(3) only required the debtor to pay for "current services" provided by the landlord during the post-petition/pre-rejection period,

but did not "overturn the long-standing practice under § 503(b)(1) of prorating debtor-tenants'
rent to cover only the postpetition, prerejection period, regardless of billing date." *Id.* at 575-76.
In rejecting the stricter approach, the *Child World* Court explained that it simply did not believe
Congress intended to make the "billing date" determinative of when an obligation arises for
purses of section 365(d)(3). *Id.* at 576. In a more recent decision out of the Southern District of
New York, Judge Gropper continued to follow the proration approach, but did so with reluctance
in light of the District Court's reversal of his prior decision and the overwhelming "weight of
authority" for the adoption of the billing date approach. *See In re Stone Barn Manhattan LLC,*
398 B.R. 359, 368 (Bankr. S.D.N.Y. 2008).

       11.     The *Child World* Court also criticized Judge Greendyke's ruling to be an extreme
case that could not have been intended by Congress in amending the Bankruptcy Code.

> In *Appletree*, the court held that monthly, quarterly, and annual
> rent falling due, under the terms of the lease, one day before the
> debtor filed its petition, but relating almost entirely to the
> postpetition period, did not have to be paid at all. Following the
> logic of this case, if the debtor-tenant's rent consisted of a single
> annual payment, and this payment did not come due during the
> postpetition, prerejection period, the landlord would receive
> nothing from the debtor-tenant under § 365(d)(3) pending
> assumption or rejection of the lease. This is not what Congress had
> in mind when it acted to ensure that landlords received timely
> payment for the services they are forced to provide pending
> assumption or rejection of the lease.

*See In re Child World, Inc.,* 161 B.R. at 576. But since Judge Greendyke's 1992 decision,
several courts have followed the same "plain reading" approach. First, the Sixth Circuit adopted
the "billing date" approach in *Koenig Sporting Goods*, discussed *supra.*

12.     Second, the Third Circuit adopted the "billing date" approach in *Centerpoint Properties v. Montgomery Ward Holdings Corp. (In re Montgomery Ward Holdings Corp.),* 268 F.3d 205 (3d Cir. 2001).  In that case, a split panel for the Third Circuit adopted the "billing date" approach, finding it to be "a straightforward interpretation that produces a rational result" and the only interpretation consistent with the plain language of section 365(d)(3).  *See id.* at 210.

13.     The lease in *Montgomery Ward* imposed an obligation on the tenant to reimburse the landlord for taxes upon the tenant's receipt of an invoice from the landlord, even if the taxes assessed may not become due and payable until after the end of the lease term.  *See id.* at 207. The debtors filed their chapter 11 petitions on July 7, 1997.  The landlords submitted invoices to the debtors four days later, covering two pre-petition installments and requiring the debtors to escrow taxes for the 1997 tax year (which had not yet been assessed).[3]  The parties disputed whether post-petition invoices for pre-petition tax periods could fall within the "obligations" to be paid under section 365(d)(3).  The majority panel for the Court held that they were, explaining that "an obligation arises under a lease for purposes of § 365(d)(3) when the legally enforceable duty to perform arises under that lease."  *See id.* at 211 (citing *In re Koenig Sporting Goods, Inc.,* 203 F.d at 986; *In re R.H. Macy,* 152 B.R. at 873).

14.     In adopting this theory, the majority in *Montgomery Ward* explained why it diverged from the 7th Circuit's earlier opinion by Judge Posner in *Handy Andy*.

> We acknowledge that there are aspects to a proration approach that
> Congress might have found desirable. It is not our role, however,

---

[3] A separate provision of the lease required the tenant to escrow taxes to serve as security for future tax assessments.

to make arguably better laws than those fashioned by Congress. [ ] We also acknowledge that proration was the pre-Code practice and that we had been admonished not to "read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Pennsylvania Dept. Pub. Welfare v. Davenport,* 495 U.S. 552, 563, 109 L.Ed.2d 588, 110 S. Ct. 2126 (1990). *It seems clear to us, however, that Congress enacted § 365(d)(3) for the purpose of altering a pre-Code practice that had created a problem for landlords of non-residential property and that our task is to determine the nature of the change based on the text chosen.* Finally, we acknowledge that the result we reach may in some cases leave room for strategic behavior on the part of landlords and tenants. Here, we tender only two observations. Tax reimbursement obligations are only a small constellation in the universe of obligations coming within the scope of § 365(d)(3), and there is no basis in the text for distinguishing them from rent and numerous other obligations of tenants. *Moreover, strategic behavior even in the area of tax reimbursement can be constrained by forethought and careful drafting.*

*Id.* at 211-12 (emphasis added).  In other words, the majority explained that it is improper to read congressional intent into clear language chosen by Congress.  This is a well-settled canon of statutory construction: it is improper to consider congressional intent or legislative history where the plain language of the statute is clear.

15.    In 2003, the Seventh Circuit revisited its 1998 *Handy Andy* decision where Judge Posner had opted for the "accrual" approach, and decided that the *Handy Andy* decision should be limited to its facts and that particular lease.  *See generally HA-LO Indus. v. CenterPoint Props. Trust,* 342 F.3d 794 (7th Cir. 2003).  In *HA-LO*, the debtor argued that *HandyAndy* compelled an application of the "accrual" approach, and the Seventh Circuit disagreed.  *See id.* at 798-99 ("We held in *Handy Andy* that the portion of taxes that accrued during Handy Andy's prepetition occupancy therefore had arisen prepetition, and thus were akin to 'sunk costs; that are

not chargeable to Handy Andy even though billed postpetition."). Said the Court, "Postpetition rent covering a period of time that extends into the postrejection period is 'not a sunk cost that relates to a time before the bankruptcy case, but a charge for the consumption of a resource during the administration of the case . . ., and costs of administration must be paid.' *Id.* at 799 (quoting *In re Comdisco, Inc.*, 272 B.R. 671, 674-75 (Bankr. N.D. Ill. 2002)). As such, the Court found that the *HandyAndy* did *not* stand for the proposition the "accrual" approach must be applied. *See id.* Reviewing the case law on the subject and the particular lease between the parties, the *HA-LO* Court found the "billing date" approach to be the one most supported by the Bankruptcy Code. *See id.* at 799-800 ("If HA-LO had rejected the lease effective October 31, rather than November 2, it would not have been obligated to pay rent for November under 11 U.S.C. § 365(d)(3). Instead, it elected to reject the lease one day after its monthly rent obligation to Center-Point would arise. Under these circumstances, we agree with the Sixth Circuit that equity as well as the statute favors full payment.").

16. The Fifth Circuit has not opined on this issue to date, but the published cases written by Courts in the Fifth Circuit, including Judge Greendyke's opinion in *Appletree Markets*, would seem to support the majority "billing date" approach.

17. In 2004, Judge Houser wrote a brief, but well-reasoned opinion explaining why the Third Circuit got it right in *Montgomery Ward*, and why the Judge Posner and courts in the Southern District of New York have it wrong by following the proration approach. *See In FFP Operating Ptrs., L.P.,* 2004 Bankr. LEXIS 884, Bankr. Case No. 03-90171-bjh-11 (Bankr. N.D. Tex. June 16, 2004). In reaching this conclusion, Judge Houser explained why this strict approach may not always be beneficial to the landlords. In that particular case, Judge Houser

explained that the debtors' obligations under the lease to pay taxes were not triggered until the landlords presented the debtors with an invoice to pay taxes. *See id.* at *17-18. Because there was no evidence that such an invoice was presented to the debtors, the Court concluded that the obligation to pay taxes never arose. *See id*. at *18-19.

18.     In *In re Mr. Gatti's, Inc.,* 164 B.R. 929 (Bankr. W.D. Tex. 1994), Judge Kelly issued an extensive opinion collecting cases discussing the 1984 amendments. While this case did not discuss the "proration" and "billing date," Judge Kelly does conclude that section 365(d)(3) has no built-in remedy for the debtor's failure to perform lease obligations timely, most likely because no remedy was necessary in light of the other Bankruptcy Code provisions. *See id.* at 946 (citing *In re Orvco,* 95 B.R. 724, 726-28 (9th Cir. B.A.P. 1989)). For that reason, he adopted what he perceived to be the majority view that section 365(d)(3) does not automatically allow the landlord an administrative expense claim for administrative rents. In that case, where the debtor vacated the least within four days of the petition date and rejected the lease as of that date, the landlord was entitled to an administrative expense claim for four days' "use" at the contract rate, or $722.68. *See id.* at 946.

19.     Two years later, Judge Abramson considered the same issue, but found that the majority view had swung in the other direction and now favored the "billing date" approach. *See In re Amber's Stores, Inc.,* 193 B.R. 819, 823-25 (Bankr. N.D. Tex. 1996) (citing *Towers v. Chickering & Gregory (In re Pacific-Atlantic Trading Co.),* 27 F.3d 401, 404-05 (9th Cir. 1994)). While praising Judge Kelly's analysis in *Mr. Gatti's*, Judge Abramson noted that the Ninth Circuit had since rejected the rationale employed by Judge Kelly in concluding that section 365(d)(3) did not automatically grant the landlords an administrative expense claim for the lease

payments due post-petition and before the rejection date of the leases.  *Id.* at 825.  Judge Abramson held that the plain language of section 365(d)(3) demanded that landlords be allowed *and paid* an administrative expense claim for all obligations arising under the lease after the petition date and before the effective rejection date of the lease.  *See id.*

20.  In *Amber's Stores*, the debtors had vacated the leased premises before the petition date, and had given the landlords unequivocal notice of their intentions to terminate the leases. *Id.*at 820-21.  On the petition date, they filed an emergency motion to reject the leases.  The Court granted the emergency motion with the other first day filings.  Shortly thereafter, one of the landlords filed a motion to compel payment of post-petition lease obligations arising between the petition date and the date the court order was entered.  The court separated the issues raised by this motion as follows: (1) is the landlord automatically entitled to an administrative expense claim; and (2) what is the effect date for the rejection of the landlord's lease?

21.  The first issue was decided in the landlord's favor for the reasons described above.  Thus, the landlord was entitled to an administrative expense claim for the obligations arising between the petition date and the effective rejection date.  On the second issue, the court framed and answered the question as follows:

> Why should the debtor be penalized by having to wait for an order to be entered rejecting a lease before the lease is considered rejected, when there is an unequivocal action on the debtor's part to reject the lease, the debtor is receiving no benefit from the leased premises, and the debtor has filed a motion with the court to reject? The short answer to this question is because the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require it.

*Id.* at 826.  Following the plain meaning of the Bankruptcy Code, and to provide lessors and potential replacements tenants with some certainty of the rejection date, the Court found that

only an order of the Court could determine the effective date of the rejection of a lease. *See id.* at 826-27. *see also In re Cafeteria Operators, L.P.,* 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) (discussing retroactive rejection); *In re Romacorp, Inc.,* 2006 Bankr. LEXIS 4674, Bankr. Case No. 05-86818-bjh-11 at *16 (Bankr. N.D. Tex. Feb. 2, 2006).

22.     Last year, the Sixth Circuit reiterated why the "billing date" approach is the one most supported by the plain language of the Bankruptcy Code. *See generally Burival v. Roehrich (In re Burival),* 613 F.3d 810 (6th Cir. 2010) (Benton, J.). In that case, the crop lease required the debtor to make the second of two lease payments on December 1st. The debtor filed its bankruptcy petition on November 29th and argued that the lease payment due two days later was really a pre-petition obligation because the value of the crop lease had been used up before that time. In *Burival,* the Sixth Circuit explained that section 365(d)(3) unambiguously grants an administrative expense claim for post-petition rents due under an unexpired lease. In reaching this conclusion, the Court of Appeals explained that the majority of Circuit Courts have followed the same approach, and that the fact that the "value" of the crop lease was used up pre-petition was simply irrelevant in light of the clear language in the statute and undisputed evidence that the second payment under the lease came due post-petition. For those reasons, the Court concluded that the lessor was entitled to an administrative expense claim for the December 1st payment that was due under the crop lease.

*Other Arguments Raised in the Objection*

23.     CIT also objects to the use of its cash collateral to pay the Wilkerson Entities. This, in and of itself, is no reason to deny the Motion. The source of funding for payments to the Wilkerson Entities is an issue to be resolved among the Debtors, the Committee and CIT. It

should be noted, however, that CIT has the most to gain from the Debtors' post-petition operations, and that payment of rents, including property taxes due under leases, are costs of post-petition operations and may be paid from CIT's collateral.

24.     Finally, the Wilkerson Entities reserve the right to address CIT's objection to their § 503(b) administrative claims in the event that this Court does not agree that the full taxes due under the leases are obligations arising after the Petition Date.

### III.   CONCLUSION

25.     There is clearly a split of authority between the "billing date" and the "accrual" approach.  While undecided by the Fifth Circuit, the overwhelming majority of courts addressing the issue have opted for the "billing date" approached, finding the plain language of section 365(d)(3) to support such an approach.  For the reasons expressed above, the Court should adopt the "billing date" approach and compel payment of taxes for which the Debtors became obligated under the Leases after the Petition Date.   Likewise, CIT's Objection should not preclude the Court's determination that such obligations are due and payable immediately by the Debtor, as such amounts may be surcharged from CIT's cash collateral, if necessary.  Finally, the Wilkerson Entities reserve the right to seek an administrative expense claim to the extent this Court does not grant the Motion.

WHEREFORE, for the reasons stated herein, the Wilkerson Entities respectfully request that the Court: (i) overrule the Objection and apply the "billing date" approach; (ii) grant the Motion as requested; and (iii) grant such other and further relief as may be just and proper.

REPLY OF THE WILKERSON ENTITIES IN SUPPORT OF THE MOTION OF THE WILKERSON ENTITIES (A) TO COMPEL TIMELY PERFORMANCE OF POST-PETITION LEASE OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(D)(3) OR, (B) IN THE ALTERNATIVE, FOR THE ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. § 503(B)(1)                                    Page 14 of 15
3293471.1

Dated:  January 18, 2011             Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**

By:   _/s/  Aaron M. Kaufman_
            Mark E. Andrews
            State Bar No. 01253520
            Aaron M. Kaufman
            State Bar No. 24060067
            1201 Elm Street, Suite 3300
            Dallas, Texas  75270
            (214) 698-7800
            (214) 698-7899 (Fax)

**ATTORNEYS FOR THE WILKERSON ENTITIES**

**CERTIFICATE OF SERVICE**

On this 18th day of January, 2011, a true and correct copy of the foregoing *Reply* has been served electronically by the Court's PACER system to those parties registered to receive electronic notice.

By:   _/s/  Aaron M. Kaufman_
            Aaron M. Kaufman