

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

**ENTERED**
**03/03/2011**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 10-60149** |
| **LACK'S STORES, INCORPORATED,** | § | |
| **ET AL.,**[1] | § | |
| | § | **(Chapter 11)** |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |

## ORDER APPROVING SALE OF REAL PROPERTY
## FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
## AND OTHER INTERESTS AND GRANTING RELATED RELIEF
## (3110 H.G. MOSLEY PARKWAY, LONGVIEW, TEXAS 75605)

[Related to Docket Nos. 365 & 591]

On March 2, 2011, the Court held a hearing (the "Sale Hearing") to consider the request of Lack's Stores, Incorporated and its affiliated debtors (collectively, the "Debtors") to sell that certain real property located at 3110 H.G. Mosley Parkway, Longview, Texas 75605 (the "Property") free and clear of all liens, claims, encumbrances, and other interests. Upon consideration of the record before it, including all pleadings and documents filed, the arguments of counsel, and all evidence presented at the Sale Hearing, and for the reasons set forth on the record,

**THE COURT FINDS THAT:**[2]

A.     The Court has jurisdiction over the sale pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors and the last four digits of their tax identification numbers are Lack's Stores, Incorporated (6528), Merchandise Acceptance Corporation (0972), Lack's Furniture Centers, Inc. (9468), and Lack Properties, Inc. (8961).

[2] To the extent that any finding of fact is construed to be a conclusion of law, it is adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is adopted as such. The Court reserves the right to make any additional findings and conclusions as may be necessary or as requested by any party.

B.     Notice of the sale, the Sale Hearing, and the relief granted in this Order was served to all necessary creditors and parties in interest.  The Court finds the scope and manner of service proper, timely, adequate, and sufficient in accordance with Bankruptcy Code § 363, Bankruptcy Rules 2002 and 6004, and the orders and local rules of this Court.  No further notice is or shall be required.

C.     The marketing and sale procedures employed by the Debtors were in accordance with the Court's *Order Approving Procedures and Bid Protections for the Sales of Real Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests (Owned Real Property)* [Docket No. 365] (the "Sale Procedures Order"), and were fair and reasonable and produced the highest and best arm's-length offer for the sale of the Property.

D.     Prior to the Sale Hearing, Triple J Investments, Inc. ("Triple J") offered and Lack Properties, Inc. ("Lack Properties") accepted, subject to Court approval, an offer to purchase the Property for $1,200,000 (the "Purchase Price"), pursuant to the terms set forth in the Purchase and Sale Agreement dated as of December 27, 2010 (the "Agreement").  A copy of the Agreement is attached hereto as **Exhibit "A."**

E.     After executing the Agreement, Buyer informed Lack Properties that, pursuant to section 12.01 of the Agreement, it intended to assign its interests in the Agreement to RVW Properties, LLC ("Buyer").  Despite this assignment, Triple J will remain fully liable under the Agreement and the terms of this Order.

F.     No other Qualified Bids, as defined in the Notice and Bid Procedures (as defined below), were received by the Debtors.  Approval of the Agreement and consummation of the transactions contemplated therein at this time are in the best interests of the estates and their respective creditors.

G.     The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification for the sale of the Property to Buyer free and clear of all liens, claims, encumbrances, and other interests except those expressly assumed by Buyer under the Agreement (collectively, the "Interests") effective on the date of the closing of the Agreement (such date being the "Effective Date") and (ii) compelling circumstances for approval of the transactions contemplated in the Agreement pursuant to Bankruptcy Code § 363(b) and (f).

H.     The Agreement was negotiated, proposed, and entered into by Lack Properties and Buyer in good faith, without collusion, and was the result of arm's-length bargaining. Neither the Debtors nor Buyer has engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code § 363(n).  Buyer is not an "insider," as that term is defined in Bankruptcy Code § 101.

I.     Buyer is a good faith purchaser of the Property under Bankruptcy Code § 363(m) and is entitled to all of the protections afforded thereby.

J.     The Purchase Price for the Property is fair and reasonable and is the highest and best offer for the Property after a fair and thorough marketing process.

K.     Lack Properties is authorized to sell the Property free and clear of all Interests because one or more of the standards set forth in Bankruptcy Code § 363(f) have been satisfied with respect to each such Interest.

L.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Court expressly finds that cause exists not to delay the implementation of this Order, and, notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall take effect immediately.

**THEREFORE, IT IS ORDERED THAT**:

1.      In accordance with the Debtors' bid procedures motion [Docket No. 234], the Sale Procedures Order, and the *Debtors' Notice of Sale Procedures, Auction Date, and Sale Hearing of Debtors' Store 108 (Owned Real Property)* [Docket No. 589] (the "Notice and Bid Procedures"), Lack Properties is authorized to sell the Property to Buyer free and clear of all Interests pursuant to the terms set forth in the Agreement.  Despite any assignment of the Agreement from Triple J to Buyer, Triple J shall remain fully liable under the terms of this Order and the Agreement.

**Approval of the Agreement**

2.      The Agreement, all exhibits and schedules thereto, and all of the terms and conditions thereof are hereby approved.

3.      Pursuant to Bankruptcy Code §§ 363(b) and (f), Lack Properties is authorized to consummate the sale pursuant to and in accordance with the terms and conditions of the Agreement.

4.      Without need for any additional Court order, Lack Properties is authorized to execute and deliver, and empowered to perform under, consummate, and implement the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be reasonably requested by Buyer or otherwise required under the Agreement.

**Transfer of the Property**

5.      Pursuant to Bankruptcy Code § 363(b) and 363(f), the transfer of the Property to Buyer pursuant to the Agreement shall vest Buyer with all of Lack Properties' right, title, and interest in and to the Property and shall be free and clear of all Interests that have or could have

been asserted by the creditors of the Debtors' estates in connection with these bankruptcy cases, if any, with the Interests attaching to the proceeds of the sale (the "Proceeds") with the same force, validity, priority, and effect as the Interests formerly had against the Property, if any, subject to the ability of parties in interest to challenge the extent, validity, priority, and effect of the Interests and subject to and as otherwise provided in any other order of the Court in these cases.

6.      The Proceeds shall be paid to Lack Properties as set forth in the Agreement, and Lack Properties is hereby authorized to (a) pay all closing costs and prorated taxes owing on the Property in order to consummate the sale set forth in the Agreement and (b) pay all commissions with respect to the sale, as previously approved by this Court [Docket No. 215].

**Termination of Intercompany Lease Agreement**

7.      The Lease Contract dated as of February 1, 2001 by and between Lack's Stores, Incorporated, as tenant, and Lack Properties, as landlord, (as may have been amended or modified, the "Lease") is hereby terminated as of the Effective Date. Any and all claims by and between the estates related to termination or rejection of the Lease are hereby preserved and shall be determined per further order of the Court. Buyer shall have no claim for, and shall not otherwise receive any benefit from, the rejection or termination of the Lease.

**Additional Provisions**

8.      This Order shall be the Court's determination that, on the Effective Date, all Interests in and to the Property being conveyed have been unconditionally released, discharged, and terminated from the Property.

9.      On the Effective Date, all creditors holding an Interest against the Property are authorized and directed to execute such documents and take all other actions as may be

reasonably necessary to release their respective Interests in the Property, if any, as such Interests may have been recorded or may otherwise exist.

10.     The Court retains exclusive jurisdiction so long as these cases are pending to: (a) enforce and implement the terms and provisions of the Agreement (including the breach of the Agreement), all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects; and (b) determine as a core proceeding (by motion and without necessity for an adversary proceeding if the Court deems appropriate) any proceeding, dispute, or controversy arising out of or related to this Order and the Sale Hearing.

11.     Nothing contained in any chapter 11 plan confirmed in these cases (or any order of the Court confirming such plan) shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

12.     The terms and conditions of the Agreement and this Order shall be binding in all respects and shall inure to the benefit of the Debtors and their respective successors and assigns and Buyer and its successors and assigns.

13.     The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

14.     The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modification, amendment, or supplement shall not have a material adverse effect on the Debtors' estates.

15.     The stay under Bankruptcy Rule 6004(h) is hereby waived; accordingly, this
Order shall take effect and be enforceable immediately.

**SIGNED this 2nd day of March, 2011.**

**Jeff Bohm**
**United States Bankruptcy Judge**

## PURCHASE AND SALE AGREEMENT
(Store #143, Longview, Texas)

This Purchase and Sale Agreement (this "**Agreement**") is made and entered into by and between Purchaser and Seller.

## RECITALS

A.    Purchaser desires to purchase the Property and Seller desires to sell the Property, all upon the terms and conditions set forth in this Agreement.

B.    Defined terms are indicated by initial capital letters. Defined terms shall have the meaning set forth herein, whether or not such terms are used before or after the definitions are set forth.

NOW, THEREFORE, in consideration of the mutual terms, provisions, covenants and agreements set forth herein, as well as the sums to be paid by Purchaser to Seller, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Purchaser and Seller agree as follows:

1.    **Basic Information**.

1.1    **Certain Basic Terms**. The following defined terms shall have the meanings set forth below:

| | | |
|---|---|---|
| 1.1.1 | **Seller**: | **LACK PROPERTIES, INC.,** a Texas corporation |
| 1.1.2 | **Purchaser**: | **TRIPLE J INVESTMENTS, INC.,** a Texas corporation |
| 1.1.3 | **Bankruptcy Court**: | United States Bankruptcy Court for the Southern District of Texas, Victoria Division |
| 1.1.4 | **Purchase Price**: | $1,200,000 |
| 1.1.5 | **Earnest Money**: | $240,000 (such amount, together with interest thereon, the "**Earnest Money**"), to be deposited in accordance with Section 3. |
| 1.1.6 | **Title Company**: | Chicago Title Insurance Company 2001 Bryan Street, Suite 1700 Dallas, Texas 75201 Attention: Joycelyn Armstrong Telephone: 214.965.1668 Facsimile: 214.965.1627 Email: armstrongjo@ctt.com |
| 1.1.7 | **Escrow Agent**: | Chicago Title Insurance Company 2001 Bryan Street, Suite 1700 Dallas, Texas 75201 Attention: Joycelyn Armstrong Telephone: 214.965.1668 Facsimile: 214.965.1627 Email: armstrongjo@ctt.com |



EXHIBIT

A

PENGAD 800-631-6989

1.1.8     **Effective Date**:     The date on which this Agreement is executed by the latter to sign of Purchaser or Seller, as indicated on the signature page of this Agreement. If the execution date is left blank by either Purchaser or Seller, the Effective Date shall be the execution date inserted by the other party.

1.1.9     **Title and Survey Review Period**:     The period ending ten (10) days after Purchaser's receipt of the initial Title Commitment and the copy of Seller's existing survey, if any, delivered to Purchaser pursuant to Section 5.1, but in any event not later than the expiration of the Inspection Period.

1.1.10     **Inspection Period**:     The period beginning on the Effective Date and ending thirty (30) days after the Effective Date; provided, however, in no event will the Inspection Period begin prior to January 3, 2011.

1.1.11     **Closing Date**:     The date which is three (3) days following entry by the Bankruptcy Court of the Sale Order (as defined below); provided, however, in no event will the Closing Date be later than sixty (60) days following the expiration of the Inspection Period except as otherwise provided in Section 9.6 below.

1.1.12     **Sale Procedures Order**:     An order entered by the Bankruptcy Court in the Bankruptcy Case approving sale procedures to, among other things, solicit higher or better offers for the Property.

1.2     **Closing Costs**. Closing costs shall be allocated and paid as follows:

| COST | RESPONSIBLE PARTY |
|---|---|
| Title Commitment | Seller |
| Premium for standard form Title Policy | Purchaser |
| Premium for any modification or upgrade of Title Policy for extended or additional coverage and any endorsements to the Title Policy desired by Purchaser, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges | Purchaser |
| Costs of any new Survey and/or any revisions, modifications or recertifications to Seller's existing Survey, if any | Purchaser |
| Costs for UCC Searches | Purchaser |
| Recording Fees | Purchaser |
| Any escrow fee charged by the Escrow Agent for holding the Earnest Money or conducting the Closing | Purchaser ½ Seller ½ |
| All other closing costs, expenses, charges and fees | Purchaser |

2

1.3 **Notice Addresses.**

Purchaser:  Triple J Investments, Inc.
P.O. Box 3142
Longview, TX 75606
Attention: Johnny Vaughn
Telephone: 903.758.6178
Facsimile: 903.753.3913
Email: jrlv21@yahoo.com

Seller:  Lack Properties, Inc.            Copy to:  Vinson & Elkins L.L.P.
200 South Ben Jordan                     2001 Ross Avenue, Suite 3700
Victoria, TX 77901                       Dallas, TX 75201
Attention: Melvin Lack                   Attention: Paul Heath
Telephone: 361.578.3571                  Telephone: 214.220.7976
Facsimile: 361.576.9814                  Facsimile: 214.999.7976
Email: mlack@lacks.com                   E-mail: pheath@velaw.com

2. **Sale and Purchase.** Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the "**Property**"): the land described in Exhibit A hereto (the "**Land**"), together with (a) all improvements located thereon, but expressly excluding improvements and structures owned by any tenant or other third party, if any ("**Improvements**"), (b) without warranty, all right, title and interest of Seller, if any, in and to the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining thereto, and (c) without warranty, all right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining the Land.

3. **Earnest Money.**

3.1 **Deposit and Investment of Earnest Money.** Within two Business Days after the Effective Date, Purchaser shall deposit the Earnest Money with Escrow Agent. Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Seller and Purchaser, shall not commingle the Earnest Money with any funds of Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made. Such account shall have no penalty for early withdrawal, and Purchaser accepts all risks with regard to such account. If Purchaser fails to timely deposit any portion of the Earnest Money within the time periods required, Seller may terminate this Agreement by written notice to Purchaser, in which event any Earnest Money that has previously been deposited by Purchaser with Escrow Agent shall be immediately delivered to Seller and thereafter the parties hereto shall have no further rights or obligations hereunder, except for rights and obligations which, by their terms, survive the termination hereof.

3.2 **Independent Consideration.** If Purchaser elects to terminate this Agreement for any reason and is entitled to receive a return of the Earnest Money pursuant to the terms of this Agreement, the Escrow Agent shall first disburse to Seller One Hundred and No/100 Dollars ($100.00) as independent consideration for Seller's performance under this Agreement ("**Independent Consideration**"), which shall be retained by Seller in all instances.

3.3 **Disposition of Earnest Money.** The Earnest Money shall be applied as a credit to the Purchase Price at Closing. However, if Purchaser timely elects to terminate this Agreement prior to the expiration of the Inspection Period pursuant to Section 4.2, Escrow Agent shall pay the entire Earnest Money (less the Independent Consideration) to Purchaser one (1) Business Day following Escrow Agent's receipt of the Due Diligence Termination Notice from Purchaser (as long as the current investment can be liquidated and disbursed in one (1) Business Day and, if not, as promptly as possible). No notice to Escrow Agent from Seller shall be required for the release of the Earnest Money to Purchaser by Escrow Agent if Purchaser terminates this Agreement pursuant to Section 4.2. In the event of a termination of this Agreement by either Seller or Purchaser for any reason other

3

than pursuant to Section 4.2, Escrow Agent is authorized to deliver the Earnest Money to the party hereto entitled to same pursuant to the terms hereof on or before the tenth (10th) Business Day following receipt by Escrow Agent and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies Escrow Agent that it disputes the right of the other party to receive the Earnest Money. In such event, Escrow Agent may interplead the Earnest Money into a court of competent jurisdiction in the county in which the Earnest Money has been deposited. All attorneys' fees and costs and Escrow Agent's costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.

4.    **Due Diligence**.

4.1    **Physical Due Diligence**.   Commencing on the Effective Date and continuing until the Closing or earlier termination of this Agreement, Purchaser shall have reasonable access to the Property at all reasonable times during normal business hours, for the purpose of conducting reasonably necessary tests, including surveys and architectural, engineering, geotechnical and environmental inspections and tests, provided that (a) Purchaser must give Seller two (2) full Business Days' written notice of any such inspection or test, and with respect to any intrusive inspection or test (i.e., core sampling) must obtain Seller's prior written consent (which consent may be given, withheld or conditioned in Seller's sole discretion), (b) prior to performing any inspection or test, Purchaser must deliver a certificate of insurance in form and substance reasonably acceptable to Seller evidencing that Purchaser and/or its contractors, agents and representatives, as applicable, have in place (and Purchaser and/or its contractors, agents and representatives, as applicable, shall maintain during the pendency of this Agreement) (1) commercial general liability insurance with limits of at least Two Million Dollars ($2,000,000) for bodily or personal injury or death, (2) property damage insurance in the amount of at least Two Million Dollars ($2,000,000), (3) contractual liability insurance with respect to Purchaser's obligations hereunder, and (4) workers' compensation insurance in accordance with applicable law to the extent required for any applicable employees, all covering any accident arising in connection with the presence of Purchaser, its contractors, agents and representatives on the Property, which insurance shall (A) name as additional insureds thereunder Seller and such other parties holding insurable interests as Seller may designate and (B) be written by a reputable insurance company having a rating of at least "A+:VII" by Best's Rating Guide (or a comparable rating by a successor rating service), and (C) otherwise be subject to Seller's prior approval, and (c) all such tests shall be conducted by Purchaser in compliance with Purchaser's responsibilities set forth in Section 4.5 below.  Purchaser shall bear the cost of all such inspections or tests and shall be responsible for and act as the generator with respect to any wastes generated by those tests, which obligation shall survive the termination of this Agreement and shall survive Closing.

4.2    **Termination Right**.   If for any reason Purchaser, in its sole discretion, is not satisfied with the Property, then Purchaser may terminate this Agreement, by delivering to Seller and Escrow Agent a written notice of termination at any time during the Inspection Period (the "**Due Diligence Termination Notice**"), and upon such termination, the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement.  If Purchaser does not give a Due Diligence Termination Notice, this Agreement shall continue in full force and effect, Purchaser shall have waived its right to terminate this Agreement under this Section 4.2 and Purchaser shall be deemed to have acknowledged that it has received or had access to all information and conducted all inspections and tests of the Property that it considers important.

4.3    **Proprietary Information; Confidentiality**.   Purchaser acknowledges that any materials or information received by or for Purchaser in connection with the Property and any information concerning the Property observed or obtained during any inspection of the Property (including any notes, memoranda, summaries, analyses, compilations and other writings relating thereto or based thereon prepared by or on behalf of Purchaser) (collectively, and including the Property Information, the "**Confidential Information**") is proprietary and confidential and has been delivered to Purchaser solely to assist Purchaser in determining the feasibility of purchasing the Property.  Purchaser shall not use the Confidential Information for any purpose other than as set forth in the preceding sentence or disclose the Confidential Information to any person other than to those persons who are responsible for determining the feasibility of Purchaser's acquisition of the Property and who have agreed to preserve the confidentiality of such information as required hereby (collectively, "**Permitted Outside Parties**").  Purchaser shall not divulge the contents of the Confidential Information except in strict accordance with the

4

confidentiality standards set forth in this Section 4.3. In permitting Purchaser to review the Confidential Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created. Purchaser's obligations under this Section 4.3 shall survive the termination of this Agreement. If Purchaser terminates this Agreement, Purchaser shall promptly return to Seller all originals and copies of the Confidential Information.

    4.4    **NO REPRESENTATION OR WARRANTY BY SELLER.** PURCHASER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION REGARDING THE TRUTH, ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION OR ANY OTHER MATERIALS RECEIVED BY OR FOR PURCHASER IN CONNECTION WITH THE PROPERTY OR THE SOURCE(S) THEREOF AND SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION WITH RESPECT THERETO. SELLER EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY FOR REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, STATEMENTS OF FACT AND OTHER MATTERS CONTAINED IN, OR FOR OMISSIONS FROM, THE CONFIDENTIAL INFORMATION, ANY OTHER MATERIALS RECEIVED BY OR FOR PURCHASER IN CONNECTION WITH THE PROPERTY OR ORAL COMMUNICATIONS TO PURCHASER.

    4.5    **Purchaser's Responsibilities**. In conducting any inspections, investigations or tests of the Property, Purchaser and its agents and representatives shall: (a) not interfere with the operation and maintenance of the Property, including Seller's conduction of any going out of business sale at the Property; (b) not damage any part of the Property or any personal property owned or held by any tenant or third party; (c) not injure or otherwise cause bodily harm to Seller or its agents, guests, invitees, contractors and employees; (d) comply with all applicable laws; (e) promptly pay when due the costs of all tests, investigations, and examinations done with regard to the Property; (f) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder; (g) repair any damage to the Property resulting directly or indirectly from any such inspection or tests; and (h) not reveal or disclose prior to Closing any information obtained concerning the Property and the Confidential Information to anyone other than the Permitted Outside Parties, in accordance with the confidentiality standards set forth in Section 4.3 above, or except as may be otherwise required by law. Purchaser's obligations under this Section 4.5 shall survive the termination of this Agreement.

    4.6    **Purchaser's Agreement to Indemnify**. Purchaser hereby agrees to indemnify, defend and hold Seller harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Purchaser's inspections or tests permitted under this Agreement or any violation of the provisions of Sections 4.1, 4.3 and 4.5; provided, however, the indemnity shall not extend to protect Seller from any pre-existing liabilities for matters merely discovered by Purchaser (i.e., latent environmental contamination) so long as Purchaser's actions do not aggravate any pre-existing liability of Seller. Purchaser's obligations under this Section 4.6 shall survive the termination of this Agreement and shall survive the Closing.

5.    **Title and Survey**.

    5.1    **Title Commitment and Survey**. Within ten Business Days after the Effective Date, the following information (the "**Property Information**") shall be delivered to Purchaser: (a) the Title Company shall deliver to Purchaser with a copy to Seller a current commitment for title insurance (the "**Title Commitment**") for the Property and addressed to Purchaser, and copies of all documents referenced in the Title Commitment and (b) Seller shall deliver to Purchaser a copy of the most-current survey of the Land and the Improvements in Seller's possession, if any (the "**Survey**"), which Purchaser may revise, modify or recertify as necessary in order for the Title Company to delete the survey exception from the Title Policy or otherwise satisfy Purchaser's objectives.

    5.2    **Title Review**. During the Title and Survey Review Period, Purchaser shall review title to the Property as disclosed by the Title Commitment and the Survey. Seller shall have no obligation to cure title objections except financing liens of an ascertainable amount created by Seller, which liens Seller shall cause to be released at or prior to Closing (with Seller having the right to apply the Purchase Price or a portion thereof for such purpose), and Seller shall deliver the Property free and clear of any such financing liens. Seller further agrees to remove any exceptions or encumbrances to title which are voluntarily created by Seller after the Effective Date

without Purchaser's consent (if requested, such consent shall not be unreasonably withheld or delayed).  The term "**Permitted Exceptions**" shall mean, collectively:  the specific exceptions (including exceptions that are a part of the promulgated title insurance form) in the Title Commitment that the Title Company has not agreed to remove from the Title Commitment as of the end of the Title and Survey Review Period and that Seller is not required to remove as provided above; matters created by, through or under Purchaser; items shown on the Survey which have not been removed as of the end of the Inspection Period (or if Purchaser does not obtain a Survey, all matters that a current, accurate survey of the Property would show); and real estate taxes not yet due and payable.

       5.3    **Delivery of Title Policy at Closing**.  In the event that the Title Company does not issue at Closing, or unconditionally commit at Closing to issue, to Purchaser, an owner's title policy in accordance with the Title Commitment, insuring Purchaser's fee simple title to the Land in the amount of the Purchase Price, subject only to the standard exceptions and exclusions from coverage contained in such policy and the Permitted Exceptions (the "**Title Policy**"), Purchaser shall have the right to terminate this Agreement, in which case the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement.

6.    **Ongoing Operations and Removal of Personal Property**.  From the Effective Date through Closing, Seller shall:  (a) not commit or permit to be committed any physical waste to the Property; (b) not, without the prior written consent of Purchaser enter into any lease or other agreement or instrument or take any action that would encumber the Property after Closing, that would bind Purchaser or the Property after Closing, or that would be outside the normal scope of maintaining and operating the Property; and (c) maintain all insurance policies relative to the Property in full force and effect as they exist on the Effective Date.  Seller shall have the right to remove all personal property from the Land until five Business Days after Closing.

7.    **Casualty**.  If the Property, or any part thereof, suffers damage from fire or other Casualty prior to Closing, then Purchaser may either (a) terminate this Agreement, whereupon the Earnest Money shall be refunded to Purchaser, and neither party shall have any further rights or obligations pursuant to this Agreement other than those that by their terms survive the termination of this Agreement, or (b) consummate the Closing, whereupon Seller's rights, if any, in the proceeds of any insurance covering such damage shall be assigned to Purchaser at Closing, Purchaser shall receive a credit against the Purchase Price in the amount of the deductible, and there shall be no other reduction or abatement in the Purchase Price.

8.    **Condemnation**.  If proceedings in eminent domain are instituted with respect to the Property or any portion thereof, Purchaser may, at its option, by written notice to Seller given within ten (10) days after Seller notifies Purchaser of such proceedings (and if necessary the Closing Date shall be automatically extended to give Purchaser the full ten (10)-day period to make such election), either:  (a) terminate this Agreement, in which case the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (b) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in respect of such matter.  If Purchaser does not give Seller written notice of its election within the time required above, then Purchaser shall be deemed to have elected option (b) above.

9.    **Closing**.

       9.1    **Generally**.  The consummation of the transaction contemplated herein ("**Closing**") shall occur on the Closing Date at the offices of Escrow Agent (or such other location as may be mutually agreed upon by Seller and Purchaser).

       9.2    **Seller's Deliveries in Escrow**.  As of or prior to the Closing Date, Seller shall deliver in escrow to Escrow Agent the following:  (a) a special warranty deed in the form of Exhibit B hereto subject to the Permitted Exceptions (the "**Deed**"), (b) a Foreign Investment in Real Property Tax Act certificate in the form of Exhibit C hereto executed by Seller, and (c) any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Seller or

6

result in any new or additional obligation, covenant, representation or warranty of Seller under this Agreement beyond those expressly set forth in this Agreement).

       9.3    **Purchase Price**. At or before noon local time on the Closing Date, Purchaser shall deliver to Escrow Agent the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, in immediate, same-day U.S. federal funds wired for credit into Escrow Agent's escrow account, which funds must be delivered in a manner to permit Escrow Agent to deliver good funds to Seller or its designee on the Closing Date (and, if requested by Seller, by wire transfer); in the event that Escrow Agent is unable to deliver good funds to Seller or its designee on the Closing Date, then the closing statements and related prorations will be revised as necessary.

       9.4    **Prorations; Taxes; Utilities; Final Adjustment After Closing**. At Closing, the following items shall be prorated as of the Closing Date, and Purchaser shall be responsible for all items of income and expense for the Property from and after (and including) the Closing Date: real and personal ad valorem taxes ("**Taxes**"); and any assessments by private covenant for the then-current calendar year of Closing. If Taxes for the year of Closing are not known or cannot be reasonably estimated, Taxes shall be prorated based on Taxes for the year prior to Closing. Any additional Taxes relating to the year of Closing or prior years arising out of a change in the use of the Property or a change in ownership shall be assumed by Purchaser effective as of Closing and paid by Purchaser when due and payable, and Purchaser shall indemnify, defend and hold harmless Seller from and against any and all such Taxes, which indemnification obligation shall survive the Closing. Purchaser shall take all steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies. Seller shall request that all utility meters are read as of the Closing Date. Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date. If final utility bills are not available or cannot be issued prior to Closing for any item being prorated under this Section 9.4, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as such bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. The provisions of this Section 9.4 shall survive the Closing.

       9.5    **Possession**. Seller shall deliver possession of the Property to Purchaser at the Closing subject only to the Permitted Exceptions.

       9.6    **Outside Closing Date**. If the Closing Date has not occurred within sixty (60) days following the expiration of the Inspection Period, Purchaser may, at its option, by providing written notice thereof to Seller within one (1) Business Day following the expiration of such sixty (60) day period, either (a) terminate this Agreement, in which case Purchaser shall be entitled to return of the Earnest Money, or (b) extend the Closing Date for an additional thirty (30) days. If the Closing Date has not occurred within ninety (90) days following the expiration of the Inspection Period, this Agreement shall terminate, Purchaser shall be entitled to return of the Earnest Money, and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement.

    10.    **Remedies**.

       10.1    **Seller's Remedies**. If Purchaser fails to consummate the purchase of the Property pursuant to this Agreement or otherwise defaults on its obligations hereunder at or prior to Closing for any reason except failure by Seller to perform hereunder, and such default or breach is not cured by the earlier of the third (3rd) Business Day after written notice thereof from Seller or the Closing Date (except no notice or cure period shall apply if Purchaser fails to consummate the purchase of the Property hereunder), Seller shall be entitled, as its sole remedy (except as provided in Sections 10.3, 10.4 and 12.20 hereof), to terminate this Agreement and recover the Earnest Money as liquidated damages and not as penalty, in full satisfaction of claims against Purchaser hereunder. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine and the Earnest Money is a fair estimate of those damages which has been agreed to in an effort to cause the amount of such damages to be certain. Notwithstanding anything in this Section 10.1 to the contrary, in the event of Purchaser's default or a termination of this Agreement, Seller shall have all remedies available at law or in equity in the event Purchaser or any party related to or affiliated with Purchaser is asserting any claims or right to the Property that would otherwise delay or prevent Seller from having clear, indefeasible and marketable title to the

Property.  In all other events Seller's remedies shall be limited to those described in this Section 10.1 and Sections 10.3, 10.4 and 12.20 hereof.  If Closing is consummated, Seller shall have all remedies available at law or in equity in the event Purchaser fails to perform any obligation of Purchaser under this Agreement.

        10.2    **Purchaser's Remedies**.  If Seller fails to consummate the sale of the Property pursuant to this Agreement or otherwise defaults on its obligations hereunder at or prior to Closing for any reason except failure by Purchaser to perform hereunder, and such default or breach is not cured by the earlier of the third (3rd) Business Day after written notice thereof from Purchaser or the Closing Date (Purchaser hereby agreeing to give such written notice to Seller within one (1) Business Day after Purchaser first learns of any such default or breach by Seller, except no notice or cure period shall apply if Seller fails to consummate the sale of the Property hereunder), Purchaser shall elect, as its sole remedy, either to (a) terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing and recover the Earnest Money, or (b) waive said failure or breach and proceed to Closing without any reduction in the Purchase Price.  Notwithstanding anything herein to the contrary, Purchaser shall not be entitled to a remedy of specific performance and shall be deemed to have elected to terminate this Agreement unless a duly authorized signatory of Purchaser is physically present at the offices of the Title Company on the Closing Date with all closing documents as required hereunder to be signed on behalf of Purchaser where applicable, in Purchaser's possession and Purchaser files an action with the Bankruptcy Court pursuant to Section 12.19 hereof for specific performance within ten (10) Business Days of the scheduled Closing Date. Purchaser's remedies shall be limited to those described in this Section 10.2 and Sections 10.3, 10.4 and 12.20 hereof.  **IN NO EVENT SHALL SELLER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, MEMBERS, MANAGERS, OWNERS OR AFFILIATES, ANY OFFICER, MANAGER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE.**

        10.3    **Attorneys' Fees**.  In the event either party hereto employs an attorney in connection with claims by one party against the other arising from the operation of this Agreement, the non-prevailing party shall pay the prevailing party all reasonable fees and expenses, including attorneys' fees, incurred in connection with such claims.

        10.4    **Other Expenses**.  If this Agreement is terminated due to the default of a party, then the defaulting party shall pay any fees or charges due to Escrow Agent for holding the Earnest Money as well as any escrow cancellation fees or charges and any fees or charges due to the Title Company for preparation and/or cancellation of the Title Commitment.

        10.5    **Survival**.  This Section 10 shall survive the termination of this Agreement and shall survive the Closing.

    11.    **Disclaimers; Release**.

        11.1    **Disclaimers by Seller**.  Except as expressly set forth in this Agreement, it is understood and agreed that Seller and Seller's agents or employees have not at any time made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, past, present or future, with respect to the Property, including, but not limited to, warranties, representations or guaranties as to (a) matters of title (other than Seller's special warranty of title to be contained in the Deed), (b) environmental matters of any kind relating to the Property or any portion thereof, including, without limitation, the presence of Hazardous Materials in, on, under or in the vicinity of the Property, (c) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (d) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (e) drainage, (f) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (g) the presence of endangered species or any environmentally sensitive or protected areas, (h) zoning or building entitlements to which the Property or any portion thereof may be subject, (i) the availability of any utilities to the Property or any portion

thereof including, without limitation, water, sewage, gas and electric, (j) usages of adjoining property, (k) access to the Property or any portion thereof, (l) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (m) the condition or use of the Property or compliance of the Property with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (n) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (o) any other matter affecting the stability or integrity of the Property, (p) the potential for further development of the Property or the existence of vested land use, zoning or building entitlements affecting the Property, (q) the merchantability of the Property or fitness of the Property for any particular purpose, (r) the truth, accuracy or completeness of the Confidential Information, (s) tax consequences, or (t) any other matter or thing with respect to the Property. **EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND TO PURCHASER, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL CONDITION OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY. PURCHASER IS RELYING ON ITS INVESTIGATIONS OF THE PROPERTY IN DETERMINING WHETHER TO ACQUIRE IT. THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL PART OF THE CONSIDERATION FOR SELLER EXECUTING THIS AGREEMENT, AND SHALL SURVIVE CLOSING.**

      11.2   **Sale "As-Is, Where-Is"**. Purchaser acknowledges and agrees that upon Closing, Seller shall sell and convey to Purchaser and Purchaser shall accept the Property "AS-IS, WHERE-IS, WITH ALL FAULTS," except to the extent expressly provided otherwise in this Agreement and any document executed by Seller and delivered to Purchaser at Closing. Except as expressly set forth in this Agreement, Purchaser has not relied and will not rely on, and Seller has not made and is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto (including specifically, without limitation, Property information packages distributed with respect to the Property) made or furnished by Seller, or any property manager, real estate broker, agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing. Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that, except as expressly set forth in this Agreement, it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property and shall make an independent verification of the accuracy of any documents and information provided by Seller. Purchaser will conduct such inspections and investigations of the Property as Purchaser deems necessary, including, but not limited to, the physical and environmental conditions thereof, and shall rely upon same. By failing to terminate this Agreement prior to the expiration of the Inspection Period, Purchaser acknowledges that Seller has afforded Purchaser a full opportunity to conduct such investigations of the Property as Purchaser deemed necessary to satisfy itself as to the condition of the Property and the existence or non-existence or curative action to be taken with respect to any Hazardous Materials on or discharged from the Property, and will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto, other than such representations, warranties and covenants of Seller as are expressly set forth in this Agreement. Upon Closing, Purchaser shall assume the risk that adverse matters, including, but not limited to, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Purchaser's inspections and investigations. Purchaser hereby represents and warrants to Seller that: (a) Purchaser is represented by legal counsel in connection with the transaction contemplated by this Agreement; and (b) Purchaser is purchasing the Property for business, commercial, investment or other similar purpose and not for use as Purchaser's residence. Purchaser waives any and all rights or remedies it may have or be entitled to, deriving from disparity in size or from any significant disparate bargaining position in relation to Seller.

      11.3   **Seller Released from Liability**. Purchaser acknowledges that it will have the opportunity to independently and personally inspect the Property during the Inspection Period, and during such period, observe its physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Property and adjacent areas as Purchaser deems necessary, and Purchaser hereby FOREVER RELEASES AND DISCHARGES Seller from all responsibility and liability, including without limitation, liabilities and responsibilities for the lessor's obligations under any lease relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the Effective Date, and liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et

670674v.7 LAC348/45000

seq.), as amended ("**CERCLA**"), regarding the condition, valuation, salability or utility of the Property, or its suitability for any purpose whatsoever (including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Property). Purchaser further hereby WAIVES (and by Closing this transaction will be deemed to have WAIVED) any and all objections and complaints (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Property is or may be subject, including, but not limited to, CERCLA) concerning the physical characteristics and any existing conditions of the Property, including, without limitation, liabilities and responsibilities for the lessor's obligations under any lease relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the Effective Date. Purchaser further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation. For purposes of this Agreement, "**Hazardous Materials**" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, and any other substances regulated because of their effect or potential effect on public health and the environment, including, without limitation, PCBs, lead paint, asbestos, urea formaldehyde, radioactive materials, putrescible materials, and infectious materials. Purchaser agrees to indemnify, defend and hold Seller harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or accrue after Closing and which are in any way related to the ownership, maintenance, or operation of the Property by Purchaser and its successors and assigns, including, without limitation, in connection with Hazardous Materials.

        11.4    **Indemnity**. Purchaser agrees to indemnify, defend and hold Seller harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or accrue after Closing and which are in any way related to the ownership, maintenance, or operation of the Property by Purchaser and its successors and assigns, including, without limitation, in connection with Hazardous Materials.

        11.5    **Survival**. The terms and conditions of this Section 11 shall survive Closing, shall not merge with the provisions of any closing documents and shall be incorporated into the Deed.

**PURCHASER ACKNOWLEDGES AND AGREES THAT THE FOREGOING DISCLAIMERS AND OTHER AGREEMENTS SET FORTH HEREIN ARE AN INTEGRAL PART OF THIS AGREEMENT AND THAT SELLER WOULD NOT HAVE AGREED TO SELL THE PROPERTY TO PURCHASER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH ABOVE.**

      12.    **Miscellaneous**.

        12.1    **Parties Bound; Assignment**. This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto. Purchaser may assign its rights under this Agreement upon the following conditions: (a) the assignee of Purchaser must be an entity controlling, controlled by, or under common control with Purchaser, (b) Purchaser shall not be in default under this Agreement, (c) all of the Earnest Money must have been delivered in accordance herewith, (d) the Inspection Period shall be deemed to have ended, (e) the assignee of Purchaser shall assume all obligations of Purchaser hereunder, but Purchaser shall remain primarily liable for the performance of Purchaser's obligations, (f) a copy of the fully executed written assignment and assumption agreement shall be delivered to Seller at least ten (10) days prior to Closing, and (g) the requirements in Section 12.16 are satisfied. In addition, if (1) prior to the Closing, Purchaser assigns this Agreement to any person or entity, or (2) within six (6) months after the Closing, any direct or indirect transfer, assignment, conveyance or sale of the Property or any ownership interest in Purchaser occurs, then Purchaser shall pay to Seller, immediately upon receipt thereof, the excess of (A) all compensation received by Purchaser for such transfer, assignment,

10

conveyance or sale less the actual out-of-pocket costs reasonably incurred by Purchaser with unaffiliated third parties in connection with such transfer, assignment, conveyance or sale over (B) the Purchase Price.

   12.2 **Headings.**  The article, section, subsection, paragraph and/or other headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

   12.3 **Governing Law.**  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the laws of the state in which the Property is located.

   12.4 **Invalidity and Waiver.**  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

   12.5 **Survival.**  The provisions of this Agreement that contemplate performance after the Closing and the obligations of the parties not fully performed at the Closing (other than any unfulfilled closing conditions which have been waived or deemed waived by the other party) shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing.

   12.6 **Entirety and Amendments.**  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.  All Exhibits hereto are incorporated herein by this reference for all purposes.

   12.7 **Time.**  Time is of the essence in the performance of this Agreement.

   12.8 **No Electronic Transactions.**  The parties hereby acknowledge and agree this Agreement shall not be executed, entered into, altered, amended or modified by electronic means.  Without limiting the generality of the foregoing, the parties hereby agree the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in the "Notices" section of this Agreement.

   12.9 **Notices.**  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Section 1.3.  Any such notices shall, unless otherwise provided herein, be given or served (a) by depositing the same in the United States mail, postage paid, certified and addressed to the party to be notified, with return receipt requested, (b) by overnight delivery using a nationally recognized overnight courier (e.g., Federal Express), (c) by personal delivery, (d) by facsimile transmission during normal business hours with a confirmation copy delivered by another method permitted under this Section 12.9, or (e) by electronic mail addressed to the electronic mail address set forth in Section 1.3 for the party to be notified with a confirmation copy delivered by another method permitted under this Section 12.9.  Notice given in accordance herewith for all permitted forms of notice other than by electronic mail, shall be effective upon the earlier to occur of actual delivery to the addressee or refusal of receipt by the addressee (even if such addressee refuses delivery thereof).  Notice given by electronic mail in accordance herewith shall be effective upon the entrance of such electronic mail into the information processing system designated by the recipient's electronic mail address.  Except for facsimile and electronic mail notices as described above, no notice hereunder shall be effective if sent or delivered by electronic means.  In no event shall this Agreement be altered, amended or modified by electronic mail or electronic record.  A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.  Notices given by counsel to the Purchaser shall be deemed given by Purchaser and notices given by counsel to the Seller shall be deemed given by Seller.

   12.10 **Construction.**  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction – to the effect that any ambiguities are to

670674v.7 LAC348/45000

be resolved against the drafting party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

12.11   **Calculation of Time Periods; Business Day**.   Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is not a Business Day, in which event the period shall run until the end of the next day which is a Business Day. The last day of any period of time described herein shall be deemed to end at 5:00 p.m. local time in the state in which the Property is located.  As used herein, the term "**Business Day**" means any day that is not a Saturday, Sunday or legal holiday for national banks in the city in which the Property is located.

12.12   **Execution in Counterparts**.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts, taken together, shall constitute one Agreement.  To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile or e-mail PDF counterparts of the signature pages, provided that executed originals thereof are forwarded to the other party on the same day by any of the delivery methods set forth in Section 12.9 other than facsimile or electronic PDF. Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

12.13   **No Recordation**.   Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Purchaser without the prior written consent of Seller shall constitute a default hereunder by Purchaser, whereupon Seller shall have the remedies set forth in Section 10.1 hereof.  In addition to any such remedies, Purchaser shall be obligated to execute an instrument in recordable form releasing this Agreement or memorandum or affidavit, and Purchaser's obligations pursuant to this Section 12.13 shall survive any termination of this Agreement as a surviving obligation.

12.14   **Further Assurances**.   In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

12.15   **Discharge of Obligations**.   The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

12.16   **ERISA**.   Under no circumstances shall Purchaser have the right to assign this Agreement to any person or entity owned or controlled by an employee benefit plan if Seller's sale of the Property to such person or entity would, in the reasonable opinion of Seller's ERISA advisors or consultants, create or otherwise cause a "prohibited transaction" under ERISA.  In the event Purchaser assigns this Agreement or transfers any ownership interest in Purchaser, and such assignment or transfer would make the consummation of the transaction hereunder a "prohibited transaction" under ERISA and necessitate the termination of this Agreement then, notwithstanding any contrary provision which may be contained herein, Seller shall have the right to terminate this Agreement.

12.17   **No Third-Party Beneficiary**.   The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing, except that a tenant of the Property may enforce Purchaser's indemnity obligation under Section 4.6 hereof.

12.18   **Reporting Person**.   Purchaser and Seller hereby designate the Title Company as the "reporting person" pursuant to the provisions of Section 6045(e) of the Internal Revenue Code of 1986, as amended.

12.19    **Consent to Jurisdiction of Bankruptcy Court**.  The parties hereto submit and consent to the jurisdiction of the Bankruptcy Court for all matters, including any legal action, suit or proceeding arising out of or relating to this Agreement, any related agreements or the contemplated transactions and the interpretation, implementation and enforcement of this Agreement.

12.20    **Commissions**.  Except for Beer Wells Real Estate Services, whose commission will be paid by Purchaser pursuant to a separate written agreement between Purchaser and such broker, and DJM Realty, whose commission will be paid by Seller pursuant to a separate written agreement between Seller and such broker, Seller and Purchaser each represent and warrant to the other that no real estate brokerage commission is payable to any person or entity in connection with the transaction contemplated hereby, and each agrees to and does hereby indemnify and hold the other harmless against the payment of any commission to any other person or entity claiming by, through or under Seller or Purchaser, as applicable.  This indemnification shall extend to any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and litigation costs) arising as a result of such claims.

12.21    **Confidentiality**.  Purchaser shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties, before or after the Closing, without the prior written specific consent of Seller; provided, however, that Purchaser may, subject to the provisions of Section 4.3, make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Purchaser.

12.22    **Survival**.  The terms and conditions of this Section 12 shall survive the termination of this Agreement and shall survive the Closing.

13.     **Bankruptcy Issues**.

13.1    **Generally**.  Notwithstanding any other provision of this Agreement, the provisions of this Section 13 shall apply to the sale of the Property and the various rights of Seller and Purchaser, including termination rights and remedies, related thereto.

13.2    **Sale Order**.  Seller's obligations under this Agreement are subject to the condition precedent that the Bankruptcy Court shall have entered an order (the "**Sale Order**") in the chapter 11 bankruptcy case filed by Seller in the Bankruptcy Court (the "**Bankruptcy Case**") (a) approving the sale of the Property to Purchaser subject to the terms of this Agreement free and clear of liens, claims and encumbrances other than the Permitted Exceptions, and (b) authorizing Seller to consummate the transactions contemplated by this Agreement.  The Sale Order shall be in a form reasonably acceptable to Seller and Purchaser.  The Closing shall take place as provided in Section 9 above.  Purchaser shall cooperate with Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

13.3    **Termination**.  Purchaser acknowledges that Seller intends to solicit higher and/or better offers for the Property, including entertaining other offers from competing bidders, and to conduct an auction, if necessary.  Notwithstanding any other provision of this Agreement, Seller or Purchaser shall have the right to terminate this Agreement if Seller accepts and subsequently closes on a higher or better offer for the Property pursuant to the Sale Procedures Order.  If Seller terminates this Agreement pursuant to this Section 13.3, Purchaser agrees that it shall have no damages or remedies on account of such termination, other than return of the Earnest Money less the Independent Consideration, and Seller agrees to reimburse Purchaser for Purchaser's actual, verifiable, out-of-pocket pursuit costs in an amount up to 2% of the Purchase Price (subject to Bankruptcy Court approval of the Sale Order).

[SIGNATURE PAGES AND EXHIBITS FOLLOW]

670674v.7 LAC348/45000

SELLER'S
SIGNATURE PAGE TO
PURCHASE AND SALE AGREEMENT
BETWEEN
LACK PROPERTIES, INC., AS SELLER
AND
TRIPLE J INVESTMENTS, INC., AS PURCHASER

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

SELLER:                          LACK PROPERTIES, INC., a Texas corporation

                                 By: _____
                                 Name: _____MELVIN LACK_____
                                 Title: _____PRESIDENT_____
                                 Date Executed. ____27 Dec 2010_____

670674v.7 LAC348/45000           Seller's Signature Page - 1

PURCHASER'S
SIGNATURE PAGE TO
PURCHASE AND SALE AGREEMENT
BETWEEN
LACK PROPERTIES, INC., AS SELLER
AND
TRIPLE J INVESTMENTS, INC., AS PURCHASER

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

PURCHASER:                    TRIPLE J INVESTMENTS, INC., a Texas corporation

By: _____
Name: _____ Johnny Vaughan _____
Title: _____
Date Executed: _____ 12/27/10 _____

Purchaser's Signature Page - 1

**ESCROW AGENT JOINDER**

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received and shall hold the Earnest Money required to be deposited under this Agreement and the interest earned thereto, in escrow, and shall disburse the Earnest Money, and the interest earned thereon, pursuant to the provisions of this Agreement.

Dated: December 28 , 2010

CHICAGO TITLE INSURANCE COMPANY

By:

Name: Joycelyn Armstrong

Title: Commercial Escrow Officer

Escrow Agent Joinder - 1

**EXHIBIT A**

**PROPERTY DESCRIPTION**

[NOTE: TO BE PROVIDED BY TITLE COMPANY]

A-1

### EXHIBIT B

### SPECIAL WARRANTY DEED

| | |
|---|---|
| STATE OF \_\_\_\_\_ | § |
| | §     KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY  OF  \_\_\_\_\_ | § |

_____, a _____ ("**Grantor**"), for and in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, and CONVEYED and by these presents does GRANT, BARGAIN, SELL, and CONVEY unto _____, a _____ ("**Grantee**") the tract or parcel of land in _____ County, _____, described in Exhibit A, together with, without warranty, all rights, titles, and interests of Seller, if any, appurtenant thereto including, without limitation, Grantor's interest, if any, in any and all adjacent streets, alleys, rights of way and any adjacent strips and gores (such land and interests are hereinafter collectively referred to as the "**Property**").

     This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to all easements, restrictions, reservations and covenants now of record and further subject to all matters that a current, accurate survey of the Property would show, together with the matters described in Exhibit B hereto and incorporated herein by this reference, to the extent the same are validly existing and applicable to the Property (hereinafter referred to collectively as the "**Permitted Exceptions**").

     Grantee acknowledges that Grantee has independently and personally inspected the Property. The Property is hereby conveyed to and accepted by Grantee in its present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**" Notwithstanding anything contained herein to the contrary, it is understood and agreed that Grantor and Grantor's agents or employees have never made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, past present or future, with respect to the Property, including, but not limited to, warranties, representations or guaranties as to (1) matters of title (other than Grantor's warranty of title set forth herein), (2) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of Hazardous Materials and  in, on, under or in the vicinity of the Property, (3) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (4) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (5) drainage, (6) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (7) the presence of endangered species or any environmentally sensitive or protected areas, (8) zoning or building entitlements to which the Property or any portion thereof may be subject, (9) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (10) usages of adjoining property, (11) access to the Property or any portion thereof, (12) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (13) the condition or use of the Property or compliance of the Property with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (14) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (15) any other matter affecting the stability and integrity of the Property, (16) the potential for further development of the Property, (17) the merchantability of the Property or fitness of the Property for any particular purpose, (18) the truth, accuracy or completeness of the Confidential Information, (19) tax consequences, or (20) any other matter or thing with respect to the Property. **EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE PURCHASE AND SALE AGREEMENT BETWEEN GRANTOR AND GRANTEE, GRANTOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND TO GRANTEE, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL CONDITION OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY. GRANTEE IS RELYING ON ITS INVESTIGATIONS OF**

670674v.7 LAC348/45000

THE PROPERTY IN DETERMINING WHETHER TO ACQUIRE IT.  THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL PART OF THE CONSIDERATION FOR GRANTOR EXECUTING THIS SPECIAL WARRANTY DEED, AND SHALL SURVIVE CLOSING.

Grantee hereby **FOREVER RELEASES AND DISCHARGES** Grantor and all of Grantor's predecessors-in-interest from all responsibility and liability relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the date hereof, and liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 *et seq.*), as amended ("**CERCLA**"), regarding the condition, valuation, salability or utility of the Property, or its suitability for any purpose whatsoever (including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Property).  Grantee further hereby **WAIVES** any and all objections and complaints (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Property is or may be subject, including, but not limited to, CERCLA concerning the physical characteristics and any existing conditions of the Property, whether arising before or after the date hereof.  Grantee further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation.  For purposes hereof, "**Hazardous Materials**" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, and any other substances regulated because of their effect or potential effect on public health and the environment, including, without limitation, PCBs, lead paint, asbestos, urea formaldehyde, radioactive materials, putrescible materials, and infectious materials.

Grantor hereby reserves and excludes from the conveyance hereunder for the benefit of Grantor and Grantor's successors and assigns forever all of the oil, gas and other minerals in, on, under and that may be produced from the Property including the right to pool or unitize the Property or portions thereof with other lands for the purpose of exploration, production and development of oil, gas and other minerals.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor but not otherwise, subject to the Permitted Exceptions.

Grantee's address is: _____.

B-2

EXECUTED as of _____, 20___.

_____, a

_____

By: _____

Name: _____

Title: _____

THE STATE OF _____        §
                                   §
COUNTY OF _____          §

    This instrument was acknowledged before me on _____, 20___, by _____,
_____ of _____, a _____, on behalf of said
_____.

_____

Notary Public, State of _____

My Commission Expires:_____

_____

Printed Name of Notary

B-3

**EXHIBIT A**

**DESCRIPTION OF THE PROPERTY**

670674v.7 LAC348/45000

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

670674v.7 LAC348/45000

**EXHIBIT C**

**FIRPTA CERTIFICATE**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform _____ ("**Transferee**") that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ ("**Transferor**"), the beneficial owner of _____ (U.S. employer identification number _____), the undersigned, in his capacity as _____ of _____, but not individually, hereby certifies to Transferee the following on behalf of Transferor:

    1.     Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

    2.     Transferor is not a disregarded entity as defined in Section 1.1445 2(b)(2)(iii);

    3.     Transferor's U.S. employer identification number is _____; and

    4.     Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated as of _____, 20__.

                             _____, a
                             _____

                             By: _____
                             Name: _____
                             Title: _____

THE STATE OF _____     §
                                 §
COUNTY OF _____     §

This instrument was acknowledged before me on _____, 20__, by _____, _____ of _____, a _____, on behalf of said _____.

                             _____
                             Notary Public, State of _____
                             My Commission Expires:_____

                             _____
                             Printed Name of Notary

670674v.7 LAC348/45000