

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
07/25/2012**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 10-60149** |
| **LACK'S STORES, INCORPORATED,** | § | **(Chapter 11)** |
| **ET. AL.,** | § | **(Jointly Administered)** |
| | § | |
| **Debtors.** | § | |
| | § | |

**MEMORANDUM OPINION ON DEBTORS' SIXTH OMNIBUS OBJECTION TO (1)
UNDOCUMENTED CLAIMS, AND (2) CLAIMS FOR WHICH THE DEBTORS ARE
NOT LIABLE[1]**

**[Related to Docket Nos. 1399, 1441, 1657, and 1681]**

### I. INTRODUCTION

Lack's Stores, Inc. (Lack's) filed a voluntary Chapter 11 petition and thereafter rejected a

Lease (the Lease) on real property located in Williamson County at 13530 HWY 183 North, in

Austin, Texas (the Property). Thrivent Financial for Lutherans, Inc. (Thrivent), an assignee of the

Lease, filed a proof of claim against Lack's for lease rejection damages.  The Group Family

Limited Partnership (GFP), the landlord under the Lease and title owner of the Property, filed its

own proof of claim for lease rejection damages under the same Lease.   Prior to Lack's

bankruptcy filing, Thrivent loaned $3,400,000.00 to GFP secured by a Deed of Trust and

Security Agreement and Fixture Financing Statement (the Deed of Trust), an Assignment of

Leases and Rents (the Assignment), and other collateral security documents (the Security

Documents).  Thrivent contends that as assignee of the Lease—in accordance with the provisions

of the Deed of Trust, Assignment, and Security Documents—it is entitled to the lease rejection

---

[1] This Memorandum Opinion only relates to the Claim of Thrivent Financial for Lutherans for Lease Rejection
Damages for the Premises at 13530 HWY 183 North, Austin, Texas.

damages.  GFP contends that it, as the landlord under the Lease, is entitled to the lease rejection damages.

At the close of the hearing on this dispute, the Court took the matter under advisement. Based on the entire record, the Court now makes the following written findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves the right to make additional findings and conclusions as it deems appropriate.

## II. FINDINGS OF FACT

1. The Group J-Bar, Inc. (J-Bar) leased the Property to Lack's.  GFP purchased the Property from J-Bar, and GFP "is the successor in interest to all of the right, title and interest of [J-Bar], as Landlord, under the Lease."  GFP assigned the Lease to Thrivent "to secure its indebtedness to Thrivent."  [Thrivent's Ex. No. 5, at Ex. A].

2. On September 28, 2005, Thrivent loaned $3,400,000.00 to GFP [Docket No. 1674].  By its own terms, the Promissory Note (the Note)[2] is secured by the Deed of Trust,[3] the Assignment,[4] and the other collateral Security Documents. [Thrivent's Ex. No. 1, p. 2 – 3]. Included among the documents is a Subordination and Attornment Agreement (the Attornment Agreement)[5] signed by Thrivent, GFP, and Lack's.  Each document sets forth that it is governed by the laws of the state where the Property is located.  [Thrivent's Ex. No. 1, p. 5; Ex. No. 2, p. 40; Ex. No. 3, p. 7; Ex. No. 4, p. 4].  The Note incorporates all the

---

[2] The Note refers to GFP as the Borrower and to Thrivent as the Lender.

[3] The Deed of Trust refers to GFP as the Grantor and to Thrivent as the Beneficiary.

[4] The Assignment refers to GFP as the Assignor and to Thrivent as the Assignee.

[5] The Attornment Agreement refers to GFP as the Borrower, to Thrivent as the Lender, and to Lack's as the Tenant.

other documents, and the documents were signed on the same day.  [Thrivent's Ex. No. 1, p. 3].   Collectively, the Note and the other documents are referred to as the "Loan Documents." [Thrivent's Ex. No. 1, p. 3].

3.  To varying degrees, each of the other Loan Documents reiterates that they serve to secure GFP's obligations to Thrivent [Thrivent's Ex. No. 2, p. 5; Ex. No. 3, p. 2; Ex. No. 4, p.1].

4.  The Note's provisions control over any inconsistencies with the other Loan Documents. [Thrivent's Ex. No. 1, p. 7].  The Note refers to the Deed of Trust for the definition of an Event of Default; thus, whatever constitutes an Event of Default under the Deed of Trust also constitutes an Event of Default under the Note.  [Thrivent's Ex. No. 1, p. 3].

5.  The Deed of Trust lists several Events of Default, including the following:

    a.  If there is a failure to pay "any principal, interest, Reinvestment Charge, or Default Premium payable under the terms of the Note" within ten days of being due. [Thrivent's Ex. No. 2, p. 30].

    b.  If there is a violation of "any non-monetary term, covenant or condition" of the Loan Documents (besides the violations incorporated into the other Events of Default) and a continuation in default for thirty days after written notice from the Beneficiary. [Thrivent's Ex. No. 2, p. 30].

    c.  If "there shall be commenced against Grantor . . . any case, proceeding or other action" "under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, dissolution or other relief with

respect to it or its debts . . . which . . . results in the entry of an order for relief or any such adjudication or appointment . . . ." [Thrivent's Ex. No. 2, p. 30 – 31].

6. Thrivent and GFP made the following stipulation: "[GFP] is not in default under the terms of the documents which evidence or otherwise relate to that certain $3,400,000[.00] loan made by [Thrivent] to [GFP] on or about September 28, 2005 . . . ." [Doc. No. 1674].

7. Thrivent's remedies under the Loan Documents are "cumulative and concurrent" and are not exclusive of each other.  [Thrivent's Ex. No. 1, p. 7; Ex. No. 2, p. 36].  To the extent that Article 6 of the Deed of Trust, entitled "Leases and Rents," conflicts with the Assignment, the Assignment controls.  [Thrivent's Ex. No. 2, p. 28; Ex. No. 3, p. 7].  However, the rights in the Assignment are "in addition to and shall be cumulative with the rights given and created in Article 6 of the Security Instrument [i.e., the Deed of Trust]."  [Thrivent's Ex. No. 3, p. 7].

8. Under the Note, GFP is not personally liable for the outstanding principal balance of the Note, and Thrivent's monetary remedies are limited to GFP's interest in the Property "and the improvements, furnishings, equipment, leases and rents."  However, several exceptions are made, and GFP is personally liable for "any rent, issues, profits, and/or income from the Premises which have been prepaid more than thirty (30) days in advance," as well as for "any rents, issues profits, and/or income collected by Borrower in excess of normal and verifiable operating expenses from Premises after the occurrence of an Event of Default hereunder or under any other Loan Document."  [Thrivent's Ex. No. 1, p. 8 – 9].  Similarly, both the Deed of Trust and the Assignment prohibit GFP from "anticipat[ing] the rents . . . for more than one (1) month in advance."  [Thrivent's Ex. No. 2, p. 26; Ex. No. 3, p. 3].

9.  In its Granting Clauses, the Deed of Trust grants "[a]ll rents, issues, income, revenue, receipts, fees, and profits now due or which may hereafter become due under or by virtue of and together with all right, title and interest of Grantor in and to any lease . . . for the use or occupancy of the Premises or any part thereof together will all security therefor and all monies payable thereunder . . . ." [Thrivent's Ex. 2, p. 7].

10. Article 6 of the Deed of Trust, entitled "Leases and Rents," concerns the assignment of Leases.  It states that "Grantor does hereby unconditionally and absolutely sell, assign and transfer unto Beneficiary all of the leases, rents, issues, income and profits now due and which may hereafter become due under or by virtue of any lease . . . , it being the intention of this Deed of Trust to establish an absolute transfer and assignment of all such leases and agreements and all of the rents and profits from the Premises and/or Grantor's operation or ownership thereof unto Beneficiary . . . ; provided, Grantor is hereby given a license by Beneficiary to collect and retain such rents and profits unless and until an Event of Default exists under this Deed of Trust." [Thrivent's Ex. No. 2, p. 27].  In the same paragraph, the Deed of Trust outlines how the Beneficiary (i.e. Thrivent) may demand surrender of the Property and Leases and collect rents before taking legal action to foreclose the lien.  The paragraph concludes, stating, "All rents and payments received by Grantor after Beneficiary has exercised any of its rights under this assignment shall be held by Grantor in trust for Beneficiary and shall be delivered to Beneficiary immediately without demand." [*Id.* at 27 – 28].

11. Under the Deed of Trust, one of Thrivent's remedies after an Event of Default is to "enter . . . the Premises . . . and *thereupon* . . . demand, sue for, collect and receive all rents

of the Premises and every part thereof." [Thrivent's Ex. No. 2, p. 32—33] (emphasis added).

12. The Assignment assigns to Thrivent the Leases "together with the immediate and continuing right to collect and receive all rents, revenues, income, payments, issues and profits arising from the Leases or out of the Premises or any part thereof." [Thrivent's Ex. No. 3, p. 2]. Moreover, the "Assignment shall constitute a perfected, absolute and present assignment of the Leases and Rents, provided Assignee hereby grants a license to Assignor to collect all of the Rents, but not prior to accrual, and to retain, use and enjoy the same unless and until an Event of Default, as defined in the [Deed of Trust], shall occur and be continuing." [Thrivent's Ex. No. 3, p. 3]. The Attornment Agreement reiterates that GFP "absolutely . . . assigns . . . the Lease and all rents and other sums payable under the Lease" to Thrivent, "provided, however, that until written demand is made by Lender to Tenant, all rents and other sums payable under the Lease shall be paid to Borrower, but only as they accrue." [Thrivent's Ex. No. 4, p. 2].

13. Upon an Event of Default, the Assignment allows Thrivent to instruct Lack's to pay rents to Thrivent. [Thrivent's Ex. No. 3, p. 3 – 4]. The Assignment obligates Lack's to make payments upon Thrivent's demand, without need for Lack's to verify whether an Event of Default actually occurred. [Thrivent's Ex. No. 3, p. 5]. Pursuant to the Attornment Agreement, once Thrivent gives written notice to Lack's, Lack's agrees to "pay the rent and all other sums due" to Thrivent instead of to GFP. [Thrivent's Ex. No. 4, p. 2].

14. In the Attornment Agreement, Lack's attorned to Thrivent "as the landlord under the Lease, . . . effective and self-operative . . . upon [Thrivent's] succe[ssion] to the interest of the landlord under the Lease." Thrivent can acquire GFP's interest under the Lease "as a

result of foreclosure, trustee's sale, deed in lieu of foreclosure or other proceeding for the enforcement of the Security Instrument [i.e., the Deed of Trust] or rights of Lender under the Assignment." [*Id.*].  Once Thrivent acquires GFP's rights under the Lease, Thrivent "shall not be . . . bound by any rent or additional rent that Tenant might have paid in advance to any prior lessor under the Lease . . . for any period beyond the month in which [Thrivent] succeeds to the interest of Borrower under the Lease." [*Id.* at p. 2 – 3].

15. GFP has assigned to Thrivent "all proceeds from settlements relating to terminations of leases and all claims for damages arising from rejection of any lease under the bankruptcy laws." [Thrivent's Ex. No. 2, p. 27].  GFP has also assigned "claims for damages resulting from default under said Leases whether resulting from acts of insolvency or bankruptcy or otherwise, and lump sum payments for the cancellation of said Leases." [Thrivent's Ex. No. 3, p. 2].  Moreover, the Assignment states that "[u]pon or at any time during the continuance of an Event of Default," Thrivent—"to the exclusion of [GFP]"—has the right to file proofs of claim against the tenants.  [Thrivent's Ex. No. 3, p. 6].

16. In the Attornment Agreement, Lack's expressly "recognizes the Assignment made by Borrower to Lender and agrees to pay, upon receipt of written demand from Lender, all rents and other sums as directed by Lender." [Thrivent's Ex. No. 4, p. 2].

17. According to the Assignment, the term "Rents" includes actual rental payments as well as a variety of other types of claims, such as "claims for damages resulting from default under said Leases." [Thrivent's Ex. No. 3, p. 2].  The Assignment lists items that the Rents may be applied to (in the order chosen by Thrivent); among these is payment of the indebtedness due under the Note and the Loan Documents.  [*Id.* at p. 4].

18. On November 16, 2010, Lack's filed a voluntary petition under Chapter 11 of the Bankruptcy Code. [Docket No. 1]. On December 15, 2010, the Court ordered that Lack's could reject the Lease if it gave the landlord ten days notice. [*see* Docket No. 177]. On January 20, 2011, Lack's filed a notice of intent to vacate the premises and reject the Lease; the rejection was effective as of January 31, 2011.[6] [Docket No. 449].

19. On February 16, 2011, GFP filed its proof of claim against Lack's for lease rejection damages under the Lease.[7] [Thrivent's Brief, Doc. No. 1657, at 1]. GFP's claim was for $879,791.97.[8] On February 25, 2011, Thrivent filed its own proof of claim against Lack's for lease rejection damages in the amount of $780,955.41. [Thrivent's Ex. No. 5]. In Lack's Sixth Omnibus Objection (filed on December 14, 2011) to certain claims, Lack's requested that this Court disallow Thrivent's claim, and that—without prejudicing any of Thrivent's rights against GFP—this Court expunge Thrivent's claim from the record. [Doc. No. 1399, at 6 – 7]. Thrivent responded on January 3, 2012. [Doc. No. 1441].

20. In 2011 and 2012, GFP made ad valorem tax payments to Williamson County totaling approximately $193,841.00. [Tape Recording 6/20/2012 Hearing at 3:08:35 p.m.]. GFP has incurred approximately $23,000.00 in legal fees. [*Id.* at 3:09:16 p.m.]. GFP has also spent approximately $32,280.00 on property insurance for the Property; the Property sustained

---

[6] In the Attornment Agreement, Lack's committed that "in the event the Lease is rejected or deemed rejected in any bankruptcy proceeding with respect to landlord, Tenant shall not exercise any right it may have to treat the Lease as terminated under 11 U.S.C. § 365(h), as amended." [Thrivent Ex. No. 4, p. 3].

[7] This Court notes an insider relationship between GFP and Lack's: GFP is a partnership among Jay Lack, his wife and his children. [Tape Recording, 6/20/2012 Hearing at 3:07:19 p.m.]. Thus, Jay Lack signed the Attornment Agreement for Lack's in his capacity as Vice President, *and* he signed the same document for GFP as manager of Keeping it Together, LLC, which is the General Partner of GFP. [Thrivent Ex. No. 4, p. 6 – 7]. This insider relationship in no way changes the Court's decision in this dispute.

[8] A register of filed claims—including GFP's—may be found at the Kurtzman Carson Consultants, LLC website (http://www.kccllc.net/Lacks). GFP's claim is listed as Claim No. 322 on the website. Thrivent's claim is listed as Claim No. 402. In this Court's claims registry, Thrivent's claim is listed as Claim No. 122. GFP's claim is not in this Court's registry.

damage from vandalism but the insurance deductible is $50,000.00. [*Id.* at 3:10:03 p.m., 3:10:19 p.m.]. Seeking to mitigate damages, GFP has found two prospective new tenants for the Property. [*Id.* at 3:10:40 p.m.]. Estimates are still being sought, but the estimated renovation cost to prepare the Property for the new tenants is between $250,000.00 and $300,000.00. [*Id.* at 3:10:55 p.m.]. GFP does not anticipate receiving the required building permits until August or September of 2012. [*Id.* at 3:11:44].

21. GFP makes monthly payments to Thrivent in the amount of $25,470.00. [*Id.* at 3:09:38 p.m.]. GFP has remained current on its obligations to Thrivent. [*Id.* at 3:08:03 p.m.]. Since the Lease was rejected, GFP has paid Thrivent $432,990.00. [*see Id.* at 3:09:38 p.m.; GFP's Ex. No. 1, p. 1 – 15]. By the time the building permits for renovations are obtained, GFP expects to have paid approximately $75,000.00 more to Thrivent under the Note. [Tape Recording 6/20/12 Hearing at 3:12:03 p.m.].[9]

22. Within two or three months of June 20, 2012, GFP expects to have paid more with regard to the Note and the Property than the amount GFP requests for lease rejection damages. [*Id.* at 3:15:10 p.m.].

23. At a hearing on January 18, 2012 concerning Lack's Sixth Omnibus Objection, the Court continued the hearing on the dispute at bar to February 15, 2012. On February 15, 2012, counsel for Thrivent and GFP were present and indicated they were approaching an agreement on who could collect lease rejection damages. The Court therefore continued the hearing to February 29, 2012, at which time the parties indicated that they were unable to reach a settlement. The Court therefore set a hearing for April 18, 2012. The Court took evidence at the April 18 hearing and continued the hearing to May 22. The Court then

---

[9] This Finding of Fact is based on Jay Lack's Testimony at the June 20, 2012 Hearing as well as on GFP's Exhibit No. 1, p. 1 – 15.

continued the May 22 hearing to June 20.  At the hearing on June 20, this Court heard testimony from Jay Lack, and the Court then took the matter under advisement.  Now, based upon the Court's review of the exhibits, its consideration of Jay Lack's testimony and oral arguments of counsel and the briefs of Thrivent, the Court issues this ruling in favor of GFP.

### III. CREDIBILITY OF WITNESSES

Jay Lack (also known as Erwin Jay Lack) testified at the hearing on June 20, 2012.  Lack is the Manager of Keeping It Together, LLC, which is the General Partner of GFP.  His testimony included, among other topics, the statement that GFP filed its own proof of claim for lease rejection damages, a description of GFP's expenses concerning the Note and the Property, as well as a description of the nature of GFP.  This Court finds Lack to be a credible witness, and gives substantial weight to his testimony.

No other witnesses testified for GFP, and no witnesses at all testified for Thrivent.

### IV. CONCLUSIONS OF LAW

**A. Jurisdiction, Venue, and Constitutional Authority to Sign a Final Order**

    1.   <u>Jurisdiction</u>

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This contested matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (K), (M), and (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

    2.   <u>Venue</u>

Venue is proper pursuant to 28 U.S.C. § 1408.

3.     Constitutional Authority to Enter a Final Order

In wake of the Supreme Court's ruling in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court must also evaluate whether it has the constitutional authority to sign a final order adjudicating the dispute at bar.    In *Stern*, the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final orders on counterclaims filed by the debtor—is  an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based solely on state common law and does not affect the claims adjudication process. 131 S. Ct. at 2616.

In the dispute at bar, the facts are easily distinguishable from those in *Stern*.  Here, two creditors (Thrivent and GFP) have filed claims in this Chapter 11 case, and this Court must determine which claim to the lease rejection damages should prevail.   Stated differently, the resolution of this dispute necessarily involves the claims adjudication process.  For this reason, the Court concludes that it has the constitutional authority to enter a final order in this dispute.

**B.  The Court must apply Texas Law to examine the parties' respective rights**

The Supreme Court has held that state law governs property interests unless a federal interest requires a different result.  *Butner v. U.S.*, 440 U.S. 48, 55 (1979).  "Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a 'windfall merely by reason of the happenstance of bankruptcy.'"  *Id.* (quoting *Lewis v. Manufacturers Nat. Bank*, 364 U.S. 603, 609 (1961)).   The justification for using state law applies not only to ownership interests, but also to security interests, including a mortgagee's interest in rents.  *Id.*  Because the Property is located in Texas and because each of the Loan Documents has a provision setting

11

forth that Texas law governs any disputes [*see* Finding of Fact No. 2] this Court will apply Texas law to examine the parties' respective rights.

## C. Under Texas Law, GFP—not Thrivent—is entitled to recover from Lack's on its Proof of Claim

Thrivent makes two arguments as to why it should prevail in this dispute: (1) Thrivent asserts that Lack's must pay lease rejection damages directly to Thrivent because GFP assigned the Lease to Thrivent and Lack's specifically agreed to pay Thrivent upon demand; and, alternatively, (2) Thrivent argues that even if GFP can recover on its claim from Lack's, GFP must turn the proceeds over to Thrivent because the Deed of Trust and the Assignment prohibit GFP from anticipating rents more than one month in advance, and the Attornment Agreement evidences that the Lease was material to Thrivent making the Loan to GFP.

This Court will first consider Thrivent's second argument. Then, this Court will address Thrivent's first argument.

1. Presently, GFP is not required to turn over the lease rejection damages to Thrivent

    i.  *Discussion of Texas law on assignment of rents*[10]

Two types of assignments of rents exist under Texas law: absolute assignments and collateral assignments. *Las Torres Dev., LLC v. La Placita Shopping Ctr., LLC* (*In re Las Torres Dev., LLC*), 408 B.R. 876, 882 (Bankr. S.D. Tex. 2009) (citing *Cadle Co. v. Collin Creek Phase II Ass'n*, 998 S.W.2d 718, 722 (Tex. App.—Texarkana 1999, no pet.). Functionally, both types of assignments serve to secure debt. *FDIC v. Int'l Prop. Mgmt., Inc.*, 929 F.2d 1033, 1035

---

[10] Technically, Thrivent is not seeking *rents*, but *damages* for the rejection of the Lease. Nevertheless, the law governing assignments remains the same. *See Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex. 1981) (holding that under the lien theory of mortgages, "the mortgagee is not the owner of the property and is not entitled to its *possession, rentals or profits*" (emphasis added)); *see also* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 4.2 cmt. e (1997) ("The term 'rents,' as used in this section, encompasses also 'issues and profits' of real estate. Moreover, the definition includes not only rents and royalties that arise out of lease relationships, but also other proceeds that are paid primarily for the possession, occupancy, or use of real property."). Indeed, even the Assignment refers to "claims for damages resulting from default under said Leases" as "Rents." [Finding of Fact No. 17].

(5th Cir. 1991). But until recently, only a collateral assignment created a security interest; an absolute assignment went a step farther—it "passe[d] title to the rents" contingent on an event, such as default. *Taylor v. Brennan*, 621 S.W.2d 592, 594 (Tex. 1981).

On June 17, 2011, a new section of the Texas Property Code went into effect. This Code provides that "[a]n assignment of rents creates a presently effective security interest in all accrued and unaccrued rents arising from the real property . . . regardless of whether the document is in the form of an absolute assignment, an absolute assignment conditioned on default or another event, [or] an assignment as additional security. . . ." Tex. Prop. Code. Ann. § 64.051(b) (West 2011). In other words, both "absolute" and "collateral" assignments of rents are actually security interests. However, the new provisions do "not affect an action or other proceeding commenced before the effective date of this Act." 2011 Tex. Sess. Law Serv. 1537 (West). In the case at bar, both proofs of claim were filed in February 2011, *before* the new provisions became effective. [Finding of Fact No. 19]. Therefore, this Court will analyze prior Texas law in resolving this dispute.[11]

Before the new Texas Property Code provisions were enacted, the courts described absolute assignments in a number of ways.[12] An absolute assignment "transfer[s] the right to rentals automatically upon the happening of a specified condition, such as default." *Taylor*, 621 S.W.2d at 594. "The borrower under an absolute assignment immediately transfers title to rents to the lender, but retains the right to receive those rents unless and until the borrower defaults.

---

[11] Because the Debtors' Objection to Thrivent's proof of claim was filed on December 14, 2011 [Finding of Fact No. 19], this Court acknowledges the possibility that this dispute was not actually commenced until after the new Texas Property Code provisions came into effect. This Court will therefore also analyze the dispute under the new provisions, but the outcome is the same.

[12] There is a strong presumption against absolute assignments in Texas, and courts require "especially clear evidence" of intent to create an absolute assignment. *Las Torres Dev.*, 408 B.R. at 883 (citing *Int'l Prop. Mgmt.*, 929 F.2d at 1036). Otherwise, the automatic transfer of the right to rents could unnecessarily threaten the interests of the mortgagor. *Taylor*, 621 S.W.2d at 594.

Thus, although the lender's rights arise immediately, the assignment defers the lender's enjoyment of those rights until the borrower's default." *Int'l Prop. Mgmt.*, 929 F.2d at 1035.  It "vests fee title in the assignee" and "operates as a present transfer of title to rents contingent upon the mortgagor's default." *Las Torres Dev.*, 408 B.R. at 882 (citing *Int'l Prop. Mgmt.*, 929 F.2d at 1035).  Regardless of the phraseology, a default must occur before the assignee can collect rents.[13]  Effectively, absolute assignments are "*contingent* present assignments." [14]  *Int'l Prop. Mgmt.,* 929 F.2d at 1036 (emphasis added).

In contrast, collateral assignments grant a lesser interest—a security interest—in the assignee.  Texas adheres to the lien theory of mortgages, such that the assignee of mortgaged property does not have the right of "possession, rentals or profits." *Taylor,* 621 S.W.2d at 594.  Texas follows the common law rule that the assignment, as a security pledge, "does not become operative until the mortgagee obtains possession of the property, or impounds the rents, or secures the appointment of a receiver, or takes some similar affirmative action." *Id.* at 594; *see also In re Spears*, 352 B.R. 83, 90 (Bankr. N.D. Tex. 2006); *Cadle Co.*, 998 S.W.2d at 722.  Thus, collateral assignments—as security for the debt—prevent the mortgagee from collecting rent until he "[takes] affirmative action . . . to perfect an interest in the payment." *See In re Spears*, 352 B.R. at 90.  Such affirmative steps to perfect that interest occur *after* default.[15]

---

[13] Admittedly, the foundational case on Texas assignment law, *Taylor v. Brennan*, held that an absolute assignment "transfer[s] the right to rentals automatically upon the happening of a specified condition, *such as* default."  621 S.W.2d at 594 (emphasis added).  At first glance, the words "such as" may suggest that absolute assignments can be contingent on events besides default.  Later cases, however, indicate otherwise.  For example, the Fifth Circuit (applying Texas law) determined that an absolute assignment "defers the lender's enjoyment of those rights until the borrower's default."  *Int'l Prop. Mgmt.*, 929 F.2d at 1035 – 36.  Similarly, this Court held that an absolute assignment "operates as a present transfer of title to rents contingent upon the mortgagor's default." *Las Torres Dev.*, 408 B.R. at 882.

[14] The logical inconsistency of an "absolute" and simultaneously "contingent" assignment caused the Fifth Circuit to term absolute assignments a "legal fiction." *Int'l Prop. Mgmt.*, 929 F.2d at 1035.

[15] Applying Texas law, the Fifth Circuit has stated that "a mortgagee [must] take affirmative steps to secure his interests in rents collected *between default* and foreclosure." *Wolters Vill., Ltd. v. Vill. Properties, Ltd. (Matter of*

In sum, both types of assignment—absolute and collateral—require default before rent can be recovered.[16]  Even though the Lease Documents prohibit GFP from anticipating rents more than one month in advance [Finding of Fact No. 8], and although GFP is personally liable under the Note for rents collected more than thirty days in advance [*Id.*], and even though GFP assigned the right to file proofs of claim [Finding of Fact No. 15], Texas law indicates that Thrivent cannot recover anything from Lack's unless GFP is in default.  Therefore, if GFP is not in default, it does not matter whether the assignment is absolute or collateral.

     ii.    *Pursuant to the parties' stipulations, GFP is not in default under the Loan Documents*

At the hearing on this issue on April 18, 2012, Thrivent and GFP stipulated that GFP "is not in default under the terms of the documents which evidence or otherwise relate to that certain [$3,400,000.00] loan made by Thrivent Financial for Lutherans to the Group Family Partnership on or about September 28, 2005." [Finding of Fact No. 6].  Thrivent cannot prevail on its proof of claim absent a default under any of the terms of the Loan Documents.  Given the importance of the Stipulation, this Court considers the two alternative interpretations of the Stipulation: (1)

---

*Vill. Properties, Ltd.*) 723 F.2d 441, 443 (5th Cir. 1984) (emphasis added).  Though the Fifth Circuit did not have reason to consider whether the mortgagee could also claim rents accruing *before* default, the statement illustrates that default is typically a precondition to recovery.  A key principle confirms this conclusion.  A collateral assignment is a *lesser* grant than an absolute assignment; therefore, the assignee of a collateral assignment should not be able to perfect its interest and collect rents in situations where an assignee under an absolute assignment could not.

[16] During oral arguments, Thrivent asserted that its rights to the lease rejection damages are analogous to a mortgagee's or an assignee's rights to insurance or condemnation proceeds.  These scenarios are distinguishable for two reasons: (1) Most insurance and condemnation proceedings are for the loss of physical portions of the premises.  In this case, the premises remain and can be leased to new tenants (this Court does not address whether the new Texas Property Code provisions alter this specific conclusion; the new provision states that "the security interest in rents is *separate and distinct* from any security interest held by the assignee in the real property from which the rents arise," Tex. Prop. Code Ann. § 64.051(b) (West 2012) (emphasis added)); and (2) Historically, Texas law on assignments of rents is distinct from that regarding insurance, as evidenced by many insurance cases that do not even reference whether the assignment was absolute or collateral.  *See, e.g., Lewis v. Wells Fargo Home Mortg., Inc.*, 248 S.W.3d 828 (Tex. App.—Texarkana 2008, no pet.); *Hughes v. Alpert*, 1997 WL 161815 (Tex. App.—Dallas 1997, writ denied) (not designated for publication); *Zidell v. John Hancock Mut. Life Ins. Co.*, 539 S.W.2d 162 (Tex. App.—Dallas 1976, writ ref'd n.r.e.).

GFP is not in monetary default, or (2) GFP is not in default (either monetary or nonmonetary) under any terms of the various Loan Documents.

A stipulation admitting or agreeing on the existence of designated facts for the purpose of trial is to be fairly and reasonably construed as a whole in order to effectuate the parties' intention and should be interpreted in light of the whole record and surrounding circumstances. *See Rice v. Glad Hands, Inc.*, 750 F.2d 434, 438 (5th Cir. 1985). "Factual stipulations are binding on parties, having 'the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' " *E.E.O.C. v. Service Temps Inc.*, 679 F.3d 323, 330 (5th Cir. 2012) (quoting *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2983 (2010)).  Once a matter is stipulated, it should not be further inquired unless the stipulation is vacated by consent or set aside by the court. *Downs v. American Emp. Ins. Co.*, 423 F.2d 1160, 1164 – 65 (5th Cir. 1970). "A stipulation binds parties only to the terms actually agreed upon." *Glad Hands*, 750 F.2d at 438.  "Under federal law, stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them, unless manifest injustice would result . . . or evidence contrary to [the] stipulation [is] substantial." *United States v. Needham* (*In re Needham*), 354 F.3d 340, 346 (5th Cir. 2003) (quoting *Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996)).

During oral arguments, the parties frequently discussed the stipulation in terms of GFP making timely payments pursuant to the Note; nevertheless, this Court adopts the second interpretation because it accords with the apparent intention of the parties.  First, the breadth of the stipulation—which makes no reference to payments—suggests that the parties desired to rule out the possibility of any type of default under any of the Loan Documents.  [*see* Finding of Fact No. 6].  Indeed, the very nature of the Loan Documents points to the same conclusion: the Note

16

refers to the Deed of Trust for the definition of an Event of Default [Finding of Fact No. 4] and the Deed of Trust lists multiple ways for GFP to default [Finding of Fact No. 5]. This Court sees no reason to assume that the parties did not have all of the terms of the Deed of Trust in mind when they made the stipulation.

Second, if Thrivent actually contends that GFP is in default under non-monetary provisions of the Loan Documents, it would have so contended. Though Thrivent notes that GFP agreed not to anticipate rents more than one month in advance [Finding of Fact No. 8], Thrivent has never argued that GFP's actions create a default. And during oral arguments, when GFP asserted that Thrivent could not recover absent default, Thrivent never responded by arguing that GFP is actually in non-monetary default.

Accordingly, the actions of Thrivent—as well as the plain language of both the Stipulation and the Loan Documents—strongly indicate that the Stipulation means that GFP is not in default in any form whatsoever under any of the Loan Documents. Though GFP may be "anticipating rents," Thrivent has not alleged any default. Thrivent has no right at this time to collect rents; as between the two parties, GFP presently has superior rights to the rents. Thus, if Lack's pays lease rejection damages to GFP, GFP does not have to remit the funds to Thrivent.[17]

---

[17] If this Court concluded that the parties intended the Stipulation to encompass only monetary default, then this Court would need to consider whether Lack's bankruptcy filing effectuated a non-monetary default by GFP, and whether this would constitute an unenforceable ipso facto clause under 11 U.S.C. §365(e)(1). An ipso facto clause is a contractual or other provision that results in a loss of property rights or the elimination of obligations that existed prior to the commencement of a bankruptcy proceeding through which the loss, elimination or limitation occurs due to the debtor's bankruptcy or insolvency. *Tex. Attorney Gen. v. Brown* (*In re Fort Worth Osteopathic Hosp., Inc.*), 387 B.R. 706, 711 (N.D. Tex. 2008) (citing *Northrop Grumman Tech. Servs. v. Shaw Group Inc. (In re IT Group, Inc.)*, 302 B.R. 483, 487 (D. Del. 2003)). The Deed of Trust provides that a proceeding relating to bankruptcy commenced against the Grantor constitutes an Event of Default. [Finding of Fact No. 5(c)]. Generally, courts protect the debtor who files for bankruptcy by prohibiting ipso facto clauses. *Mims v. Fid. Funding, Inc.*, 307 B.R. 849, 858 (N.D. Tex. 2002) (accepting the general prohibition against ipso facto clauses, but holding that the prohibition was inapplicable in that case). Some jurisdictions also indicate that a contractual provision resulting in the loss of a *non-debtor's* property rights due to a bankruptcy filing against the non-debtor constitutes an unenforceable ipso facto clause. *See In re B. Siegel Co.*, 51 B.R. 159 (E.D. Mich. 1999); *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (S.D.N.Y. 2010). However, because ipso facto clauses are commonly intended to apply to protect debtors during bankruptcy, its application to

iii.    *Even if the new Texas Property Code section applies, Thrivent still cannot collect rents absent default*

According to the new provisions of the Texas Property Code, all assignments of rents create security interests. Tex. Prop. Code. Ann. § 64.051(b). "The security interest in rents is separate and distinct from any security interest held by the assignee in the real property from which the rents arise." *Id.*

Under the new Texas Property Code provisions, the assignee can recover absent default if agreed to by the assignor:

> On recordation of a document creating an assignment of rents, the security interest in the rents is perfected.  This subsection prevails over a conflicting provision in the document creating the assignment of rents or a law of this state other than this chapter that prohibits or defers enforcement of the security interest until the occurrence of a subsequent event, *such as a subsequent default of the assignor*, the assignee's obtaining possession of the real property, or the appointment of a receiver.

Tex. Prop. Code Ann. § 64.052(b) (emphasis added).  According to another subsection, the assignee can collect rents "[a]fter default, *or as otherwise* agreed by the assignor."  Tex. Prop. Code Ann. §§ 64.054(a), 64.055(a) (emphasis added).

Thus, although the assignee can collect absent default, the assignor must so agree.  For two reasons, this Court concludes that GFP did not agree that Thrivent could recover absent default.  First, even under the new Property Code provisions, this Court construes the Loan Documents in accordance with Texas precedent.  Just as Texas courts have demanded very clear evidence of intent to create an absolute assignment (since absolute assignments could jeopardize the assignor's interests), so this Court requires clear evidence of intent to allow recovery absent default.  Second, specific provisions of contracts must be construed in light of the whole contract.  *See SAS Institute, Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (per curiam).

non-debtors is ambiguous.  And, because the parties have already stipulated that GFP is not in default, this Court declines to analyze whether the Deed of Trust contains an unenforceable ipso facto clause.

Notwithstanding the provisions authorizing Thrivent to collect rent upon demand, the various Loan Documents—when construed together—condition Thrivent's recovery on default. Both the Assignment and the Deed of Trust grant GFP a license to collect rents *until* an Event of Default occurs. [Finding of Fact Nos. 10, 12]. And, the Attornment Agreement predicates Lack's' attornment to Thrivent on Thrivent first "succeed[ing] to the interest of the landlord under the Lease." [Finding of Fact No. 14]. Although GFP is personally liable under the Note for rents collected more than thirty days in advance [Finding of Fact No. 8], this section of the Note does not specifically authorize Thrivent to collect such rents when GFP is not in default. In sum, because of the presumption against recovering without default, and because the Loan Documents evidence that the parties did not intend for Thrivent to recover absent default, Thrivent cannot collect the rents until GFP falls into default.

The new provisions of the Texas Property Code allow an assignee of rents to collect rents "upon default, or as otherwise agreed by the assignor." Here, GFP did not agree that Thrivent could collect rents absent default. Because the parties stipulated that GFP is not in default, Thrivent cannot collect the rents.

2. <u>Because the Attornment Agreement does not alter the nature of Thrivent's rights, Thrivent cannot recover directly from Lack's</u>

    i. *The Attornment Agreement must be construed in conjunction with the other Loan Documents*

Thrivent—citing to the Attornment Agreement—contends that it can recover lease rejection damages directly from Lack's instead of GFP. However, this Court cannot consider the Attornment Agreement in isolation from the other Loan Documents; rather, this Court must construe them together.

By definition, a subordination agreement merely alters the priority of different parties' liens, and it "must be construed according to both the expressed intention of the parties and its own terms." *Western Auto Supply Co. v. Brazosport Bank*, 840 S.W.2d 157, 159 (Tex. App.—Houston [1st Dist.] 1992, no writ).   Indeed, when the terms of a subordination agreement indicate that the parties intended it to be interpreted alongside a *past* security agreement, the subordination agreement must be incorporated into the past security agreement. *Id.* at 160.   In an attornment agreement, "the lessee agrees to abide by the lease, even though the original lessor may cease to hold rights in the property . . . ."   *City of Galveston v. Saint-Paul*, 2008 WL 384145, at *1 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (mem. op.).

In this dispute, the Attornment Agreement is not even a past agreement; the parties signed it on the same date as the other Loan Documents.   [Finding of Fact No. 2].   Also, the Attornment Agreement specifically references the Deed of Trust and the Assignment.   [Finding of Fact No. 14].   Because (1) the parties signed the Attornment Agreement simultaneously with the other Loan Documents, and (2) the Attornment Agreement specifically references the Deed of Trust and the Assignment, the three parties manifestly intended the Attornment Agreement to be interpreted together with the other Loan Documents.

Although the Attornment Agreement allows Thrivent to acquire GFP's interest in the Property, it is for the purpose of enforcing the Deed of Trust and Thrivent's rights under the Assignment.   In the Attornment Agreement, Lack's attorned to Thrivent "as the landlord under the Lease, . . . effective and self-operative . . . upon [Thrivent's] succe[ssion] to the interest of the landlord under the Lease." [Finding of Fact No. 14].   Lack's attorned to Thrivent if, and only if, Thrivent should acquire GFP's interest, but the Deed of Trust and the Assignment specify

how Thrivent may acquire GFP's interest.  Thus, the Attornment Agreement must be interpreted in conjunction with the other Loan Documents.

ii.   *The Attornment Agreement does not change the respective rights of Thrivent vis à vis GFP*

Undoubtedly, the three parties intended for GFP to *assign* the rents to Thrivent.  Indeed, the Attornment Agreement itself characterizes GFP's transfer of interest to Thrivent as an assignment.  By creating an assignment, GFP and Thrivent implicitly intended for the transaction to be governed by the law of assignments, and the law of assignments conditions Thrivent's right to collect the rents upon GFP's default.  The terms of the Attornment Agreement reinforce this conclusion.  Lack's attornment assumes that Thrivent first "succeed[s] to the interest of the landlord under the Lease."  [*Id.*].  But, the other Loan Documents—construed in accordance with Texas law—prevent Thrivent from succeeding to GFP's interest unless GFP defaults.[18]  And, as already discussed, GFP is not in default, thereby preventing Thrivent from succeeding to GFP's interests under the Lease—including the right to collect the rents therefrom.

Does Lack's signature of the Attornment Agreement change this conclusion?  Stated differently, because Lack's signed a document that Thrivent also signed—i.e., the Attornment Agreement—does Thrivent have a separate contractual right to make demand upon Lack's to pay the rents to it (i.e., Thrivent) regardless of GFP's rights?  This Court concludes that Thrivent does not.  Again, the Attornment Agreement must be construed in conjunction with the other

---

[18] This Court notes *MBank Houston, N.A. v. Armco, Inc.*, where a mortgagee did succeed to the mortgagor's interest. 1 F.3d 1439, 1443 (5th Cir. 1993).  The landlord constructed and leased property to the tenant. *Id.* at 1441-42.  The tenant, the landlord, and the landlord's lender signed a Subordination, Non-disturbance and Attornment Agreement in which the tenant agreed to recognize any new owners of the property as landlord under the existing lease. *Id.* at 1443.  Eventually, the tenant's default under the lease precipitated the landlord's default on its obligations to the lender, and the lender stepped into the shoes of the landlord. *Id.* at 1445.  Both the lender and the original landlord sued the tenant for breach of the subordination agreement. *Id.*  In concluding that the original landlord could not recover for breach of the *subordination* agreement, the Fifth Circuit also observed that the original landlord could not recover for breach of the *lease* since the lender acquired the original landlord's interest when the landlord defaulted. *Id.* at 1449 n.10.  In contrast, the landlord in the case at bar—GFP—has not fallen into default.

Loan Documents. These are not two separate and distinct contracts—one between Thrivent and GFP and the other between Thrivent and Lack's—but rather only one contract.[19] The intended meaning of the Loan Documents—and the law governing them—should not change with the addition of a single signature. Lack's signature does not vest Thrivent with rights contrary to Texas law; instead, Lack's signature acquiesces to Thrivent's rights as defined by Texas law.[20]

Admittedly, this conclusion prevents the strict and very literal enforcement of certain discrete clauses in the Assignment and in the Attornment Agreement (e.g., Lack's commitment to pay Thrivent upon demand). However, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *SAS Institute*, 167 S.W.3d at 841; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Historically, the law of assignments often requires subjugating individual terms to the meaning of the document as a whole.[21] For example, in *Cadle Co. v. Collin Creek Phase II Association*, the Court held that the assignment was collateral even though the assignment identified itself as "absolute." 998 S.W.2d at 723. Moreover, in *Las Torres Development, LLC v. La Placita Shopping Center, LLC (In re Las Torres Development, LLC)*, this Court held that

---

[19] "A court may determine, as a matter of law, that multiple documents comprise a written contract, and in appropriate instances, may construe all the documents as if they were part of a single unified instrument." *The Courage Co., L.L.C. v. The Chemshare Corp.*, 93 S.W.3d 323, 333 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Because the Note specifically incorporated each of the other Loan Documents, and because all of the Loan Documents were signed on the same day [Finding of Fact No. 2] this Court construes them as a single contract.

[20] Thrivent argues that the Attornment Agreement does not require Thrivent to recognize any payments that Lack's makes to GFP more than one month in advance. However, this provision controls only after Thrivent "succeeds to the interest of [GFP] under the Lease." [Finding of Fact No. 14]. Because Thrivent has not succeeded to GFP's interest, this provision is not applicable.

[21] However, individual terms should not be "rendered meaningless." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Coker*, 650 S.W.2d at 393. In this case, the Attornment Agreement is *not* rendered meaningless by this Court's holding that Thrivent cannot recover absent default. After GFP's default and upon written demand from Thrivent, Lack's would indeed have to make payments directly to Thrivent. The Assignment provision requiring tenants to pay Thrivent *without the tenants investigating* whether an Event of Default actually occurred [Finding of Fact No. 13] also retains meaning. Upon default, this clause eases Thrivent's ability to collect rents from Lack's. The clause need not mean that Thrivent can claim the rents **before** GFP defaults; it merely facilitates Thrivent's rights **after** GFP defaults. Neither does the prohibition against anticipating rents lose meaning; as will be seen shortly, GFP's use of the proceeds is limited until the Note is paid in full.

an assignment was collateral—as described by the deed of trust—even though the assignment document indicated an absolute assignment. 408 B.R. at 884 – 85. Stated differently, relevant law can limit the literal effect of certain terms.

In this case, Thrivent's rights against GFP—as defined by Texas law—prevent Thrivent from recovering rents from Lack's until an Event of Default by GFP, regardless of Lack's individual promises. Adding a third party, Lack's, to the equation does not suddenly vest Thrivent with title to the rents. Similarly, GFP's obligation to not anticipate rents more than one month in advance does not vest Thrivent with rights contrary to Texas law. Despite Lack's promises and despite the prohibition on anticipating rents, Lack's owes rent to the owner of the rents, and GFP continues to be the owner.

3. Equitable considerations: GFP is entitled to the lease rejection damages, but its use of the funds is limited until the Note is repaid

i. *It is equitable for GFP to receive lease rejection damages because GFP is a responsible borrower*

GFP has been a responsible borrower and will not receive a windfall if this Court holds that GFP, not Thrivent, is entitled to the lease rejection damages. Though GFP seeks $879,791.97 in lease rejection damages [Finding of Fact No. 19], GFP has paid $432,990.00 to Thrivent since the Lease was rejected and approximately $193,841.00 to Williamson County in ad valorem taxes in 2011 and 2012; moreover, GFP expects to pay $250,000.00 to $300,000.00 in renovations of the Property. [Finding of Fact Nos. 20, 21]. Assuming renovations cost $250,000.00, these expenditures will total $876,831.00 (i.e. $432,990.00 + $193,841.00 + $250,000.00). When this sum is added to GFP's continuing monthly payments of $25,470.00, GFP's expenses exceed $900,000.00. Moreover, GFP has purchased insurance for the Property and is seeking new tenants. [Finding of Fact No. 20]. In sum, if lease rejection damages are

awarded to GFP, the damages will cover GFP's expenses instead of giving GFP a windfall, as Thrivent contends. [*see* Finding of Fact No. 22].

Thrivent asserts that regardless of GFP's expenditures, GFP is presently "anticipating rents" because lease rejection damages constitute the remaining value of an entire stream of rent payments. Though this may be true, this Court, as a matter of equity, holds that it is equitable for a responsible borrower such as GFP—which is not in default—to collect the damages.

    ii.   *Thrivent's lien on the Lease also attaches to the rejection damages associated with the Lease, thereby limiting GFP's use of the damages awarded to it*

Lack's rejection of the Lease did not terminate the Lease; instead, the rejection breached the Lease. "[T]he trustee, subject to the court's approval, may assume or *reject* any executory contract or unexpired lease of the debtor." 11 U.S.C.A. § 365(a) (emphasis added). "[R]ejection refers to the debtor's decision *not to assume* a burdensome lease or executory contract. *Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.*), 19 F.3d 1077, 1082 (5th Cir. 1994). Section 365(g) states that rejection of a lease "constitutes a breach" except as provided in subsections (h)(2) and (i)(2) for timeshare interests sales where rejection constitutes termination. § 365(g)-(i). According to the Fifth Circuit, the language of § 365 means that a "breach has been deemed to occur," not "that the executory contract or lease has been terminated." *Austin Dev. Co.*, 19 F.3d at 1082. "Consistent with this interpretation, § 502(g) permits the creditor on a rejected lease . . . to assert a claim for damages as of the date of bankruptcy, although under § 502(b)(6) a landlord's claim may be subject to a cap." *Austin Dev. Co.*, 19F.3d at 1082. This cap "is akin to a liquidated damages provision, intended to give a fair remedy to both the debtor and the landlord." *In re Andover Togs, Inc.*, 231 B.R. 521, 545 (Bankr. S.D.N.Y. 1999). "Rejection is treated as a breach to preserve the rights of the party whose lease with the debtor has been rejected by providing a prepetition claim . . . ." *Austin Dev. Co.*, 19 F.3d at 1082.

Thrivent asserts that the rejection of the Lease eliminated one of the assets collateralizing the Note. As already discussed, Thrivent cannot recover the damages from Lack's. However, since Lack's rejection of the Lease breaches the Lease instead of terminating it, the rejection does not terminate Thrivent's lien on the rental proceeds associated with the Lease. Therefore, although GFP is entitled to collect the lease rejection damages instead of Thrivent, Thrivent has a lien on these funds.[22] GFP may only use the proceeds as allowed by the Loan Documents, such as for making payments on the Note to Thrivent. [*see* Finding of Fact No. 17]. Thrivent's lien on these proceeds shall remain until all obligations under the Note are paid in full.

## V. CONCLUSION

Thrivent has an assignment from GFP, which allows Thrivent to recover the rents from the Property only in the event of default by GFP—and GFP is not in default. Accordingly, this Court concludes that Thrivent, as a matter of law, is not entitled to the lease rejection damages asserted in its Proof of Claim; and this Court further concludes that GFP is entitled to collect the lease rejection damages from Lack's. Nevertheless, Thrivent's lien attaches to these funds, and GFP cannot freely use them until the Note is repaid.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Opinion.

---

[22] Indeed, the Deed of Trust grants "[a]ll rents, issues, income, revenue, receipts, fees, and profits now due or which may hereafter become due under or by virtue of and together with all right, title and interest of Grantor in and to any lease . . . for the use or occupancy of the Premises or any part thereof together will all security therefor and all monies payable thereunder . . . ." [Finding of Fact No. 9]. Similarly, the Assignment granted "claims for damages resulting from default under said Leases whether resulting from acts of insolvency or acts of bankruptcy or otherwise, and lump sum payments for the cancellation of said Leases . . . ." [Finding of Fact No. 15]. And, the Attornment Agreement granted "the Lease and all rents and other sums payable under the Lease . . . ." [Finding of Fact No. 12].

Signed on this 25th day of July, 2012.

Jeff Bohm
Chief United States Bankruptcy Judge